IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

ANGELICA HALE,

  *Plaintiff*

v.

EMPORIA STATE UNIVERSITY (ESU),
GWEN ALEXANDER, PH.D.,
DAVID CORDLE, PH.D.,
JACKIE VIETTI, PH.D.,

  *Defendants*.

Case No. 16- 4182-DDC-TJJ

**COMPLAINT**

  COMES NOW Plaintiff Angelica Hale, pro se, and alleges as follows for her cause of action against Defendants ESU, Alexander, Cordle and Vietti as follows:

**DESIGNATION OF PLACE OF TRIAL**

Plaintiff hereby requests that the trial of this cause be held in Topeka, Kansas.

**JURISDICTION AND VENUE**

  1. This action arises under the Constitution of the United States and the provisions of 42 U.S.C. § 1983 and Title VII. The jurisdiction of this court is invoked pursuant to 28 U.S.C. § 1331, and to 42 U.S.C. § 1983, and to Title VII, and to the First Amendment of the United States Constitution.

  2. The Court has personal jurisdiction over Defendants because the unlawful acts and conduct complained of herein occurred within this Judicial District.

  3. All administrative prerequisites and conditions precedent have been met.

## THE PARTIES

4. Plaintiff ANGELICA HALE is currently a resident of Arizona. Her national origin is African American. At the time relevant to the Complaint she was a resident of Emporia, Kansas, and held the position of Assistant to the Dean for Marketing in the School of Library and Information Management (SLIM) at Emporia State University (ESU). Her employment was from July 2014 to July 2015.

5. ESU is a state-supported institution of higher learning, with the main campus located in Emporia, Kansas, and it has a current enrollment of just under 6,000 students. Angelica Hale has received a Right-To-Sue Letter from the Department of Justice to pursue Title VII claims against ESU. A true and accurate copy of the Right-to-Sue Letters and Hale's KHRC Complaint are attached as **Exhibits A and B** respectively to Plaintiff s Complaint, and are incorporated by reference herein.

6. Defendant GWEN ALEXANDER, PH.D., was the Dean of SLIM during the time that Angelica Hale was employed at ESU. She is Caucasian. The Dean of SLIM is the direct supervisor for SLIM faculty.

7. Defendant DAVID CORDLE, PH.D., is the Provost of ESU, and presides over all academic affairs at the university. He is Caucasian.

8. Defendant JACKIE VIETTI, PH.D., is the former Interim President of ESU. She is Caucasian.

9. Drs. Alexander, Cordle, and Vietti are all sued in their individual capacities for money damages.

10. Defendants are all sued in their official capacities for injunctive relief.

11. Defendants sued in their individual capacities were residents of the State of Kansas and employees of Emporia State University at the Emporia, Kansas, campus at all times relevant to the (TAC). These individual Defendants were acting in the course and scope of their employment, or as agents of ESU, when they took the actions set forth herein.

## FACTS COMMON TO ALL CLAIMS

12. Emporia State University ("ESU") hired Angelica Hale as an Assistant to the Dean of SLIM for Marketing on July 1, 2014.

13. Emporia State University ("ESU") hired Angelica's spouse, Dr. Melvin Hale, as an Assistant Professor with the School of Library and Information Management ("SLIM") on July 1, 2014.

14. In December 2014, Dr. Hale accused Debra Rittgers, Office Manager and Assistant to the Dean of SLIM, of a deliberate act of what he believed was racial discrimination directed towards his wife.  He reported that concern to Dean Alexander.

15. Dr. Hale enumerated several instances of perceived discriminatory conduct by Rittgers directed at either he or his wife since they arrived in July 2014.

16. Dean Alexander ridiculed Dr. Hale's allegations by stating that he and Angelica were probably too sensitive, and that Rittgers was not acting in a racially discriminatory manner as far as she was concerned.

17. Dr. Alexander asked Dr. Hale if Angelica was going through menopause.

18. From that point forward Dean Alexander began to defame Angelica and Dr. Hale to various faculty, staff and administrators.

3

19. Alexander started a course of termination for Angelica Hale and Dr. Hale because she opposed their views on racial discrimination.

20. That Dean Alexander, who is Caucasian, would debate with Dr. Hale or Angelica Hale, who are African American, about their feelings towards racialized acts, and not take them serious, is itself problematic.

21. Dr. Hale informed Dean Alexander that Angelica would not return to work at SLIM unless certain conditions were met following this December incident.

22. Dr. Hale requested that Angelica Hale be moved to a private office upstairs on the fourth floor, the top floor of the building, away from Rittgers.

23. Angelica believes that her complaints and her transfer, a non-faculty contractor, upstairs to a prime location and the second largest office on the faculty floor, ultimately ignited the rage that resulted in the racial slur that was found in her graduate assistant's office, also on the fourth floor, on or about April 8, 2014.

24. Angelica's fourth floor office happened to be directly across the hall from Dr. Hale.

25. Both Angelica's office and Dr. Hale's offices were large in comparison to other offices on the fourth floor.

26. On information and belief, this move upstairs created unspoken tensions in the workplace.

27. After moving to the fourth floor, Dean Alexander described Rittgers as "territorial."

28. Rittgers terminated all except necessary communications with Angelica after the move.

29. Rittgers failed to have Angelica Hale's phone transferred upstairs for almost six months, although this was her responsibility.

30. Rittgers interfered with Angelica Hale's assignments for her graduate assistant, and gave her conflicting assignments.

31. Angelica believes that Rittgers and the viewed her and Dr. Hale wife as non-conformists, so they consorted to offend the Hales in a show of defiance and power.

32. Angelica Hale's graduate assistant, who is Caucasian, reported workplace hostilities as well.

33. As African Americans, the Hales represented a threat to the racial lens at SLIM.

34. On April 8, 2015, Angelica Hale's graduate assistant reported that when she arrived at work that her office door was "unlocked," that things were "tampered with," and that the word "NIGGAZ" was found written on the notepad on her desk.

35. The graduate assistant, Brenda, was in shock that someone would do such a thing.

36. The graduate assistant waited until Angelica came back from a meeting to specifically inform Angelica of the acts of hate speech and vandalism.

37. The graduate assistant had plenty of opportunity to inform the Dean, who was present on that day, of the incident, but chose to inform her direct supervisor, Angelica.

38. Angelica believes that the act of vandalizing the student's notebook with a racial slur was directed at her and Dr. Hale for their boldness, which is uncommon at ESU, and that her assistant was merely a conduit for that message.

39. ESU fosters a white-dominated culture that does not appear to feel the need to diversify, starting from the top down.

40. Despite the fact that ESU over 150 years old in the 2014-2015 academic school year, it did not have even one tenured African American professor, and only one African American male tenure-track faculty, Dr. Hale.

41. The entire senior administration at ESU lacks Americans of African descent and at the time of the incident was entirely of Caucasian decent.

42. On information and belief, Dean Alexander and Debra Rittgers are close personal friends outside of the office.

43. Angelica believes that Dean Alexander commenced her hostile and retaliatory actions in response to Dr. Hale's accusations of racism against her good friend and right-hand assistant, Debra Rittgers.

44. Dean Alexander is on record, literally recorded, stating to Dr. Hale that he should expect racist conduct because "This is Kansas."

45. It became apparent that Dean Alexander did not plan to do anything about the racist message or vandalism of the graduate student's office.

46. Dean Alexander stated that ESU did not have a coherent policy on what to do in a situation like the one reported on April 8, 2015.

47. Dean Alexander ridiculed the notion of racism and disparaged the Hales.

48. Dean Alexander's stance became the official stance of ESU and ultimately all the Defendants towards Angelica and her husband.

49. In April 2015, after Angelica and Dr. Hale made a request to Dean Alexander to investigate the bias incident, Dr. Hale also informed SLIM Faculty Chair Dr. Dow about the incident, a few days later, and asked her to investigate why nothing apparently was being done.

50. Subsequently, Angelica Hale confided with Dr. Dow her concerns about the incident and the manner in which it was addressed.

51. Dr. Dow stated that she was amazed that Dean Alexander had done nothing about the incident after about a month after it occurred, and agreed to speak to Dean Alexander and Human Resources about it.

52. In May 2015, Angelica Hale came to believe that the handwriting found in the graduate student's notepad was similar to the distinctive style of Defendant Rittgers, so she sent samples of Rittger's handwriting to forensic handwriting examiner Wendy Carlson, along with a high-resolution digital photograph of the slur, unbeknownst to Dr. Hale.

53. Carlson concluded that Defendant Rittgers was the most probable author of the slur, assigning her level of confidence at eight on a nine-point scale.

54. In late June 2015, Angelica and Dr. Hale reported the bias incident to the ESU Provost David Cordle and to the Director of Human Resources Judy Anderson.

55. After meeting with Dr. Cordle and Judy Anderson, the Hales went to the ESU Police Department and attempted to file a crime report.

56. The ESU Police Department was shown the handwriting and was provided with the opinion of handwriting examiner Carlson, and was asked to follow up with her.

57. ESU Police Department Chief, Chris Hoover, refused to investigate the matter, and immediately took the position that no crime had occurred, stating that ESU offices were public property and had open access. He refused to call the actions vandalism or hate speech or anything related to a hate crime.

58. ESU Police Chief Chris Hoover dismissed the Hales' account of the bias incident as if he already had an opinion about it and would not change it; and he did not send anyone to physically investigate the scene.

59. Dr. Hale then called the office of Lyon County Attorney, Marc Goodman, and left a message for Goodman to contact him regarding a possible hate crime at ESU.

60. Goodman never returned Dr. Hale's phone call, but relying on information relayed by ESU, did not investigate the scene nor collect any evidence, but made the judgment call that "no crime had occurred."

61. Dr. Hale sent a letter to ESU Interim President Jackie Vietti and asked her to look into the situation, and informed her that it appeared that he and Angelica were the victims of retaliation.

62. Shortly after this Ray Lauber of Human Resources contacted the Hales and stated that he was doing a private report on the bias incident for Dr. Vietti.

63. Lauber stated to the Hales, and to Dr. Dow, that his report was for Dr. Vietti's eyes only, and that this report was not a formal investigation.

64. Angelica and Dr. Hale met with Lauber separately, and relayed their concerns about the April 2015 bias incident, and about previous incidents involving Rittgers.

65. Angelica Hale referenced the opinion of Carlson to Lauber regarding Rittgers as a suspect.

66. The Hales were subsequently informed by an employee of ESU that Ray Lauber was babysat by Rittgers when Rittgers worked with Lauber's mother in the Alumni Center.

67. When confronted by Dr. Hale with this information, Lauber admitted the relationship of his family to Rittgers, but denied knowledge that she ever babysat him, and professed to be impartial. Lauber copied Vietti and Cordle on his answer to Dr. Hale about Rittgers.

68. Dr. Hale informed Lauber, Vietti, Cordle and ESU General Counsel Kevin Johnson that he did not believe that Lauber could be impartial, and that he should recuse himself from the investigation.

69. Vietti refused to remove Lauber from proceeding with the report, neither would Lauber recuse himself.

70. After reporting the hate incident to the Provost and the ESU Police, Dean Alexander began to treat the Hales differently than others in the department.

71. On July 7, 2015, Alexander visited the entire faculty on the fourth floor, but refused to visit the Hales.

72. Dr. Hale and Angelica discussed this and decided that Dr. Hale should go and talk to the Dean.

73. Shortly after the Dean left the fourth floor, Dr. Hale went down to the third floor to the Dean's office, and asked her about how things were going.

74. Dr. Hale legally recorded his meeting with the Dean on his Samsung Galaxy 4 smartphone.

75. Dean Alexander commenced on a rant about how disappointed she was that the Hales had taken their concerns about the hate incident to the Provost and the Police Department.

76. The Dean admitted that the performance of the Hales was stellar leading up to that point, and that she was "blindsided" by allegations of misconduct direct towards her and Rittgers.

77. At one point the Dean stated that she had hoped that Dr. Hale would have overlooked the hate incident and issues of racism because he could have been a model for showing others how African-Americans are professional.

78. Instead, she expressed frustration and outright anger at Hales' insistence that something be done about the hate incident and said he should understand because "This is Kansas."

79. Dr. Hale mentioned that Rittgers was a true suspect, and that she was getting away with too much.

80. The Dean responded that she did not consider Carlson to be handwriting expert, just a person with no integrity that anyone could find on the Internet and use for whatever purposes.

81. Dean Alexander did not contact the graduate student the day of the incident, as she was asked to do by the Hales.

82. Dean Alexander did not contact the graduate student the following day either.

83. The Provost relayed to the Hales that the Dean told him she contacted the student the day of, or the day after, the hate incident.

84. The student is on record stating that the Dean did not contact her until sometime in June 2015, after the Hales had brought the matter to the attention of the Provost.

85. Angelica worked on a contractual basis during her first year at SLIM, but had been promised by the Dean that she would be made permanent because of the excellent job she was doing.

86. Because Angelica had taken almost four years of college but had never finished her Bachelor's degree, the Dean wanted her to complete her degree while she worked as permanent

employee. That would permit her to make a higher salary and a more upwardly mobile career at ESU. On the recording the Dean states that "

87.  In the early months of her tenure working for the Dean, Angelica was asked to provide a resume and other materials that the Dean would use to structure a permanent position for her.

88.  When Rittgers was on medical leave, Angelica took over the majority of her responsibilities for about a month, and was commended for running everything without a hitch.

89.  When Brenda came to work as Angelica's graduate assistant in January 2015, her desk was in Angelica's office (Rm. 415) on the fourth floor, but tech support could not provide a separate computer network connection, so Brenda was later transferred to her own private office (Rm. 413).

90.  Angelica enrolled in classes at ESU starting in the fall of 2015 per her earlier agreement with Gwen for being made permanent. Gwen had this to say to Dr. Hale on the recording when he stated that he was not a "token" hire: "[Y]ou *are* competent, you have the qualifications, you're competent and you're doing the work, and you're making great contributions. Here's the funny part. I have told *everybody* how great Angelica is, and I have encouraged Angelica to go get her degree."

91.  After the reporting of the hate incident to the Provost and the Police Department, and after meeting with Interim President Vietti later that same day, July 7, Dean Alexander made an abrupt about face, and after numerous queries from Angelica that went on for days, the Dean informed her that her contract would not be renewed, neither would she be made permanent. Angelica had to drop her classes.

92. Knowing that she had been lied to and that a heinous incident of hate was going to go unpunished, Angelica wrote an Open Letter to Dean Alexander regarding her feelings on the matter and resigned two weeks before her contract was going to be terminated.

93. Angelica resigned because Dean Alexander had asked her to interface with Rittgers in what she perceived to be a demeaning and subservient manner.

94. Shortly after Angelica resigned, the Dean sent the faculty a curious email in which she praised Angelica's work, but disparaged her for resigning, and in the same email asked the staff for recommendations for filling the vacated post, a clear sign that neither Angelica's performance nor a budgetary shortfall were the reason her contract was not renewed, or she was not promoted to permanent status.

95. Cordle and Vietti turned a deaf ear to Angelica's and Dr. Hale's complaints about racial discrimination and retaliation for reporting the same.

96. By allowing Dean Alexander to terminate Angelica's contract, ESU and the defendants effectively prevented her from discussing and making allegations of discrimination while employed at ESU.

97. But for Angelica's allegations of discrimination and her reporting of a bias incident, it strongly appears that she would not have been subjected to adverse employment actions and wrongful termination, and would have enjoyed an upwardly mobile career at ESU.

98. Angelica performed several for Mirah Dow. Dow was immensely satisfied with Angelica's performance.

99. Concerning Dr. Hale and Angelica, Dow is on record as stating that "I don't know of any two better people to come to SLIM than you and Angelica. I mean I say that consistently, and almost using the same words every time on purpose. And I really mean it."

100. ESU's and SLIM's unlawful termination has affected Angelica Hale's professional career negatively, causing her physical and mental stress as well as financial hardship.

101. ESU's and SLIM's termination of Angelica was illegal.

102. Angelica Hale was subjected to extreme hostility and negative publicity, all with the full endorsement of Dean Gwen Alexander, Provost David Cordle and Interim President Jackie Vietti.

### Count I – Individual Capacity 42 U.S.C. § 1983 First Amendment Retaliation Claim Against Defendants Alexander, Cordle, and Vietti

235. Defendants Alexander, Cordle, and Vietti retaliated against Plaintiff Angelica Hale on the basis of her exercising his right to speak out against discrimination and racism, in violation of 42 U.S.C. § 1983.

236. Defendants Alexander, Cordle, and Vietti retaliated against Plaintiff Angelica Hale by terminating her contract despite exemplary performance, a move that would chill a person of ordinary firmness for speaking out against discrimination, in violation of 42 U.S.C. § 1983, activities protected by the First Amendment.

237. Defendants Alexander, Cordle, and Vietti acted under color of state law when they violated Plaintiff Hale's rights.

238. Plaintiff Hale has been damaged by the illegal conduct of Defendants Alexander, Cordle, and Vietti.

239. Plaintiff Hale is entitled to pursue relief against Defendants Alexander, Cordle, and Vietti under 42 U.S.C. § 1983 and the First Amendment.

WHEREFORE, Plaintiff Angelica Hale prays that judgment be entered against

Defendants Gwen Alexander, David Cordle, and Jackie Vietti for an amount in excess of $3,000,000.00, for punitive damages, compensatory damages, economic damages, for all remedies allowed by law including an award of attorney's fees and costs, and for such other and further relief as the Court may order.

### Count II—Title VII Claim against Defendant Emporia State University

240. Defendant ESU employed Plaintiff Hale.

241. Defendant ESU retaliated against Hale on the basis of her race and color.

242. Plaintiff Hale engaged in activities protected by Title VII.

243. Defendant ESU retaliated against Plaintiff Hale because she engaged in activities protected by Title VII.

244. Plaintiff Hale has been damaged by Defendant ESU's illegal conduct.

245. Plaintiff Hale is entitled to relief for Defendant ESU's illegal conduct.

WHEREFORE, Plaintiff Angelica Hale prays that judgment be entered against Defendant Emporia State University for an amount in excess of $75,000.00, for punitive damages, compensatory damages, economic damages, for all remedies allowed by law including an award of attorney's fees and costs, and for such other and further relief as the Court may order.

DATED:  December 8, 2016                              Respectfully submitted,


_____
/s/ Angelica Hale, Plaintiff *Pro Se*
P.O. Box 6176
Goodyear, AZ 85338
angelicahale@yahoo.com
916-690-7927