**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| ANGELICA HALE, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | Case No. 16-4182-DDC-TJJ |
| ) | |
| EMPORIA STATE UNIVERSITY (ESU), ) | |
| GWEN ALEXANDER, PH.D., ) | |
| DAVID CORDLE, PH.D., ) | |
| JACKIE VIETTI, PH.D., ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

Hale alleges ESU retaliated against her on the basis of her race in violation of Title VII after she reported a racial slur found in the workplace. Hale also brings a claim under 42 U.S.C. § 1983 for First Amendment retaliation against Defendants Alexander, Cordle, and Vietti for allegedly terminating her contract in retaliation for Hale exercising her right to speak out against discrimination and racism. Defendants move to dismiss Hale's Complaint in its entirety.

**Statement of Facts**

Hale sues Vietti, the former Interim President of ESU; Cordle, ESU's Provost; and Alexander, the Dean of ESU's School of Library and Information Management during the time Hale was employed at ESU. (Doc. 1, at 2.)

Hale alleges that in April 2015, a graduate assistant reported a racial slur was found written on the notepad of the graduate assistant's desk. (Doc. 1, at 5.)

With respect to her allegations against Vietti, Hale claims her husband sent a letter to Vietti and "asked her to look into the situation" relating to the racial slur, and her husband informed Vietti "that it appeared that he and Angelica were the victims of retaliation." (Doc. 1, at 8.) Hale

further alleges that after an ESU Human Resources employee contacted them regarding the incident, Hale's husband confronted the investigator regarding his alleged bias; Vietti was allegedly copied on an e-mail from the Human Resources employee professing his impartiality. (Doc. 1, at 9.) Hale then alleges her husband contacted Vietti regarding the Human Resource employee's impartiality, requesting the employee recuse himself from the investigation, but Vietti refused to remove the employee from proceeding with the investigation. (Doc. 1, at 9.) Hale alleges that after the incident was reported to Cordle and ESU's Police Department, and after meeting with Vietti, Alexander informed Hale that her contract would not be renewed and she would not be made a permanent employee. (Doc. 1, at 11.) Hale alleges Cordle and Vietti "turned a deaf ear to Angelica's and Dr. Hale's complaints about racial discrimination and retaliation for reporting the same." (Doc. 1, at 12.) She finally alleges that Vietti fully endorsed subjecting Hale to extreme hostility and negative publicity. (Doc. 1, at 13.)

With respect to Cordle, Hale claims she, along with her husband, reported the racial slur incident to Cordle in June 2015. (Doc. 1, at 7.) Similarly to Vietti, Hale alleges that after an ESU Human Resources employee contacted them regarding the incident, Hale's husband confronted the investigator regarding his alleged bias; Cordle was allegedly copied on an e-mail from the Human Resources employee professing his impartiality. (Doc. 1, at 9.) Hale then alleges her husband contacted Cordle regarding the Human Resource employee's impartiality, requesting the employee recuse himself from the investigation. (Doc. 1, at 9.) Cordle allegedly told the Hales that Alexander said she had contacted the student on whose notepad the racial slur was found the day of or the day after the incident. (Doc. 1, at 10.) Hale alleges Cordle "turned a deaf ear to Angelica's and Dr. Hale's complaints about racial discrimination and retaliation for reporting the same." (Doc.

2

1, at 12.) She finally alleges that Cordle fully endorsed subjecting Hale to extreme hostility and negative publicity. (Doc. 1, at 13.)

With respect to Alexander, Hale alleges her husband accused a co-worker of racial discrimination he believed was directed at Hale in December 2014 by reporting his concerns to Alexander. (Doc. 1, at 3.) Alexander allegedly ridiculed Hale's husband's allegations. (Doc. 1, at 3.) Alexander also allegedly asked Hale's husband if Hale was going through menopause. (Doc. 1, at 3.) Hale claims that Alexander began to "defame" her to various faculty, staff, and administrators and "started a course of termination" for Hale because Alexander opposed Hale's views on racial discrimination. (Doc. 1, at 3-4.) Hale also asserts Alexander "commenced her hostile and retaliatory actions in response to Dr. Hale's accusations of racism." (Doc. 1, at 6.) Hale contends that in April 2015, after she and her husband requested Alexander investigate the incident, Dr. Hale informed his faculty chair about the incident. (Doc. 1, at 6.) Hale states she also confided her concerns to the faculty chair. (Doc. 1, at 7.)

This Court should dismiss Hale's claims in their entirety. Hale's Title VII claim fails because Hale did not engage in protected opposition to discrimination. As such, she does not fall within the statute and fails to state a claim upon which relief can be granted. Hale also fails to state a claim for relief with respect to her First Amendment retaliation claim, as her alleged speech was not on a matter of public concern. Even if this Court finds that her speech was on a matter of public concern, though, this Court should still dismiss her claims against Defendants Alexander, Cordle, and Vietti due to qualified immunity, as it would not have been clear to a reasonable official that Hale's speech was addressed to matters of public concern, rather than an unprotected statement of personal grievances. Finally, with respect to any claims against the individual defendants in their

official capacities, such claims are barred under the Eleventh Amendment and because in their official capacity, such defendants do not constitute persons under § 1983.

**Hale's Title VII Claim Fails Because Hale did Not Engage in Protected Opposition to Discrimination.**

Hale brings her Title VII claim against ESU alleging retaliation against her on the basis of race and color after she reported the writing of a racial slur on a notepad in a graduate student's office. (Doc. 1, ¶¶ 34, 49, 54, 55, 62-65, 240-45.) Hale's claim, however, fails because Hale cannot establish she engaged in protected opposition to discrimination such that she falls within the ambit of Title VII protection.

Title VII's anti-retaliation provision states:

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

In order to establish a prima facie case of retaliation, Hale must show "(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Robinson v. Cavalry Portfolio Servs., LLC*, 365 Fed. Appx. 104, 112 (10th Cir. 2010).

Here, Hale will not be able to establish the first element of a prima facie case. She did not engage in protected opposition to discrimination when she complained regarding the racial slur written on the notepad in the graduate student's office. "A complaint of a single racist remark by

4

a colleague, without more, is not 'opposition protected by Title VII.'" *Robinson*, 365 Fed. Appx. at 112. As the Tenth Circuit Court of Appeals noted, a recurring point in Supreme Court opinions is that simple teasing, offhand comments and isolated incidents, such as the one here, unless extremely serious, will not amount to discriminatory changes in the terms and conditions of employment. *Robinson*, 365 Fed. Appx. at 113; *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 269-71, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001) (finding no one could reasonably believe an isolated incident violated Title VII; incident involved a supervisor's comment made at a meeting that he didn't know what the statement "I hear making love to you is like making love to the Grand Canyon" meant, co-worker's response "Well, I'll tell you later," and chuckling of both); *Jordan v. Alt. Res. Corp.*, 467 F.3d 378, 379-80 (4th Cir. 2006) (noting that Title VII is not a general civility code for the workplace and does not prohibit all verbal or physical harassment in the workplace). As such, the Tenth Circuit noted, the Supreme Court has "'implicitly reject[ed] any interpretation of Title VII which would permit a plaintiff to maintain a retaliation claim based on an unreasonable good-faith belief that the underlying conduct violated Title VII.'" *Robinson*, 365 Fed. Appx. at 113.

> "As the law stands, Title VII does not create a claim for every employee who complains about the potential for Title VII violations or about other employees' isolated racial slurs. It protects an employee who opposes 'any practice made an unlawful employment practice,' 42 U.S.C. § 2000e-3(a), or who 'reasonably believes' he is opposing a practice made an unlawful practice by Title VII." *Robinson*, 365 Fed. Appx. at 112.

Further, in order to fall within Title VII, the employer must know not only that the employee has opposed an action ***of the employer***, but that the opposition was based on a belief that

the ***employer's action*** constituted discrimination prohibited by Title VII. *Robinson*, 365 Fed. Appx. at 113.  Hale alleges that a co-worker wrote the word, not that her employer had. (Doc. 1, at 7, 10.) Hale's complaint here was not opposition to an action of ESU that allegedly constituted discrimination prohibited by Title VII.

Like in *Robinson* where an employee complained of a co-employee's racial slur, Hale's complaint here regarding the word written on the notepad in another's office is not protected conduct. No reasonable person could have believed that the single incident violated Title VII's standard, much less does Hale complain that her employer, ESU, wrote the word. As the Tenth Circuit has stated, "In the words of the Fourth Circuit:  '[N]othing in our ruling condones the contemptible comment made by the coworker in this case. . . . [But] complaining about an isolated racial slur is not opposition protected by Title VII.'" *Robinson*, 365 Fed. Appx. at 113-14.

Because Hale did not engage in protected opposition to discrimination based on the factual allegations in her Complaint, she cannot establish a prima facie case of retaliation. See *Robinson*, 365 Fed. Appx. at 113-14. This Court should dismiss her Title VII claim for failure to state a claim upon which relief can be granted.

**Hale's First Amendment Retaliation Claims Fail Because Hale did Not Speak on a Matter of Public Concern.**

Hale contends that Vietti, Cordle, and Alexander violated her First Amendment free speech right by retaliating against her in violation of 42 U.S.C. § 1983. (Doc. 1, at 13.) *See, e.g., Bunger v. Univ. of Okla. Bd. of Regents*, 95 F.3d 987 (10th Cir. 1996). In bringing these claims, Hale asserts that the three individual defendants terminated her contract and thus appears to claim that these three individual defendants retaliated against her as her employer.

Ultimately, many of Hale's pleaded allegations, as outlined above, relate to her husband's exercise of his First Amendment rights, not her own exercise of her First Amendment rights. With respect to Angelica Hale's exercise of her rights, she pleads she requested Alexander investigate the incident in April 2015; she "confided" concerns about the incident to the faculty chair, Dr. Dow; she reported the racial slur incident to Cordle and the Director of Human Resources in June 2015; she attempted to file a crime report with the ESU Police Department; and she met with an ESU Human Resources employee to relay her concerns. (Doc. 1, at 6-8.)

"By entering government service, public employees 'accept certain limitations on [their] freedom.'" *Huff v. Colo. Dep't of Corr./Limon Corr. Facility*, No. 11-CV-00149-CMA-MJW, 2012 WL 3135715, at *4 (D. Colo. July 31, 2012) (unpublished opinion) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 418, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006)). Thus, while public employees do not surrender their First Amendment rights by virtue of their governmental employment, "[w]hen the government functions as an employer rather than as a sovereign entity, it is granted 'a significant degree of control over [its] employees' words and actions; without it, there would be little chance for the efficient provision of public services.'" *Huff*, 2012 WL 3135715, at *4. "Rather, public employees retain the right 'as citizens to comment on matters of public interest.'" *Huff*, 2012 WL 3135715, at *4. This Court's task is to seek "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968); *see also Salemi v. Colo. Pub. Employees' Ret. Ass'n*, 176 F. Supp. 3d 1132, 1150 (D. Colo. 2016).

Hale's First Amendment retaliation claims are governed by the *Garcetti/Pickering* analysis comprising five elements:

"(1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct." *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014).

Even assuming for the sake of argument that Hale's speech was not made pursuant to her official duties, Hale's exercise of her First Amendment rights here was not on a matter of public concern based on case law. Rather, Hale's complaints here were internal in scope and personal in nature.

As the Supreme Court noted in *Connick v. Myers*, 461 U.S. 138, 143, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983), "[t]he repeated emphasis in *Pickering* on the right of a public employee 'as a citizen, in commenting upon matters of public concern,' was not accidental. This language, reiterated in all of *Pickering's* progeny, reflects both the historical evolvement of the rights of public employees, and the common sense realization that government offices could not function if every employment decision became a constitutional matter." In *Connick*, the Court held "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is

not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." 461 U.S. at 147.

> "To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick*, 461 U.S. at 149.

The Fifth Circuit, in analyzing speech in one such case, stated "Because almost anything that occurs within a public agency *could* be of concern to the public, we do not focus on the inherent interest or importance of the matters discussed by the employee. Rather, our task is to decide whether the speech at issue in a particular case was made primarily in the plaintiff's role as citizen or primarily in his role as employee." *Terrell v. Univ. of Tex. Sys. Police*, 792 F.2d 1360, 1362 (5th Cir. 1986). The Fifth Circuit went on to state that "the mere fact that the topic of the employee's speech was one in which the public might or would have had a great interest is of little moment." *Terrell*, 792 F.2d at 1362; *see also Brin v. Kansas*, 101 F. Supp. 2d 1343, 1351 (D. Kan. 2000) ("However, to be protected, speech must do more than just generally relate to a matter of public interest; it must also be sufficiently informative to be useful to the public in evaluating government conduct.").

Further, as the Supreme Court has noted:

> "[T]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the

9

prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch. Prolonged retention of a disruptive or otherwise unsatisfactory employee can adversely affect discipline and morale in the work place, foster disharmony, and ultimately impair the efficiency of an office or agency." *Connick*, 461 U.S. at 151 (citing *Arnett v. Kennedy*, 416 U.S. 134, 168, 94 S. Ct. 1633, 40 L. Ed. 2d 15 (1974)).

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147-48. In *Connick*, for example, an assistant district attorney distributed a questionnaire soliciting views of fellow office members concerning office transfer policy, the need for a grievance committee, the level of confidence in superiors, and whether employees felt pressured to work in political campaigns after she was notified of a transfer, which she opposed. 461 U.S. at 140-41. After she was terminated, she filed suit claiming she was wrongfully terminated because she was exercising her First Amendment right of free speech. 461 U.S. at 141. Notably, in looking at the ADA's speech in *Connick*, the Court noted that she "did not seek to inform the public that the District Attorney's office was not discharging its governmental responsibilities in the investigation and prosecution of criminal cases." 461 U.S. at 148.

In *David v. City and Cnty. Of Denver*, 101 F.3d 1344, 1349 (10th Cir. 1996), the Tenth Circuit addressed a similar situation after a police officer filed informal and formal complaints claiming she had been sexually harassed by a co-worker. The officer later filed complaints with the Equal Employment Opportunity Commission and sent a letter to the Denver City Attorney announcing she would pursue claims against the City and individual police officers for sexual harassment and retaliation. In discussing qualified immunity and the state of the law, the Court

noted that "speech relating to internal personnel disputes and working conditions ordinarily will not be viewed as addressing matters of public concern." *David*, 101 F.3d at 1355. Notably, in addition to the content, form, and context of a given statement, the Court "'will also consider the motive of the speaker to learn if the speech was calculated to redress personal grievances [and therefore spoken as an employee] or to address a broader public purpose [and therefore spoken as a citizen].'" *David*, 101 F.3d at 1355. The Tenth Circuit concluded in *David* that the officer spoke primarily in her role as an employee rather than as a citizen, reasoning that the complaints and letter "allege that she has been personally subjected to sexual harassment, retaliation, and unwarranted disciplinary action." 101 F.3d at 1356. In particular, the Tenth Circuit stated that "[h]er allegations focus on the conditions of her own employment, and in neither the EEOC complaints nor the letter to the City Attorney does Officer David allege that other employees have been subjected to harassment or retaliation or that the harassment and retaliation has interfered with the Department's performance of its governmental responsibilities." *David*, 101 F.3d at 1356.

In *Huff*, the plaintiff was a correctional officer who complained about an implementation adjustment policy to a Major. 2012 WL 3135715, at *1. The correctional officer later met with the Associate Warden, where she complained that the Major had instructed a Captain to harass her by investigating inmate grievances against the correctional officer and had prohibited her from deploying on a Critical Incident Response Team (CIRT). *Huff*, 2012 WL 3135715, at *1. The correctional officer later grieved her CIRT removal and the corrective action alleging, among other things, gender discrimination. *Huff*, 2012 WL 3135715, at *2. On her First Amendment retaliation claim, the correctional officer argued that speech addressing gender discrimination in the public workplace is always a matter of public concern. *Huff*, 2012 WL 3135715, at *5. The district court, however, noted that "Plaintiff ignores numerous cases in which the Tenth Circuit has held that

allegations of sexual harassment and discrimination are **not** matters of public concern." *Huff*, 2012 WL 3135715, at *5; *see, e.g., Kosan v. Utah Dep't of Corr.*, 290 Fed. Appx. 145, 152 (former employee's communication regarding allegations of misconduct, namely sexual harassment, against supervisor related to a purely personal grievance affecting former employee's own conditions of employment and her free speech claim failed). Thus, because the correctional officer's complaints of harassment and discrimination related to purely personal grievances affecting her own conditions of employment, the complaints were not matters of public concern. *Huff*, 2012 WL 3135715, at *5; *see also Finn v. New Mexico*, 249 F.3d 1241 (10th Cir. 2001) ("In alleging that Rahn and Roybal discriminated against him because of his disability, plaintiff was simply furthering his attempts to contest the demotion and transfer" and thus plaintiff's speech dealt with matters of purely personal interest.).

While racial discrimination may be a matter of public concern when not tied to a personal employment dispute, *Connick*, 461 U.S. at 148 n.8, speech regarding grievances about internal departmental affairs, disputes over the term of employment, and workplace frustration are not matters of public concern. *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1205 (10th Cir. 2007). Here, like in the cases above, the thrust of Hale's alleged speech was that a racial slur incident had occurred in the workplace and that she was frustrated with the workplace. It is clear that Hale was intending to address a personal grievance at the time she spoke. Her alleged speech regarding the racial slur incident arose out of *her own* working conditions. *See, e.g., Short v. City of West Point*, No. 1:95CV359-D-D, 1997 WL 88225, at *6 (N.D. Miss. Jan. 23, 1997) (finding plaintiff spoke out only as an employee distressed with how his employer's allegedly racially discriminatory practices had affected him alone and, as such, his speech only touched on a purely personal and private matter). Further, as discussed in relation to Hale's Title VII claim,

12

Hale's complaint of a single racist remark, ostensibly by a colleague, without more, is not opposition to racial discrimination that falls within Title VII; similarly, it should not be considered to be speech that seeks to expose illegal conduct of governmental officials. Further, Hale's speech did not oppose an action of her employer, such as a racially discriminatory policy, but rather Hale's speech complained about a written racial slur. Thus, her speech was not in opposition to a discriminatory practice of ESU. Because Hale spoke on a matter of private concern, as opposed to a public one, her claim fails to meet the elements of the *Garcetti*/*Pickering* analysis and she has failed to state a claim upon which relief can be granted.

**Individual Defendants are Entitled to Qualified Immunity on Hale's § 1983 Claim.**

Even assuming that this Court determines Hale's speech qualifies as a matter of public concern, Defendants Alexander, Cordle, and Vietti are entitled to qualified immunity.

"'Qualified immunity generally shields from liability for civil damages government officials performing discretionary functions . . . insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Suasnavas v. Stover*, 196 Fed. Appx. 647, 653 (10th Cir. 2006). "Once the qualified immunity defense is asserted, the plaintiff 'bears a heavy two-part burden' to show, first, 'the defendant's actions violated a constitutional or statutory right,' and, second, that the right was 'clearly established at the time of the conduct at issue.'" *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). Qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" *Medina v. Cram*, 252 F.3d 1124, 1127 (10th Cir. 2001). Because this protection is intended to shield officials even from pretrial burdens such as discovery, courts should resolve the question of law raised by a qualified immunity defense at the earliest stage possible. *Medina*, 252 F.3d at 1127-28.

While courts have found reconciling qualified immunity principles in First Amendment cases difficult in the past, they have not found them impossible. *See, e.g., Schalk v. Gallemore*, 906 F.2d 491, 499 (10th Cir. 1990) (concluding individual entitled to qualified immunity in claim for damages against him even after concluding that speech was directed to matters that are of public concern). Here, at the time of the relevant events in this case, it would not have been clear to a reasonable official that Hale spoke as an employee to matters of public concern, rather than an unprotected statement of personal grievances. Further, it was not clearly established that Hale's interest in such speech would outweigh the university's interest, as her employer, in the effective functioning of the university. Because the issue was not clear cut, as can be seen from the above-cited case law, this Court cannot say that a reasonable official should have known that Hale's allegations raised matters of public concern as a matter of clearly established law. Therefore, Defendants Alexander, Cordle, and Vietti are entitled to qualified immunity in Hale's claims for damages against them individually.

**The Eleventh Amendment Precludes Hale's Official Capacity Claims Against the Individual Defendants.**

Hale brings Count I, her First Amendment retaliation claim, against Alexander, Cordle, and Vietti. Earlier in her Complaint, Hale states her claims against all individual defendants are identified as being, in part, against the individuals in their official capacities as employees of ESU. (Doc. 1, ¶ 10.) Hale, however, fails to set forth anywhere in the Complaint any contours of any requested injunctive relief. Rather, her prayer for relief in Count I seeks "an amount in excess of $3,000,000.00, for punitive damages, compensatory damages, economic damages, for all remedies allowed by law including an award of attorney's fees and costs, and for such other and further relief as the Court may order." (Doc. 1, at 14.) Hale's requested relief is not available to her against

14

the individual defendants in their official capacities under the Eleventh Amendment to the United States Constitution, which states:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity commenced, or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State.

"'The Eleventh Amendment is a jurisdictional bar that precludes unconsented suits in federal court against a state and arms of the state.'" *Jones v. Courtney*, 466 Fed. Appx. 696, 698 (10th Cir. 2012); see also *Gray v. Univ. of Kan. Med. Ctr., Coll. of Health Scis., Sch. of Nursing*, 715 F. Supp. 1041, 1042 (D. Kan. 1989) (noting a suit may not be maintained against an agency of the state unless the state waives its immunity from suit).

It is well established that state universities in Kansas—including Emporia State University—function as arms or alter egos of the State of Kansas. *Gray*, 715 F. Supp. at 1042-43; *see also Barger v. State of Kansas*, 620 F. Supp. 1432, 1434 (D. Kan. 1985) (universities established by the State of Kansas and governed by the Kansas Board of Regents, including Emporia State University, share the state's Eleventh Amendment immunity). K.S.A. 76-711 defines "state educational institution" to include ESU, and K.S.A. 76-712 establishes that state educational institutions are controlled by and operated and managed under the supervision of the Board of Regents.

"It is well established that state university employees who are sued in their official capacities enjoy eleventh amendment immunity." *Gray*, 715 F. Supp. at 1043; *see also Jones*, 466 Fed. Appx. at 699 (noting "retroactive monetary relief sought nominally against a state official 'is in fact against the sovereign if the decree would operate against the latter'").

Here, there has been no waiver of Eleventh Amendment immunity, nor has Congress abrogated that immunity. *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 574 (10th Cir. 1996) ("Congress did not abrogate state Eleventh Amendment immunity when it enacted § 1983."); *Ndefru v. Kan. State Univ.*, 814 F. Supp. 54, 56 (1993) (dismissing § 1983 claims against university while noting "Congressional enactment of 42 U.S.C. § 1983 did not abrogate states' Eleventh Amendment immunity" and "The State has not waived its Eleventh Amendment immunity from suit in federal court by enactment of the Kansas Tort Claims Act."). Eleventh Amendment immunity precludes Hale's claims for any retroactive monetary damages under 42 U.S.C. § 1983. This Court lacks jurisdiction to hear her § 1983 claim against the individual defendants in their official capacities.

**Official Capacity Individual Defendants are Not "Persons" Under § 1983.**

A cause of action under 42 U.S.C. § 1983 requires the deprivation of a civil right by a person acting under color of state law. Hale states she sues all defendants in their official capacities for injunctive relief, though her request for relief in Count I against the individuals does not provide contours of any requested injunctive relief and instead seeks damages. (Doc. 1, ¶ 10.) Out of an abundance of caution, Defendants address Hale's claimed "official capacity" claims to the extent she seeks damages against the individual defendants. As the Tenth Circuit has noted, "'neither a State nor its officials acting in their official capacities are 'persons' under § 1983.'" *McLaughlin v. Bd. of Trs. of State Colls. of Colo.*, 215 F.3d 1168, 1172 (10th Cir. 2000) (citing *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989)); *see also Ndefru*, 814 F. Supp. at 56 ("a state university is not a 'person' who may be sued for alleged violations of 42 U.S.C. § 1983"). This Court should dismiss the claims against the individual defendants in their official capacities because they do not constitute persons under the statute.

**Conclusion**

Hale has failed to state a claim upon which relief can be granted with respect to either claim she purports to make. Her Title VII claim fails because Hale does not fall within the ambit of Title VII protection, as no reasonable person could have believed that the single racial slur incident violated Title VII's standard. Further, Hale did not oppose an action of her employer, ESU. Her 42 U.S.C. § 1983 First Amendment retaliation claim also fails: Hale's alleged speech was not on a matter of public concern. Even if this Court found her speech was on a matter of public concern, though, Defendants Alexander, Cordle, and Vietti are protected by qualified immunity, as it would not have been clear to a reasonable official that Hale's speech was addressed to matters of public concern, rather than an unprotected statement of personal grievances. Finally, with respect to any claims against the individual defendants in their official capacities, such claims are barred under the Eleventh Amendment and because in their official capacity, such defendants do not constitute persons under § 1983. Defendants request this Court dismiss Hale's claims in their entirety.

Respectfully submitted,

OFFICE OF ATTORNEY GENERAL
DEREK SCHMIDT

*s/ Anne Smith*
Anne Gepford Smith, KS No. 24636
Assistant Attorney General
Memorial Bldg., 2nd Floor
120 SW 10th Avenue
Topeka, Kansas 66612-1597
Tel:  (785) 291-3988
Fax:  (785) 296-6296
Email: anne.smith@ag.ks.gov
*Attorney for Defendants Emporia State University (ESU); Gwen Alexander; David Cordle; and Jackie Vietti*

## **CERTIFICATE OF SERVICE**

      I hereby certify that on this 9th day of February, 2017, I electronically filed the foregoing with the Court using the CM/ECF system, and a notice of electronic filing was sent via the CM/ECF system to all counsel of record and to Plaintiff Angelica Hale, a registered pro se participant who receives electronic notification in the case, at angelicahale@yahoo.com.

                                    */s/ Anne Smith*
                                    Anne Gepford Smith
                                    Assistant Attorney General