IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

ANGELICA HALE,

        Plaintiff,

vs.

EMPORIA STATE UNIVERSITY,
GWEN ALEXANDER,
DAVID CORDLE, and
JACKIE VIETTI,

        Defendants.

Case No. 16-4182-DDC-TJJ

## MEMORANDUM AND ORDER

Plaintiff Angelica Hale brings this action pro se against defendants Emporia State University ("ESU"), Gwen Alexander, David Cordle, and Jackie Vietti. Plaintiff alleges that her former employer, ESU, retaliated against her by terminating her employment because she complained about racial discrimination. She asserts a Title VII retaliation claim against ESU. Plaintiff also alleges that defendants Alexander, Cordle, and Vietti retaliated against her after she exercised her right to speak out against discrimination and racism. She asserts a First Amendment retaliation claim under 42 U.S.C. § 1983 against these three individuals.

Defendants have filed a Motion to Dismiss all of plaintiff's claims under Fed. R. Civ. P. 12(b)(6). Doc. 17. Plaintiff has filed an Opposition to defendants' Motion. Doc. 19. And, defendants have submitted a Reply. Doc. 15. After considering the parties' arguments, the court grants defendants' motion in part and denies it in part. The court grants defendants' Motion to Dismiss the official capacity claims asserted against defendants Alexander, Cordle, and Vietti. The court denies the motion in all other respects.

## I.    Factual Background

The following facts are taken from plaintiff's Complaint (Doc. 1).  The court accepts the

facts asserted in the Complaint as true and views them in the light most favorable to plaintiff.

*Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1235 (10th Cir. 2013) (citing

*Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)).  The court also construes

plaintiff's allegations liberally because she proceeds pro se.  *See Hall v. Bellmon*, 935 F.2d 1106,

1110 (10th Cir. 1991) (holding that courts must construe pro se litigant's pleadings liberally and

hold them to a less stringent standard than formal pleadings drafted by lawyers).

Plaintiff is an African-American female.  On July 1, 2014, ESU hired plaintiff as an

Assistant to the Dean for Marketing in the School of Library and Information Management

("SLIM") at ESU.  Also on July 1, 2014, ESU hired plaintiff's spouse, Dr. Melvin Hale, as an

Assistant Professor in the SLIM.

In December 2014, Dr. Hale complained to Dr. Gwen Alexander, Dean of SLIM, about

Debra Rittgers, Office Manager and Assistant to the Dean of SLIM.  Dr. Hale accused Ms.

Rittgers of racial discrimination directed at him as well as his wife (plaintiff).  Dr. Alexander

refuted Dr. Hale's claim.  Dr. Alexander told Dr. Hale that Ms. Rittgers had not committed any

acts of racial discrimination.  Dr. Alexander also told Dr. Hale that he and his wife probably

were too sensitive, and she asked if his wife was going through menopause.

Dr. Hale told Dr. Alexander that plaintiff would not return to work at the SLIM unless

her employer satisfied certain conditions, including moving plaintiff to a private office on the

fourth floor of the building, away from Ms. Rittgers.  Plaintiff believes that her move to the

fourth floor office then created "unspoken tensions in the workplace."  Doc. 1 ¶ 26.  After

plaintiff's office move, Ms. Rittgers stopped communicating with plaintiff unless necessary.  Ms.

Rittgers also failed to transfer plaintiff's phone to the upstairs office for almost six months. And, Ms. Rittgers interfered with plaintiff's assignments to a graduate assistant by giving the graduate assistant conflicting assignments.

On April 8, 2015, the graduate assistant arrived at work to find that someone had unlocked her office, tampered with its contents, and wrote the word "NIGGAZ" on a notepad on her desk. The graduate assistant reported what she found to plaintiff. Plaintiff believes that the racial slur was directed at her and her husband, and that the graduate assistant who reported it to her merely served as a conduit to deliver the message.

Plaintiff and Dr. Hale reported the incident to Dr. Alexander and requested that she investigate it. Plaintiff believes that Dr. Alexander did nothing to investigate the matter. In late June 2015, the Hales reported the incident to Dr. David Cordle, ESU's Provost, and Judy Anderson, Director of Human Resources. The Hales also reported the incident to the ESU Police Department and attempted to file a police report. According to plaintiff, the ESU Police Department refused to investigate the matter. The Hales also called the Lyon County Attorney and left a message asking that he call them to discuss a possible hate crime at ESU. The Lyon County Attorney never returned this phone call. According to plaintiff, the Lyon County Attorney chose not to investigate the matter and concluded that no crime had occurred after relying on information that ESU provided.

Dr. Hale then wrote a letter to Dr. Jackie Vietti, ESU's Interim President, asking her to investigate the April 8, 2015 incident and reporting his belief that he and his wife were victims of retaliation. Shortly after Dr. Hale sent the letter, a Human Resources employee contacted the Hales, explaining that he was assembling a report about the incident for Dr. Vietti. The Hales met with the Human Resources employee separately. During their conversations, they each

discussed their concerns about the April 8, 2015 incident. They also reported the earlier incidents of discrimination by Ms. Rittgers.

The Hales later learned that the Human Resources employee charged with writing the report about the incident was a family friend of Ms. Rittgers. The Hales accused the employee of bias and asked that he recuse himself from the investigation. The employee refused to recuse. Dr. Vietti also refused to remove the employee from reporting the matter.

Plaintiff alleges that Dr. Alexander began to treat her and her husband differently than others in the SLIM after they reported the April 8, 2015 incident to Provost Cordle and the ESU Police Department. On July 7, 2015, Dr. Alexander came to the fourth floor to visit all of the faculty members on that floor but refused to visit the Hales. Afterwards, Dr. Hale went to the third floor to talk to Dr. Alexander. During this conversation, Dr. Alexander expressed disappointment that the Hales had reported the April 8, 2015 incident to the Provost and the ESU Police Department. Dr. Alexander said that the Hales' performance had been stellar leading up to their complaints, but that she felt blindsided by their allegations that she and Ms. Rittgers had engaged in misconduct. Dr. Alexander told Dr. Hale that she had hoped he would have overlooked the April 8, 2015 incident because he could have served as a model for professional behavior by an African-American. Dr. Alexander also expressed frustration that the Hales wanted something done about the incident. She told him that he should accept the incident because "[t]his is Kansas." Doc. 1 ¶ 78.

Plaintiff was a contractual employee when she started working for the SLIM. According to plaintiff, Dr. Alexander promised that she would make plaintiff a permanent employee because she was doing an excellent job. Dr. Alexander encouraged plaintiff to complete her Bachelor's degree so that she could earn a higher salary and have the opportunity for promotions

at ESU.  Plaintiff enrolled in classes at ESU starting in the fall of 2015, so that she could work toward her degree.  But, after the Hales complained to the Provost and the ESU Police Department about the April 8, 2015 incident, Dr. Alexander told plaintiff that ESU would not renew her contract and that she would not become a permanent employee.  Because of this decision, plaintiff had to drop her enrollment in the college courses at ESU.

Plaintiff resigned from ESU two weeks before her contract ended.  She did so because Dr. Alexander had asked her to interact with Ms. Rittgers in what plaintiff perceived as a demeaning and subservient manner.  After plaintiff resigned, Dr. Alexander sent an email to the SLIM faculty praising plaintiff's work, informing them of her resignation, and asking for recommendations to fill the vacant position.  Plaintiff alleges that this email shows that Dr. Alexander did not terminate plaintiff's contract based on her performance or a budget shortfall. Instead, plaintiff asserts that Dr. Alexander terminated her contract as retaliation for plaintiff complaining about racial discrimination.  Plaintiff also alleges that Dr. Cordle and Dr. Vietti ignored her and her husband's complaints about racial discrimination and retaliation for reporting discrimination.

## II.    Motion To Dismiss Standard Under Fed. R. Civ. P. 12(b)(6)

Fed. R. Civ. P. 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Although this Rule "does not require 'detailed factual allegations,'" it demands more than "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, as the Supreme Court explained, "will do do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"To survive a motion to dismiss [under Fed. R. Civ. P. 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "Under this standard, 'the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims.'" *Carter v. United States*, 667 F. Supp. 2d 1259, 1262 (D. Kan. 2009) (quoting *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)).

Although the court must assume that the factual allegations in the complaint are true, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* at 1263 (quoting *Iqbal*, 556 U.S. at 678).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim for relief. *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).

### III.    Analysis

Defendants assert that the two claims plaintiff asserts in her Complaint fail to state a claim sufficient to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6).  The court addresses plaintiff's two claims separately, below.

### A.  Plaintiff's Title VII Claim Against ESU

Title VII prohibits an employer from discriminating against an employee "because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  To state a retaliation

claim under Title VII, a plaintiff must allege: "(1) that [she] engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (citations and footnote omitted).

Defendants assert that plaintiff's Complaint fails to allege facts sufficient to satisfy the first element of a Title VII retaliation claim against ESU. That is, defendants argue that plaintiff's Complaint never alleges that she engaged in protected opposition to discrimination. Defendants contend that plaintiff made just one complaint of racial discrimination—when she and her husband reported the racial slur found in her graduate assistant's office on April 8, 2015. Relying on an unpublished Tenth Circuit decision, defendants assert that this one complaint is insufficient to constitute protected opposition to discrimination and support a Title VII retaliation claim. *See Robinson v. Cavalry Portfolio Servs., LLC*, 365 F. App'x 104, 112 (10th Cir. 2010) ("A complaint of a single racist remark by a colleague, without more, is not "opposition protected by Title VII." (citing *Jordan v. Alt. Res. Corp.*, 467 F.3d 378, 380 (4th Cir. 2006)).

In *Robinson*, the plaintiff brought a Title VII retaliation claim against her former employer. The plaintiff alleged that the employer had fired her as retaliation for providing a witness statement about a conversation she had with a co-worker who repeatedly used the word "nigger" and then made a racist comment. 365 F. App'x at 108. After trial, the jury returned a verdict for plaintiff on the retaliation claim, and the district court denied the employer's motion for directed verdict. *Id.* at 110. The Tenth Circuit reversed, concluding that the plaintiff had failed to establish a prima facie case of retaliation with her one complaint about a single racist remark. *Id.* at 113–14. The Circuit explained: "No reasonable person could have believed that

the single . . . incident violated Title VII's standard.  It is undisputed that the employees' reports, including [plaintiff's] do not claim [the employer] did anything wrong."  *Id.* at 113.

Ta    *Robinson* differs from the facts alleged in plaintiff's Complaint here for several reasons. First, *Robinson* involved a report of just a single racial remark.  But, plaintiff's Complaint in this case alleges more than that.  First, plaintiff alleges that her husband complained to Dr. Alexander in December 2014 about Debra Rittgers and "several instances" of racially discriminatory conduct directed at either him or his wife.  Doc. 1 ¶ 15.  Second, plaintiff alleges that she and her husband reported the racial slur found in the graduate assistant's office to Dr. Alexander and requested that she investigate it.  Third, plaintiff alleges that she and her husband reported the racial slur to Dr. Cordle, ESU's Provost.  Fourth, plaintiff alleges that her husband wrote a letter to Dr. Jackie Vietti, ESU's Interim President, asking her to investigate the racial slur *and* reporting his belief that he and his wife were victims of retaliation.  Fifth, plaintiff alleges that she met with the Human Resources employee charged with writing a report about the racial slur. Plaintiff asserts that she discussed with the Human Resources employee both her concerns about the April 8, 2015 incident *and* earlier incidents of discrimination by Ms. Rittgers.  Finally, plaintiff alleges that, when Dr. Hale met with Dr. Alexander on July 7, 2015, Dr. Alexander said "she was 'blindsided' *by allegations of misconduct direct towards her and Rittgers*."  *Id.* ¶ 76 (emphasis added).  This allegation confirms that plaintiff complained not only about the April 8, 2015 incident but also about Dr. Alexander and Ms. Rittgers.

Ta    Viewing all of these facts in the light most favorable to plaintiff, the Complaint alleges that plaintiff reported more than just one incident of racial discrimination to ESU on more than one occasion.  The court recognizes that plaintiff's husband made some of the reports, but viewing the allegations in plaintiff's favor, the Complaint alleges that plaintiff's husband was

complaining for her.  *See O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1255 (10th Cir. 2001)

(concluding that "whether [plaintiff] or his attorney wrote the letter is wholly irrelevant" when

"[t]he letter was an informal complaint which disclosed [plaintiff's] dissatisfaction with his new

position" and characterized it "as retaliatory conduct").  For example, with the first complaint in

December 2014, plaintiff's husband told Dr. Alexander that plaintiff would not return to work at

the SLIM unless ESU met certain conditions, including that plaintiff move to a different office,

away from Ms. Rittgers—a request that Dr. Alexander accommodated, according to the

Complaint's allegations.  These facts are sufficient to show that plaintiff complained about more

than just a single racist remark.

Second, *Robinson* differs from the facts alleged here because, in *Robinson*, the plaintiff

conceded in her witness statement that, at first, she was not offended by the comment.  She said

that she didn't think her co-worker had used the racial slur negatively but was "just using the

term to describe a certain situation."  *Id.* at 108.  In contrast, here, plaintiff's Complaint describes

the alleged discriminatory acts as hostile and hate speech.  *Robinson* also emphasized that

plaintiff's report did not claim that the employer did anything wrong; instead, it was the co-

employee making the racist comment.  *Id.* at 113.  But, here, plaintiff accuses ESU of

wrongdoing—she contends that ESU administrators either failed to investigate her complaints

properly or ignored them.

Finally, the Tenth Circuit considered plaintiff's retaliation claim in *Robinson* in the

context of a post-trial motion for a directed verdict, and not a motion to dismiss.  In contrast,

here, plaintiff's allegations are sufficient at this early stage of the litigation if they "nudge[ ] [her]

claims across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 555.  Plaintiff's

Complaint in this case has satisfied that standard.

Defendants also cite a Supreme Court case holding that an employer was entitled to summary judgment against a plaintiff's retaliation claim when she alleged only a single discriminatory act. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (per curium) (holding that "[n]o reasonable person could have believed that the single incident recounted above violated Title VII's standard" when plaintiff's "job required her to review the sexually explicit statement in the course of screening job applicants[,]" "[h]er co-workers who participated in the hiring process were subject to the same requirement," and plaintiff "conceded that it did not bother or upset her to read" the discriminatory statement). *Breeden* differs from the facts alleged here for many of the same reasons that *Robinson* is different.  Most importantly, *Breeden* involved just one discriminatory remark.  In contrast, plaintiff's Complaint here alleges more than a single complaint about the use of one racial slur in the workplace.  Plaintiff alleges that she and her husband complained about that incident and several other alleged discriminatory acts by Ms. Rittgers on several, independent occasions.  These allegations suffice to state a retaliation claim under Title VII and thus survive a Rule 12(b)(6) motion to dismiss.

### B.  Plaintiff's § 1983 Claim Against the Individual Defendants

Defendants assert that three arguments support dismissal of plaintiff's retaliation claim under § 1983 against the three individual defendants.  First, defendants argue that plaintiff's Complaint fails to state a claim under § 1983 because her alleged speech is not a matter of public concern entitled to First Amendment protection.  Second, defendants assert that even if plaintiff's speech is a matter of public concern, defendants Alexander, Cordle, and Vietti are entitled to qualified immunity against plaintiff's § 1983 claim.  Finally, defendants contend that Eleventh Amendment immunity bars plaintiff's official capacity claim against defendants Alexander, Cordle, and Vietti.

**1. Does plaintiff's Complaint allege protected speech that is a matter of public concern?**

The Supreme Court has held that "a public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140 (1983) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). But, at the same time, the Supreme Court recognizes that "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom" because "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citations omitted). The Supreme Court thus instructs courts to balance carefully the competing "interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Helget v. City of Hays, Kan.*, 844 F.3d 1216, 1221 (10th Cir. 2017) (quoting *Lane v. Franks*, 134 S. Ct. 2369, 2374 (2014) (further quotation omitted)).

To balance those competing interests carefully, the court applies the five step *Garcetti/Pickering* test to determine whether plaintiff has stated a First Amendment retaliation claim. *Id.* The five steps require the court to consider these five factors:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Id.* at 1221–22 (quoting *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014) (further quotation omitted)).  The first three steps are questions of law for the court to decide.  *Id.* (citation omitted). The last two steps are questions of fact.  *Id.* (citation omitted).

Defendants argue that plaintiff fails to allege facts to support the second element of this test—that plaintiff's speech involved a matter of public concern.  This element requires the employee to allege that her speech "involves a matter of public concern and not merely a personal issue internal to the workplace."  *Moore v. City of Wynnewood*, 57 F.3d 924, 931 (10th Cir. 1995) (citing *Connick*, 461 U.S. at 146–47); *see also Morris v. City of Colo. Springs*, 666 F.3d 654, 661 (10th Cir. 2012) ("[S]peech relating to internal personnel disputes and working conditions ordinarily will not be viewed as addressing matters of public concern." (citation and internal quotation marks omitted)).  In other words, "speech that simply airs 'grievances of a purely personal nature' typically does not involve matters of public concern."  *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1205 (10th Cir. 2007) (quoting *Connick*, 461 U.S. at 147–48).

Speech is a matter of public concern "when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."  *Lane*, 134 S. Ct. at 2380 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)).  "The inquiry turns on the 'content, form, and context' of the speech."  *Id.* (quoting *Connick*, 461 U.S. at 147–148).  In *Connick v. Myers*, the Supreme Court stated that "racial discrimination" is "a matter inherently of public concern." 461 U.S. at 148 n.8; *see also Quigley v. Rosenthal*, 327 F.3d 1044, 1060 (10th Cir. 2003) (explaining that *Connick* stated that "'racial discrimination,' at least in the

context of public-employment, is 'a matter inherently of public concern.'" (quoting *Connick*, 461 U.S. at 148 n.8)).

Defendants assert that plaintiff never alleges that her speech involved a matter of public concern because the Complaint only alleges that plaintiff spoke of a personal grievance arising out of her own working conditions. The court doesn't read plaintiff's Complaint so narrowly. Instead, construing the Complaint's allegations liberally and viewing them in the light most favorable to plaintiff, it appears that plaintiff's speech addressed both her personal grievances and a purported culture at ESU that allegedly discriminates against African-Americans. For example, the Complaint alleges that "ESU fosters a white-dominated culture that does not appear to feel the need to diversify, starting from the top down." Doc. 1 ¶ 39. The Complaint also alleges that plaintiff and her husband's complaints "represented a threat to the racial lens at the SLIM." Doc. 1 ¶ 33. And, the Complaint alleges that the Hales attempted to report the racial slur incident as a hate crime with the ESU Police Department but that the ESU Police Department Chief refused to investigate the matter and concluded that no crime had occurred. Construing these allegations liberally and in the light most favorable to plaintiff, the Complaint alleges that plaintiff's complaints about racial discrimination involved both her own personal complaints and speech about a matter of public concern sufficient to survive a Rule 12(b)(6) motion to dismiss.

The court recognizes that discovery eventually may support or fail to support the Complaint's allegations. But, at this stage, plaintiff's Complaint only needs to assert facts that, accepted as true, allege plaintiff's speech addressed a matter of public concern. Plaintiff has satisfied this pleading standard sufficient to survive defendants' motion to dismiss.

## 2.  Are defendants entitled to qualified immunity?

"Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'"  *Lane*, 134 S. Ct. at 2381 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011)).  This doctrine "protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  Qualified immunity shields a government official from a money damages award in his or her personal capacity "unless 'the official violated a statutory or constitutional right,' and 'the right was "clearly established" at the time of the challenged conduct.'"  *Lane*, 134 S. Ct. at 2381 (quoting *al-Kidd*, 563 U.S. at 735).  So, on a motion to dismiss based on qualified immunity, "a court must consider 'whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'"  *Leverington v. City of Colo. Springs*, 643 F.3d 719, 732 (10th Cir. 2011) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)).  The Supreme Court has held that courts have discretion to decide "which of the two prongs of the qualified immunity analysis" to address "first in light of the circumstances in the particular case at hand."  *Pearson*, 555 U.S. at 236.

"Although qualified immunity defenses are typically resolved at the summary judgment stage, district courts may grant motions to dismiss on the basis of qualified immunity."  *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014).  Asserting a qualified immunity defense in a Rule 12(b)(6) motion, however, "subjects the defendant to a more challenging standard of review than would apply on summary judgment."  *Id.* (quoting *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004)).  This is so because at the motion to dismiss stage, the court scrutinizes defendants' conduct as alleged in the complaint for "objective legal reasonableness."  *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996).  But, on summary judgment, the plaintiff no longer can rest

on the pleadings, and the court considers the evidence in the summary judgment record when conducting the qualified immunity inquiry. *Id.*

Here, the court concludes that plaintiff's Complaint alleges facts sufficient to establish that the individual defendants violated a clearly established constitutional right. The Complaint alleges that defendants Alexander, Cordle, and Vietti terminated plaintiff's employment contract in retaliation for exercising her First Amendment rights to speak out against discrimination and racism. As explained in the above section, Supreme Court precedent clearly establishes that "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick*, 461 U.S. at 142; *see also Lane*, 134 S. Ct. at 2377 ("[P]ublic employees do not renounce their citizenship when they accept employment, and this Court has cautioned time and again that public employers may not condition employment on the relinquishment of constitutional rights." (citations omitted)). Indeed, the Supreme Court has found it "essential that public employees be able to speak out freely [on matters of public concern] without fear of retaliat[ion]." *Connick*, 461 U.S. at 149; *see also Lane*, 134 S. Ct. at 2377 ("Speech by citizens on matters of public concern lies at the heart of the First Amendment," and "[t]his remains true when speech concerns information related to or learned through public employment.").

The court thus concludes that plaintiff's Complaint alleges that the individual defendants violated a clearly established constitutional right when they terminated plaintiff's employment contract as retaliation for her exercise of First Amendment protected speech. Plaintiff's Complaint sufficiently alleges facts to support this claim. So, defendants are not entitled to qualified immunity at this stage in the proceedings.

### 3. Does Eleventh Amendment immunity bar plaintiff's official capacity claims?

Finally, defendants assert that the Eleventh Amendment bars plaintiff's official capacity claims against defendants Alexander, Cordle, and Vietti. The Eleventh Amendment generally bars suits against states and their agencies based on their sovereign immunity. *Levy v. Kan. Dep't of Soc. and Rehab. Servs.*, 789 F.3d 1164, 1168 (10th Cir. 2015) (quoting *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court.")). But, three exceptions to Eleventh Amendment immunity exist:

> First, a state may consent to suit in federal court. Second, Congress may abrogate a state's sovereign immunity by appropriate legislation when it acts under Section 5 of the Fourteenth Amendment. Finally, under *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L.Ed. 714 (1908), a plaintiff may bring suit against individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks prospective relief.

*Id.* (quoting *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012)).

Here, defendants assert that the Eleventh Amendment bars plaintiff's official capacity claims against the three individual defendants (who are state officials) because the State never has consented to suit under § 1983, Congress never has abrogated the states' sovereign immunity from those suits, and plaintiff's Complaint just seeks retroactive money damages as relief. The court agrees. *See Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1196 & n.13 (10th Cir. 1998) (explaining that the Eleventh Amendment barred plaintiff's §§ 1981, 1983, and 1985 claims for money damages against state officials in their official capacities); *see also Hale v. Emporia State Univ.*, No. 15-4947-SAC-KGS, 2016 WL 917896, at *3 (D. Kan. Mar. 8, 2016) (holding that the Eleventh Amendment barred plaintiff's § 1983 claims for money damages against ESU and the individual defendants in their official capacities).

In her Opposition to defendants' Motion to Dismiss, plaintiff asserts that her claims fall within the *Ex Parte Young* exception to the Eleventh Amendment's guarantee of sovereign immunity. Doc. 19 at 18. *Ex Parte Young* held that "the Eleventh Amendment generally will not operate to bar suits so long as they (i) seek only declaratory and injunctive relief rather than monetary damages for alleged violations of federal law, and (ii) are aimed against state officers acting in their official capacities, rather than against the State itself." *Hill v. Kemp*, 478 F.3d 1236, 1255–56 (10th Cir. 2007) (citing *Ex Parte Young*, 209 U.S. at 159–60). But, plaintiff concedes that her Complaint never requests the requisite declaratory or injunctive relief, as the *Ex Parte Young* exception demands. Plaintiff's Opposition provides "preliminary proposals" of injunctive relief but contends "that the specific mode of any injunctive relief should be deferred until after discovery." Doc. 19 at 19. And, importantly, her Complaint never asks for prospective injunctive relief that would allow her to assert her official capacity claims against the individual defendants consistent with *Ex Parte Young*. Thus, the *Ex Parte Young* exception does not apply here.

To the extent plaintiff seeks to amend her Complaint to include a request for injunctive relief, she may file the appropriate motion under Fed. R. Civ. P. 15 and D. Kan. Rule 15.1. The court cautions plaintiff, however, that any requested injunctive relief must seek prospective relief that the three named individual defendants have the power to perform. *See Klein v. Univ. of Kan. Med. Ctr.*, 975 F. Supp. 1408, 1417 (D. Kan. 1997) (explaining that a federal court may grant prospective injunctive relief against a state official acting in his or her official capacity but "the state official must have the power to perform the act required in order to overcome the jurisdictional bar of the Eleventh Amendment" (citing *Ex Parte Young*, 209 U.S. at 157)).

Many of plaintiff's "preliminary proposals" for injunctive relief seek retroactive relief. *See* Doc. 19 ¶ A (seeking an order that "Defendants engaged in conduct subject to penalty under 42 U.S.C. § 1983 and Title VII"), ¶ B (seeking an order that "Defendants engaged in a sham investigation and a cover-up involving allegations of a bias incident at ESU" and requiring defendants to "retract their claim that at fair, logical and thorough investigation was done"), ¶ D (seeking an order requiring the ESU Bulletin (a student newspaper) to retract "false statements attributed to [plaintiff] or her husband, and admit to publishing false narratives and allegations against [plaintiff]").  Also, many of plaintiff's "preliminary proposals" seek relief that the three named individual defendants lack the power to implement.  *See id.* ¶ C (seeking an order requiring Ms. Rittgers (who is not a defendant in the case) "to submit to a forensic handwriting examination and polygraph test to determine whether she wrote the racial epithet"), ¶ D (seeking an order requiring the ESU Bulletin (not a defendant in this case) to retract statements), ¶ E (seeking reinstatement for plaintiff as Assistant to the Dean for Marketing in SLIM).  Plaintiff cannot assert such claims and avoid application of the Eleventh Amendment immunity bar.

Thus, if plaintiff seeks leave to amend her Complaint to request injunctive relief of this kind, the request would be futile because the *Ex Parte Young* exception does not exempt these claims from the Eleventh Amendment's sovereign immunity bar.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (explaining that a court may deny leave to amend based on the futility of the proposed amendment).

## IV.    Conclusion

For the reasons explained above, the court grants in part and denies in part defendants' Motion to Dismiss.  The court grants defendants' Motion to Dismiss plaintiff's official capacity

claims against defendants Gwen Alexander, David Cordle, and Jackie Vietti, but denies the motion in all other respects.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion to Dismiss (Doc. 17) is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated this 14th day of July, 2017, at Topeka, Kansas.

> **s/ Daniel D. Crabtree**
> **Daniel D. Crabtree**
> **United States District Judge**