UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| ANGELICA HALE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 16-cv-4182-DDC-TJJ |
| | ) | |
| EMPORIA STATE UNIVERSITY (ESU), | ) | |
| GWEN ALEXANDER, PH.D., | ) | |
| DAVID CORDLE, PH.D., | ) | |
| JACKIE VIETTI, PH.D., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM AND ORDER**

Plaintiff Angelica Hale brings this action pro se against defendants Emporia State University ("ESU"), Gwen Alexander, David Cordle, and Jackie Vietti. Plaintiff alleges that her former employer, ESU, retaliated against her by terminating her employment because she complained about racial discrimination. This matter is before the Court on Plaintiff's Motion to Compel Production of ESU's Litigation Files and Attorney-Client Communications (ECF No. 63) ("Motion to Compel"). Plaintiff requests an order compelling the production of all the internal investigation documents withheld by ESU and identified on its privilege log. As explained below, the motion is granted in part and denied in part.

I.    **RELEVANT FACTS**

At the August 28, 2017 scheduling conference with the Court, Plaintiff requested that ESU produce a copy of its internal investigation report referred to as the "350-plus page" investigative report disclosed during a press conference held by ESU.[1]  Counsel for ESU agreed

---

[1] *See* Scheduling Conference Tr. at 11:4–7 and 19:19–20, ECF No. 44.

to early production of the report, subject to redactions for attorney work product and privilege.

The Scheduling Order reflected this agreement and set a deadline for production of the report:

> Plaintiff requested a copy of Defendant ESU's internal investigation report. After discussion, counsel for Defendants agreed to produce the investigative report to Plaintiff within fourteen (14) days after entry of the protective order, subject to any redactions for attorney-client privilege. Defendants shall file a notice of service at the time they produce the report to Plaintiff.[2]

On September 27, 2017, ESU produced four discrete sections totaling 33 pages, which it claimed comprised its investigative report. On October 2, 2017, Plaintiff emailed the Court alleging ESU failed to produce the entire 350 pages of ESU's investigation of the reported hate crime. The Court ordered the parties to confer and, if unable to resolve their discovery dispute, Plaintiff could file a motion to compel production of the investigation report from Defendant ESU.[3] Plaintiff filed her motion to compel on October 18, 2017.[4]

On October 31, 2017, the Court conducted a hearing on Plaintiff's motion to compel ESU's investigation documents. Defendant ESU objected that Plaintiff had failed to confer and asserted a claim of privilege and/or protected work product for many of the documents contained in what it called its litigation file. At the conclusion of the hearing, Defendant ESU was ordered to:

> produce to Plaintiff a copy of its 300+ page[5] Litigation File discussed during the hearing, subject to any redactions or pages withheld as privileged or protected work product, and a privilege log for any redactions or pages withheld from production. If Plaintiff seeks to compel production of any redacted information or pages withheld, then the parties shall confer in good faith in an attempt to resolve

---

[2] Sept. 8, 2017 Scheduling Order ¶ 2(g), ECF No. 38.

[3] *See* Oct. 10, 2017 text-only Order, ECF No. 45.

[4] ECF No. 53.

[5] ESU's internal investigation report is referenced various ways in the record including as a 350-page report and a 300+ page report. For consistency and ease of reference hereinafter it will be referenced as simply "the Investigation Report."

their disputes. If the parties are unable to resolve their disputes after conferring, Plaintiff Hale shall file her motion to compel identifying the redacted information or withheld documents at issue.[6]

Defendants were also ordered to produce an unredacted copy of the file to the Court for a possible *in camera* review.

On November 14, 2017, ESU produced 166 pages of the Investigation Report, and a privilege log which listed 98 documents. The privilege log indicates that ESU is withholding documents on the following bases: (1) attorney-client privilege, (2) attorney work product, (3) "work product of attorney's agent," and (4) "mental impressions of agent to general counsel." Plaintiff filed the instant Motion to Compel on November 22, 2017. She argues all the documents being withheld by ESU are discoverable under the crime-fraud exception to privilege, or any privilege was waived by disclosure of the documents to third parties. She also argues these documents are discoverable because they were predominantly created for the ordinary business purpose of conducting an investigation into the Hales' report of a racial slur written on the notebook of Plaintiff's graduate assistant, and not for the purpose of seeking legal advice.

## II.    CRIME-FRAUD EXCEPTION

Before addressing the privileges and protections ESU asserts for each category of documents withheld, the Court will address Plaintiff's argument that all ESU's withheld documents regarding its internal investigation are discoverable because they fall within the crime-fraud exception to privilege. Plaintiff's main theory is that ESU used its general counsel to enable and aid it in the planning and commission of a fraud which involved public deception. More specifically, Plaintiff argues that ESU and the individual defendants made false statements

---

[6] Minute Sheet from 10/31/2017 motion hearing, ECF No. 57.

to the media, the university, and the community when it announced the results of its investigation into Plaintiff's report of a hate crime and racial discrimination. Plaintiff argues ESU's "investigation" was a fraudulent and tortious apparatus created to intentionally mislead the public. Plaintiff identifies forty-two falsehoods allegedly told by ESU and the individual defendants that were used to deceive the public, retaliate against her and her spouse, and chill dissent and opposition to racism at ESU.  Plaintiff alleges that as a result of ESU's false statements, her and her spouse's names were added to an online national registry of hate hoax perpetrators and they were shunned on social media.

Under the crime-fraud exception, "[t]he attorney-client privilege does not apply where the client consults an attorney to further a crime or fraud."[7] The crime-fraud exception also applies to documents claimed to be protected from discovery as work product.[8] The purpose of the crime-fraud exception is to assure that the seal of secrecy between the attorney and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime.[9] The crime-fraud exception has not been extended to torts generally.[10] The party claiming that the crime-fraud exception applies must present *prima facie* evidence that the allegation of attorney participation in a crime or fraud has some foundation in fact.[11] The

---

[7] *Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1551 (10th Cir. 1995). *See Clark v. United States*, 289 U.S. 1, 15 (1933) ("There is a privilege protecting communications between attorney and client. The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told.").

[8] *See In re Vargas*, 723 F.2d 1461, 1467 (10th Cir. 1983) (court's analysis on crime-fraud exception applied to "both the attorney-client and work-product privileges").

[9] *United States v. Zolin*, 491 U.S. 554, 563 (1989); *Burton v. R. J. Reynolds Tobacco Co.*, 167 F.R.D. 134, 140 (D. Kan. 1996).

[10] *Motley*, 71 F.3d at 1551.

[11] *Id.*

determination of whether such a *prima facie* showing has been made is left to the sound discretion of the district court.[12]

Plaintiff has alleged ESU's general counsel was involved in the commission of a fraud. The elements of fraud under Kansas law are:

> (1) The defendant made a false statement concerning an existing and material fact; (2) the defendant knew the statement was false or recklessly made the statement without knowing its validity; (3) the defendant intentionally made the statement for the purpose of inducing the plaintiff to act upon it; (4) the plaintiff reasonably relied and acted upon the defendant's statement; and (5) the plaintiff sustained damage by relying upon the statement.[13]

With respect to the first and third elements, many of the alleged false statements do not appear to be material statements of fact made by the Defendants for purposes of inducing Plaintiff to act upon them. Moreover, with respect to the fourth and fifth elements, Plaintiff does not allege that she reasonably relied and acted upon ESU's allegedly false statements, or that she sustained damage by relying upon those statements. Nor do any of the exhibits offered by Plaintiff in the briefing on the motion provide a factual basis to support these elements. Plaintiff has thus failed to make a *prima facie* showing that ESU's actions constituted fraud, let alone that its general counsel's communications were made for the purpose of giving advice for the commission of the allegedly fraudulent conduct.[14]

---

[12] *Id.*

[13] PIK Civ. 4th 127.40; *Bomhoff v. Nelnet Loan Servs., Inc.*, 279 Kan. 415, 422, 109 P.3d 1241 (2005).

[14] Plaintiff also argues, as a basis for the crime-fraud exception, that ESU's general counsel was used to facilitate a "fraud upon the public" through ESU's false statements to the media, the university, and the community when it announced the results of its investigation. To the extent the crime-fraud exception would include a "fraud upon the public," similar to the one discussed in *Burton v. R.J. Reynolds Tobacco Co.*, 167 F.R.D. 134, 143 (D. Kan. 1996), Plaintiff again has not shown any *reliance* of the public upon any allegedly false statements by ESU or damages to the public resulting from reliance upon those statements.

**A.    Whether an *In Camera* Review is Necessary to Determine the Applicability of the Crime-Fraud Exception**

Having found Plaintiff has not made a *prima facie* showing ESU's actions constituted fraud, the Court considers whether it must conduct an *in camera* review of the documents withheld by ESU to determine the applicability of the crime-fraud exception.

The decision whether to conduct an *in camera* review is left to the sound discretion of the district court.[15] "The court may and does review documents *in camera* to determine an alleged privilege, when the party asserting it has made some initial, factual showing that it exists. The court must have some bases or grounds for conducting an *in camera* review."[16]

> Such review may be useful if there is a genuine dispute between the parties as to the accuracy of the withholding party's description of certain documents. Such review is not, however, to be routinely undertaken, particularly in a case involving a substantial volume of documents, as a substitute for a party's submission of an adequate record in support of its privilege claims.[17]

In cases where the crime-fraud exception is at issue, the court may conduct an *in camera* review to determine the applicability of the crime-fraud exception, but only if the party requesting such a review makes a "showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish that the crime-fraud exception applies."[18] This evidentiary standard requires less than what is required ultimately to overcome the privilege.[19] In making this decision, the court should

---

[15] *Zolin*, 491 U.S. at 572; *Motley*, 71 F.3d at 1522–53. *See also In re Grand Jury Subpoenas*, 906 F.2d 1485, 1493 (10th Cir. 1990) (trial court has discretion in its decision whether to review fee contracts *in camera* to determine whether they contain any confidential communications that were protected by attorney-client privilege).

[16] *Black & Veatch Corp. v. Aspen Ins. (UK) Ltd.*, 297 F.R.D. 611, 621 (D. Kan. 2014).

[17] *Id.*

[18] *Zolin*, 491 U.S. at 572.

[19] *Id.*

consider the facts and circumstances of the particular case including, among other things, the volume of materials to be reviewed, the relative importance of the alleged privileged information to the case, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply.[20] In contrast to the *Zolin* standard for determining whether to conduct an *in camera* review, the Court notes that Kansas law prohibits review of the actual communications in determining whether the fraud-crime exception applies.[21]  Plaintiff's claims in this case arise under federal statute, therefore federal law (instead of state law) governs any claim of privilege. The Court will therefore apply the standard set out in *Zolin*.

In light of the deficiencies noted above in establishing all the elements required to show fraud, the Court finds the evidence presented by Plaintiff in her motion and briefing does not establish a "factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish that the crime-fraud exception applies." Accordingly, the Court declines to conduct an *in camera* review of the withheld documents for purposes of the crime-fraud exception to attorney-client privilege.

## III.    WAIVER BY DISCLOSURE TO THIRD PARTIES

Plaintiff also argues that ESU's disclosure of its litigation file to third parties negates any attorney-client privilege.  She points to the public statement by ESU Interim President, Dr. Jackie Vietti, ("Vietti") at the September 9, 2015 press conference that ESU decided to have two

---

[20] *Id.*

[21] *See* K.S.A. 60-426(b) (the attorney-client privilege "shall not extend to a communication . . . [i]f the judge finds that sufficient evidence, *aside from the communication*, has been introduced to warrant a finding that the legal service was sought or obtained in order to enable or aid the commission or planning of a crime or a tort.") (emphasis added).

external independent individuals review the process, findings, and conclusions of its investigation. The reviewers were an attorney with no connection to ESU and an HR consultant. Plaintiff argues this intentional disclosure to the independent reviewers waived any privilege.

The attorney-client privilege protects from discovery the communications between an attorney and client, made in confidence, under "circumstances from which it may reasonably be assumed that the communication will remain in confidence."[22] Because confidentiality is critical, the attorney-client privilege will be "lost if the client discloses the substance of an otherwise privileged communication to a third party."[23] "The confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived."[24] Where disclosure to a third party is voluntary, the privilege is waived.[25]

ESU asserts that waiver by disclosure to third parties is not an issue here because the only documents ESU provided to the independent reviewers have already been produced to Plaintiff. ESU offers the affidavit of its general counsel, Kevin Johnson, who states ESU "provided the independent consultants with the four investigative reports for review and no other documentation."[26]  The four-part investigation reports reviewed by the independent reviewers were all produced to Plaintiff on September 27, 2017.

---

[22] *In re Qwest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006).

[23] *United States v. Ary*, 518 F.3d 775, 782 (10th Cir. 2008).

[24] *Id.*

[25] *Id. See also Burton*, 167 F.R.D. at 140 ("Intentional disclosure to third parties of privileged information is a waiver of any privilege.").

[26] Johnson Aff. ¶ 10, ECF No. 66-1.

Based upon ESU's representation (through the sworn statements of its general counsel) that it has produced to Plaintiff all documents reviewed by the independent reviewers, the Court denies Plaintiff's request to compel documents on the grounds of third party disclosure.

## IV.     DOCUMENTS WITHHELD BY ESU AS PRIVILEGED AND/OR AS WORK PRODUCT

ESU groups its withheld documents into five categories:  (1) handwritten and typewritten interview notes prepared by its Assistant Director of Human Resources, Ray Lauber ("Lauber"), from his interviews with various individuals during the course of the ESU investigation; (2) drafts of Lauber's investigation reports; (3) internal ESU emails with its general counsel, Kevin Johnson ("Johnson"), regarding legal advice relating to the Hales and his responses; (4) an email and memorandum from Johnson providing legal advice regarding initiation of the investigation to ESU Interim President Vietti and Lauber; and (5) two independent reviews performed by an attorney consultant and human resources consultant. The Court will address the privileges and work-product protections ESU asserts for each category of documents.

### A.     Handwritten and Typewritten Interview Notes Prepared by Lauber

ESU identifies several documents in its privilege log, most of which are undated or dated in July and August 2015, described as either handwritten or typewritten interview notes with various individuals who ESU describes as witnesses interviewed by Lauber. Some of the privilege log entries indicate that Lauber's interview notes are from interviews or meetings with Plaintiff and her husband, Dr. Melvin Hale, (collectively the "Hales"). ESU's log indicates that all interview notes are being withheld because they reflect "work product of attorney's agent."

### 1.    Notes from Witness Interviews[27]

ESU argues the witness interview notes prepared by Lauber fall within the work-product doctrine and their disclosure should not be compelled because Lauber acted as an agent of ESU's general counsel and conducted the investigation at his behest. ESU contends Lauber's notes are documents protected by the work-product doctrine because they were not generated in the ordinary course of business, but in response to the Hales' failure to make a formal request to initiate an investigation while making it well known that they intended to file federal court litigation in the event ESU did not acquiesce to their demands. ESU asserts that the investigation was initiated upon the legal advice of ESU's general counsel, Johnson, after the Hales were encouraged and ultimately refused to file a grievance with ESU in order to initiate the investigation in the first place. ESU claims that Johnson advised Vietti to initiate the request for an investigation into the situation in the School of Library Science and Information Management ("SLIM").

Plaintiff argues that the interviews and inquiries by Lauber were never labeled as an official investigation and Lauber made it clear during meetings with Plaintiff that he was conducting fact finding at the direction of Vietti and following the steps of an informal grievance policy. Plaintiff claims that ESU is relabeling its investigation file as a "litigation file" so that it does not have to produce these documents in discovery.  Plaintiff also argues that ESU, through Vietti, made public statements that its internal investigation concerned the allegations of a hate crime and racial discrimination at SLIM and was initiated pursuant to institutional policy.

The work-product doctrine is codified in Fed. R. Civ. P. 26(b)(3)(A):

---

[27] Privilege log entries for Lauber's witness interview notes 2–4, 6, 8–9, 11–17, 20–33, 36–40, 50–58, 60–61, 79, 81–94.

> Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:
>
> (i) they are otherwise discoverable under Rule 26(b)(1); and
>
> (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.[28]

If the court orders discovery of any work-product documents, "it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or *other representative* concerning the litigation."[29]

For ESU to establish protection under the work-product doctrine, it bears the burden to demonstrate "(1) the materials sought to be protected are documents or tangible things; (2) they were prepared in anticipation of litigation or for trial; and (3) they were prepared by or for a party or a representative of that party."[30] For work-product protection to apply, "there must be a real and substantial probability that litigation will occur at the time the documents were created."[31]

There are two components in determining whether documents are prepared "in anticipation of litigation."[32] The first is the causation requirement; the document in question must have been created because of the anticipation of litigation (i.e. to prepare for litigation or for

---

[28] Fed. R. Civ. P. 26(b)(3)(A).

[29] Fed. R. Civ. P. 26(b)(3)(B) (emphasis added).

[30] *Buehler v. Family Dollar, Inc.*, No. 17-1241-JTM-GEB, 2018 WL 296016, at *2 (D. Kan. Jan. 4, 2018).

[31] *Id.*

[32] *Kannaday v. Ball*, 292 F.R.D. 640, 648–49 (D. Kan. 2013).

trial). The second component imposes a reasonableness limit on a party's anticipation of litigation; the threat of litigation must be "real" and "imminent."[33] In addition, courts look "to the primary motivating purpose behind the creation of the document to determine whether it constitutes work product. Materials assembled in the ordinary course of business or for other non-litigation purposes are not protected by the work-product doctrine."[34]

The parties dispute whether the interview notes taken by the Assistant Director of Human Resources as part of ESU's internal investigation into the racial slur incident at SLIM were prepared in anticipation of litigation, or were created primarily for a non-litigation purpose, such as contemplated by ESU's own policies for investigating racial harassment and discrimination complaints. ESU contends that the primary motivating purpose of the documents was to conduct a thorough investigation of the events in question based on ESU's potential liability. In contrast, Plaintiff contends the primary purpose of the investigation documents was to comply with ESU's institutional policy 3D.0106.05(A)(2). She points to Vietti's September 9, 2015 letter to ESU faculty, staff, and students, which states, "On July 10, 2015, I directed that an internal investigation be conducted by ESU Human Resources into an alleged hate crime and a concern over potential discrimination or harassment in the School of Library and Information Management. This investigation was conducted as outlined in the University Policy Manual [3D.0106.05(A)(2)]."[35]

---

[33] *Id.* at 648–49.

[34] *Id.* at 649.

[35] Pl.'s Ex. DD, ECF No. 64-1 at 139. Section 3D.0106.05(A)(2) sets out the procedure for formal resolution of complaints of discrimination and/or harassment.

ESU has the burden to prove it is entitled to work-product protection. ESU has provided an affidavit from its general counsel, Kevin Johnson, wherein he states that "[d]uring July 2015, the Hales indicated they had retained counsel and were acting upon the advice of an attorney."[36] Johnson further states in his Affidavit that by July 10, 2015, it became apparent the Hales were refusing to file a grievance with ESU regarding their perception of discrimination and harassment in the SLIM department, and he recommended that ESU President Vietti initiate a request for an investigation into the Hales' allegations.[37] Based upon these sworn statements by Johnson, the Court concludes that as of July 10, 2015, ESU was on reasonable notice that Plaintiff intended legal action against ESU and that it reasonably anticipated litigation as of at least that date.

ESU must also show that Lauber's purpose in preparing the witness interview notes was in anticipation of litigation, and not for some other non-litigation purpose. Notwithstanding the public statements made by ESU's Interim President Vietti regarding ESU's investigation,[38] which might suggest the investigation was for purposes of a more general university investigation into discrimination and harassment in the SLIM department, the Court finds Lauber conducted the witness interviews at the direction of Vietti, who was acting upon Johnson's advice and recommendation that an investigation be initiated into the Hales' allegations.

In this district, courts look to the "primary motivating purpose behind the creation of the document to determine whether it constitutes work product."[39] After conducting an *in camera*

---

[36] Johnson Aff. ¶ 6, ECF No. 66-1.

[37] Johnson Aff. ¶¶ 3–4.

[38] Vietti Sept. 9, 2015 Letter, ECF No. 64-1 at 159.

[39] *Kannaday*, 292 F.R.D. at 649 (quoting *Marten v. Yellow Freight Sys., Inc.*, No. 96-2013-GTV, 1998 WL 13244, at *10 (D. Kan. Jan. 6, 1998)).

review of a sampling of the withheld witness notes, the Court concludes that Lauber's primary purpose behind the creation of these interview notes was in anticipation of litigation with the Hales and not for purposes of conducting an investigation under university policies. The privilege log lists many of Lauber's interview notes as undated so the Court cannot tell when Lauber interviewed each person or prepared the notes. However, to the extent the privilege log lists dates for Lauber's interview notes, they are all dated after July 10, 2015, and a review of the undated interview notes indicates it is very likely Lauber also conducted those interviews or prepared those interview notes after July 10, 2015. Plaintiff's motion is therefore DENIED with respect to these documents.

### 2.    Notes from Interviews or Meetings with the Hales

The Court separately addresses ESU's claim of work product for Lauber's interview notes from his interviews and meetings with the Hales. These notes are referenced in ESU's privilege log as entries 18, 19, 35, 47–49, 66, 78, and 80. Four of the notes are dated or reference July 20 or 22, 2015, and the remainder are undated.

For the notes Lauber took during the interviews and meetings with the Hales, the Court finds that ESU has demonstrated Lauber's creation of these notes would have been both for the purpose of investigating the racial slur incident and also in anticipation of litigation brought by the Hales. Lauber's *primary* purpose in preparing these notes would have been in anticipation of litigation with the Hales since they indicated around the early June 2015 timeframe they had retained counsel and were acting upon the advice of an attorney. ESU has shown an underlying nexus between the preparation of Lauber's notes from interviews and meetings with the Hales and this specific litigation. The Court also finds that because one or both of the Hales were present during these meetings and interviews with Lauber, and apparently also have audio

14

recordings of some meetings, they would be aware of the substance of those meetings. Plaintiff

therefore cannot show that she has substantial need for the Lauber's interview notes and cannot

obtain their substantial equivalent by other means. In addition, the Court finds that Lauber's

interview notes would likely contain his mental impressions and opinions in his role as a

representative of ESU's general counsel. Under Fed. R. Civ. P. 26(b)(3)(B), the Court is

required to "protect against disclosure of the mental impressions, conclusions, opinions, or legal

theories of a party's attorney or other representative concerning the litigation." The Court

concludes Lauber's notes from interviews and meetings with the Hales are not discoverable.

Plaintiff's motion to compel is DENIED with respect to privilege log entries 18, 19, 35, 47–49,

66, 78, and 80. [40]

**B.    Drafts of the Investigation Reports**

Privilege log entries 1, 34, 59, and 64 describe the withheld documents as "Draft of

Investigation Reports" from Lauber to Vietti; three are dated August 20, 2015 and the other is

undated. ESU's log indicates that these reports are being withheld as attorney-client privilege

and because they reflect work product.

ESU has already produced to Plaintiff the final version of the August 20, 2015

Memorandum that summarizes the investigation of racial allegations. ESU maintains it should

not be compelled to produce the draft versions of this report prepared by Lauber under the work-

product doctrine, as the drafts contain the mental impressions of ESU's general counsel. The

Court agrees that drafts of the Memorandum, which contain findings and conclusions regarding

---

[40] Identified on ESU's privilege log as AGO-000095–98, AGO-000099–102, AGO-000192–193, AGO-000251–263, AGO-000264–273, AGO-000274–279, AGO-000379, AGO-000465–468, and AGO-000469–472.

Plaintiff and ESU's decision not to reappoint Plaintiff, would likely contain notations or revisions that would disclose the mental impressions of ESU's general counsel or other representative.   Therefore, pursuant to Rule 26(b)(3)(B), which requires the Court to "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation," the Court must protect Lauber's drafts of the investigation report from discovery.  Plaintiff's motion to compel is DENIED with respect to privilege log entries 1, 34, 59, and 64.[41]

### C.    ESU Internal Email Communications

ESU's privilege log entries 63, 67–77, and 96 are described as a series of emails between SLIM Dean Alexander and other ESU employees regarding various topics about the Hales, such as teaching assignments, Dr. Hale's behavior, Dr. Hale's practicum, Plaintiff's graduate assistant, archives studies program, "a personnel issue," Plaintiff and Deb Rittgers, and archives practicum site visit. The emails range in date, some sent during the mid-June 2015 time frame, while others were sent as late as August 27, 2015. All but two of the identified series of emails include ESU's general counsel Johnson as a recipient.  ESU argues that these emails reflect either a request to discuss issues with legal counsel or a discussion with its attorney and therefore are protected from discovery under the attorney-client privilege.

Federal Rule of Evidence 501 provides that privileges in federal question cases are generally governed by the common law "as interpreted by United States courts in the light of reason and experience." In contrast, in civil cases in which "state law supplies the rule of

---

[41] Identified on ESU's privilege log as AGO-000035–41, AGO-000173–184, AGO-000329–339, and AGO-000366–376.

decision," state law also governs the privilege.[42] Plaintiff's claims in this case arise under federal statute, therefore federal law (instead of state law) governs any claim of privilege, including the attorney-client privilege.

> Under federal common law, the essential elements of the attorney-client privilege are:
>
> (1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at [the client's] instance permanently protected (7) from disclosure by [the client] or by the legal advisor, (8) except if the protection is waived.[43]

The party asserting the attorney-client privilege bears the burden to establish its applicability.[44]  Moreover, a party must make a "clear showing" that the privilege applies.[45] The existence of the privilege is determined on a case-by-case basis.[46]

Attorney-client privilege may attach to documents transmitted between non-attorney employees of a corporate client if the communications are confidential and are for the purpose of obtaining legal advice from an attorney.[47] As recognized in *Williams v. Sprint/United Management Co.*, "[o]rganizational clients and business entities often are personified by a number of employees. In preparation for, or in the midst of, consultations with an attorney,

---

[42] Fed. R. Evid. 501.

[43] *In re Syngenta AG MIR 162 Corn Litig.*, No. 14-MD-2591-JWL, 2017 WL 2555834, at *1 (D. Kan. June 13, 2017).

[44] *Motley*, 71 F.3d at 1550.

[45] *Ali v. Douglas Cable Commc'n*, 890 F. Supp. 993, 994 (D. Kan. 1995).

[46] *Id.* at 396–97.

[47] *High Point SARL v. Sprint Nextel Corp.*, No. CIV.A. 09-2269-CM, 2012 WL 234024, at *13 (D. Kan. Jan. 25, 2012), on reconsideration in part, No. CIV.A. 09-2269-CM, 2012 WL 1580634 (D. Kan. May 4, 2012).

employees of the client will often consult one another to ensure that the attorney's advice is based on full knowledge of all relevant facts."[48]

ESU argues that the email communications from various university personnel seeking direction on how to handle certain issues with the Hales during the investigation constitute requests for legal advice from ESU's general counsel.  Some, but not all, of these communications were initially made to high-level university personnel and then forwarded to general counsel Johnson for response. Many of these communications start with an email from Dr. Hale, followed by an inquiry of the sender regarding how to handle the email in light of the investigation and potential for litigation. ESU argues the attorney-client privilege is not defeated simply because some of the emails are not initiated to or from its general counsel; the privilege applies because communications were made to university personnel seeking legal advice in confidence. The email correspondence relating to the Hales during the investigation seeking advice of counsel meets the requirements of the attorney-client privilege and its disclosure should not be compelled.

As acknowledged by ESU, many of the email strings at issue start with an email exchange between one of the Hales and SLIM Assistant Dean Alexander and are then forwarded to other ESU officials. The Court therefore has conducted an *in camera* review of these email communications to determine whether any should be produced.[49] For example, ESU lists a three-page email string "regarding teaching assignment" as Bates number AGO-000362–364 (privilege

---

[48] *Id.* (citing *Williams v. Sprint/United Mgmt. Co.*, No. 03–2200–JWL–DJW, 2006 WL 266599, at *2 (D. Kan. Feb. 1, 2006)).

[49] The Court is unclear whether ESU may have produced these emails in a redacted form with its privilege log entry only pertaining to the redactions of those emails.  For purposes of the ruling herein, the Court assumes all documents identified by ESU (by Bates number range) on its privilege log were <u>not</u> produced, in either redacted or unredacted form.

18

log 63), but a review of the email string shows that two and a half of the three pages withheld are emails only between Alexander and the Hales.  Another example is a two-page email string "regarding payment resolution of Dr. Hale's practicum" (Bates number AGO-000433–434) (privilege log 69). A review of the emails reveals that all but the last email in the string are between only Alexander and the Hales.  ESU cannot claim attorney-client privilege with respect to the emails between its employees and the Hales without some showing those emails contain confidential attorney-client privileged or work-product information that was not disclosed to the Hales.  All of the withheld emails at issue between only ESU employees and the Hales must be produced to Plaintiff.[50]

Based upon the Court's *in camera* review of the email string communications, it finds that the Bates numbered documents listed in the table below either were sent to or received from the Hales, do not contain any attorney-client privileged communications, or do not constitute work product and should be produced:

| Privilege log number | Bates number range of document withheld | Bates number of documents to be produced |
| --- | --- | --- |
| 63 | AGO-000362–364 | AGO-000362 through AGO-000364 |
| 67 | AGO-000425 | AGO-000425 |
| 68 | AGO-000431–432 | Partial redacted AGO-000432 (redacting 6/17/2015 email to Cordle) |
| 69 | AGO-000433–434 | Partial redacted AGO-000433 (redacting 6/19/2015 email to |

---

[50] Even though the Hales sent and received the emails, the Hales may not have access to them since the Hales are no longer employed by ESU.

| | | general counsel Johnson) and unredacted AGO-000434 |
|---|---|---|
| 70 | AGO-000435–436 | Partial redacted AGO-000436 (redacting 6/19/2015 email to Johnson) |
| 71 | AGO-000437–441 | AGO-000441 |
| 72 | AGO-000442 | None |
| 73 | AGO-000443–444 | Partial redacted AGO-000443 (redacting 7/7/2015 email to Johnson) and full unredacted AGO-000444 |
| 74 | AGO-000445–447 | AGO-000446 through AGO-000447 |
| 75 | AGO-000450–454 | AGO-000452 through AGO-000454 |
| 76 | AGO-000459–460 | None |
| 77 | AGO-000461–464 | Partial redacted AGO-000463 (redacting 7/23/2015 email to Cordle) and unredacted AGO-000464 |
| 96 | AGO-000489–490 | Partial redacted AGO-000489 (redacting 8/27/2015 email from Alexander to Johnson, et al.) and unredacted AGO-000490 |

**D.    July 10, 2016 Email to and Memorandum from General Counsel**

ESU's privilege log entry 44 describes the document withheld as a July 10, 2015 email

from Vietti to Lauber and Johnson, while log entry 45 is a July 10, 2015 memorandum from

Johnson to Vietti and David Cordle. ESU claims this email to and memorandum drafted by its

general counsel reflects advice of counsel and is therefore exempt from discovery under the

attorney-client privilege.

ESU has provided an affidavit from its general counsel, Johnson, in which he states that "[o]n July 10, 2015, I provided legal counsel to my client [ESU] by recommending [ESU Interim President] Vietti initiate a request for an investigation into the Hales' allegations."[51]

Based upon this information, the Court finds that ESU has shown the July 10, 2015 email to and memorandum drafted by its general counsel is exempt from discovery under the attorney-client privilege. Plaintiff's motion to compel with respect to privilege log entries 44 and 45[52] is DENIED.

### E.    Independent Consultants' Reviews

ESU's privilege log entries 97 and 98[53] describe the withheld documents as "Review of Investigation." The log entry 97 document is from attorney Dennis Lacey to Vietti and Johnson, while log entry 98 document is from HR consultant Janis Purdy to Vietti. ESU claims these reports are not discoverable under the attorney-client privilege, as work product, or because the authors should be considered non-testifying experts.

Plaintiff argues that the outside consultants were not retained to provide legal advice, but were hired for non-privileged purposes and were merely reviewing the work done by Lauber. She again points to Vietti's September 9, 2015 letter to ESU faculty, staff, and students, wherein Vietti stated the two external, independent consultants' reviews "encompassed an analysis of the process used to conduct the investigation and an assessment of the evidence upon which the

---

[51] Johnson Aff. ¶¶ 3–4, ECF No. 66-1.

[52] Identified on ESU's privilege log as AGO-000231 and AGO-000232–234.

[53] Identified on ESU's privilege log as AGO-000494–497 and AGO-000498–501.

findings and conclusions are based."[54]  Plaintiff argues that reviewing "results" is not a process-oriented endeavor and does not amount to legal advice.

With respect to the attorney consultant Lacey, the Court finds that his report meets all the elements of attorney-client privilege.  Lacey's report is a confidential communication from a professional legal advisor to his client, ESU, relating to legal advice sought by ESU, and there is no indication that ESU has waived any privilege by disclosing the report to third parties.

ESU claims the second report, prepared by a HR consultant, is not discoverable as the work of a non-testifying expert under Rule 26(b)(4)(D). It claims the HR consultant was employed by ESU for purposes of trial preparation and retained after ESU reasonably anticipated litigation with the Hales was imminent.

Fed. R. Civ. P. 26(b)(4)(D) governs the work of non-testifying experts and provides that:

> Ordinarily, a party may not, by interrogatories or deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial. But a party may do so only:
> > (i) as provided in Rule 35(b); or
> > (ii) on showing exceptional circumstances under which it is impracticable for the party to obtain facts or opinions on the same subject by other means.

Based upon the information in the privilege log and ESU's representations made in its response, the Court finds the HR consultant qualifies as a non-testifying expert for the purposes of this litigation under Rule 26(b)(4)(D). It is likely that her report reflects facts or opinions known and gathered by her in the course of her work as a non-testifying expert.

Once the Court determines the protections of Rule 26(b)(4)(D) apply, then the burden shifts to Plaintiff to show the report is discoverable under one of the two exceptions.  In this case,

---

[54] Vietti Sept. 9, 2015 Letter, ECF No. 64-1 at 158.

Plaintiff has made no showing either exception identified in Rule 26(b)(4)(D)(i)–(ii) is applicable.  The first exception is inapplicable because the consultant's report does not involve a Rule 35 mental or physical examination. The second exception requires showing "exceptional circumstances" under which it is impracticable for the party to obtain facts or opinions on the same subject by other means. Plaintiff has made no such showing.  The Court therefore concludes that the HR consultant's report is not discoverable under Rule 26(b)(4)(D). Plaintiff's motion to compel with respect to privilege log entries 97 and 98 is DENIED.

### F.    Other Lauber Documents Withheld

Several documents not included in any of the five categories above are listed on the privilege log as entries 5, 7, 10, 41–43, 46, 62, 65, and 95.[55]  All these documents were prepared by Lauber and contain vague descriptions such as "typewritten notes for meeting," "handwritten charts," "handwritten notes," "notes," "notes regarding questions for Robin," and "notes regarding investigation and interviewees." ESU indicates in its privilege log all these documents reflect "work product of attorney's agent." Privilege log entries 41 through 43 also indicate they contain the "mental impressions of agent to general counsel."

Due to the vague nature of the descriptions provided by ESU in its privilege log, the Court reviews these documents *in camera*.  Based upon its review, the Court finds all of the documents constitute work product or contain protected mental impressions and thus should not be produced.  Plaintiff's motion to compel with respect to privilege log entries 5, 7, 10, 41–43, 46, 62, 65, and 95 is DENIED.

---

[55] Identified on ESU's privilege log as AGO-000067, AGO-000069–70, AGO-000073, AGO-000225, AGO-000226, AGO-000228–230, AGO-000247–248, AGO-000359, AGO-000378, and AGO-000488.

## V.    REQUEST FOR REASONABLE EXPENSES UNDER FED. R. CIV. P. 37(a)(5)

Defendants request their reasonable expenses, including attorney's fees, under Fed. R. Civ. P. 37(a)(5) for responding to Plaintiff's Motion. Federal Rule of Civil Procedure 37(a)(5)(C) provides that if a motion to compel discovery "is granted in part and denied in part, the court . . . may, after giving an opportunity to be heard, apportion the reasonable expenses for the motion." In light of the rulings herein, the Court finds that each party shall bear its own expenses related to this motion. Defendants' request to recover their expenses in opposing Plaintiff's Motion to Compel is DENIED.

**IT IS THEREFORE ORDERED** that Plaintiff's Motion to Compel Production of ESU's Litigation Files and Attorney-Client Communications (ECF No. 63) is granted in part and denied in part, as set forth herein.

**IT IS FURTHER ORDERED** that each party shall bear their own costs related to the motion.

**IT IS SO ORDERED.**

Dated in Kansas City, Kansas, on this 20th day of February 2018.

*Teresa J James*

Teresa J. James
U. S. Magistrate
Judge