## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ANGELICA HALE,

      Plaintiff,

v.                                               Case No. 16-4182-DDC

EMPORIA STATE UNIVERSITY,

      Defendant.

_____

## MEMORANDUM AND ORDER

After a two-day bench trial, this matter is before the court on pro se plaintiff Angelica Hale's Title VII retaliation claim against defendant Emporia State University ("ESU"). Ms. Hale asserts that—after she discovered and reported a racial slur found in a graduate teaching assistant's notebook—ESU retaliated against her. According to Ms. Hale's claim, ESU retaliated her by refusing to renew her temporary employment appointment and by failing to select her for a full-time position. Under Federal Rule of Civil Procedure 52, the court sets forth its findings of facts and conclusions of law. And, for reasons discussed below, the court finds in Ms. Hale's favor on her retaliation claim.

### I.    Legal Standard

"In an action tried on the facts without a jury . . . , the court must find the facts specifically and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). While this rule "does not require inordinately detailed findings," the court must provide enough detail to "indicate the factual basis for the ultimate conclusion." *Colo. Flying Acad., Inc. v. United States*, 724 F.2d 871, 878 (10th Cir. 1984) (quoting *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 422 (1943)); *see also OCI Wyo., L.P. v. PacifiCorp*, 479 F.3d 1199, 1204–05 (10th Cir. 2007)

(holding that a district did not satisfy its duty under Rule 52(a) when it failed to set out facts supporting its verdict).

## II.     Findings of Fact

Before presenting the findings of fact, the court recounts several procedural decisions that limited the trial's scope and, ultimately, the record's breadth.  Specifically, at trial, the court addressed intertwined issues about Ms. Hale's witnesses that arose from her pretrial disclosures and trial subpoenas.

### A.     Rule 26 Disclosures and Trial Subpoenas

The Pretrial Order in this case directed the parties to file their final witness and exhibit disclosures under Federal Rule of Civil Procedure 26(a)(3) by December 26, 2018.  Doc. 123 at 1.  In December 2018, Ms. Hale filed her "Potential Witness & Exhibit List," (Doc. 132), which cogently set out Ms. Hale's planned exhibits and trial witnesses.  Ms. Hale listed 17 potential witnesses.  ESU filed a timely objection to Ms. Hale's witnesses and exhibits.  Doc. 137.  ESU asserted that Ms. Hale had not disclosed 12 of her 17 proposed witnesses under Rule 26(a) or (e).  Ms. Hale filed a Response (Doc. 140), and the court addressed ESU's objection before the trial started.  Because Ms. Hale had not disclosed the 12 disputed witnesses—and the failure to disclose these witnesses was not substantially justified or harmless—the court concluded that Rule 37(c)(1) prevented Ms. Hale from calling those witnesses at trial.

But, the court next considered whether Ms. Hale could call any of the precluded witnesses by cross-referencing ESU's pretrial disclosures.  Specifically, Ms. Hale listed "[a]ny witness identified by Plaintiff or any other party."  Doc. 140 at 2.  And, the court concluded that this portion of Ms. Hale's disclosure was sufficient.  The court thus decided that—for Rule 26

2

purposes—Ms. Hale was not barred from calling four witnesses identified by ESU: Jackie Vietti, Judy Anderson, David Cordle, and Mirah Dow.

This decision generated yet another witness issue: Ms. Hale represented that she had served a trial subpoena on Dr. Vietti by certified mail, but Dr. Vietti had failed to appear. First, the court considered whether delivery of a trial subpoena by certified mail complies with Rule 45's service requirement. The court concluded it did. Second, the court considered whether Dr. Vietti's receipt of a defective subpoena permitted her to ignore the subpoena. At trial, Ms. Hale—proceeding in forma pauperis—conceded that she had not included witness or mileage fees with any subpoena she had served.

It's true that a plaintiff is not excused from including a witness fee and mileage with a trial subpoena because of her IFP status. *See Hooper v. Tulsa Cty. Sheriff Dep't*, 113 F.3d 1246 (Table), 1997 WL 295424, at *2 (10th Cir. 1997) (collecting cases). Also, the court recognized a split of authority on the question whether Dr. Vietti could choose to disregard the defective subpoena or, instead, should have filed a motion to quash. 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2465 (3d ed. 2008) ("The better view is that the witness should not be permitted to disregard a subpoena that he or she has not challenged by a motion to quash, but there is authority to the contrary."). The court took the view that Dr. Vietti should have filed a motion to quash. Simply choosing to disregard the subpoena because Dr. Vietti (or her counsel) viewed it as insufficient wasted trial time.[1]

---

[1]    In fact, only one proposed witness—Brenda Rahmoeller—filed a Motion to Quash Subpoena. Doc. 133. Ms. Rahmoeller objected to her trial subpoena under Rule 45(c). Specifically, Ms. Rahmoeller asserted that she lives in St. Louis, Missouri, and thus lived more than 100 miles from the courthouse. During a telephone conference with the parties on January 2, 2019, the court granted Ms. Rahmoeller's motion because Ms. Hale could not compel Ms. Rahmoeller to travel from out of state (Missouri to Kansas) and Ms. Rahmoeller lives more than 300 miles away from the Frank Carlson Federal Building in Topeka, Kansas, the place of trial. Doc. 139.

After addressing these issues, the court exercised its discretion and adjusted the trial schedule. Originally, the trial was scheduled for four days, from Tuesday through Friday. But, in light of the subpoena issue, the court suspended trial on Wednesday so Ms. Hale could correct and re-serve her trial subpoenas. Ms. Hale elected not to re-serve her trial subpoenas. And so, trial resumed on Thursday. As a result, the parties called four total witnesses and submitted 14 exhibits. From this evidence, the court makes the following findings of fact, below.

### B.      Ms. Hale's Temporary Notices of Appointment

Ms. Hale is a black woman. Doc. 78 at 3. In July 2014, Ms. Hale and her husband, Dr. Melvin Hale, were employed by ESU in the School of Library and Information Management—a program commonly referred to as "SLIM." Def.'s Ex. 427, 428, 429; Def.'s Ex. 424 at 6. Ms. Hale worked as a recruitment coordinator as a temporary employee. As a temporary employee, Ms. Hale's employment was based on notices of temporary appointment. Ms. Hale received three notices of temporary appointment over the course of her time at SLIM. David Cordle—ESU Provost and Vice President for Academic Affairs—signed each notice. Provost Cordle is the decisionmaker who decides whether ESU should extend temporary appointments to employees.

ESU limits temporary appointments to about a year. Temporary appointments are not extended indefinitely because the temporary positions are filled without a search; no permanent position is created; and the money for a temporary position is not permanently allocated. Thus, if there is work to be done after a year, ESU must create an actual position. As such, each of Ms. Hale's notices of temporary employment contained the following language: "Inasmuch as this appointment is temporary, it carries with it no expectation of continuing employment. This

appointment is considered to be at-will and may be terminated at any time and without ca[u]se prior to the end date specified in this notice of appointment." Def.'s Exs. 427–29.

Ms. Hale's three Notices of Appointment included the following start and end dates:

- July 21, 2014–November 21, 2014.  Def.'s Ex. 427.
- November 24, 2014–June 6, 2015.  Def.'s Ex. 428.
- June 8, 2015–August 15, 2015.  Def.'s Ex. 429.

Together, these three notices covered a span of just over a year.  In spring 2015, Gwen Alexander—the Dean of SLIM—had discussed creating a full-time position for Ms. Hale with Provost Cordle.  Provost Cordle was skeptical and only agreed to sign the third notice of temporary appointment, which would run until August 15, 2015.

### C.    The Racial Slur, the Hales' Complaints, and ESU's Response

On April 8, 2015, Brenda Rahmoeller, a SLIM graduate assistant, arrived at work. Ms. Rahmoeller found the word "NIGGAZ" written in pencil in a personal notebook. Ms. Rahmoeller reported the slur to Ms. Hale.[2]  And, Ms. Hale took a photo of the page containing the slur on her cell phone.  Ms. Hale then texted the photo to her husband, Dr. Hale. And Dr. Hale reported the slur to Dean Alexander.  Dean Alexander said she would investigate the matter.  But, the Hales felt that Dean Alexander did not address their concerns adequately during the next month.  So, on June 15, 2015, Dr. Hale emailed Provost Cordle expressing his concerns directly to the Provost.

On June 26, 2015, the Hales met with Provost Cordle and Judy Anderson, ESU's Director of Human Resources, to complain about the racial slur.  Provost Cordle told the Hales he would speak with Dean Alexander, and Ms. Anderson suggested that the Hales utilize

---

[2]    At trial, Ms. Hale offered into evidence four pages of ESU's investigative report addressing whether a hate crime was committed.  Pl.'s Ex. 2.  The court admitted this evidence without objection from ESU.  During its case-in-chief, ESU offered the full investigative report into evidence without objection from Ms. Hale.

university administrative procedures to address their concerns.  On July 1, 2015, the Hales filed a

hate crime complaint with the ESU Police Department.  The Hales claimed Debra Rittgers—an

office manager at SLIM—most likely wrote the slur.  The next day, the ESU Police Department

concluded that no crime had been committed.  In response, Dr. Hale emailed ESU Interim

President Jackie Vietti.  Dr. Vietti responded to Dr. Hale and encouraged him to utilize ESU's

administrative procedures.  Dr. Hale replied that he would not utilize ESU's administrative

remedies.

### D. Ms. Hale's Resignation

On July 8, 2015, Dean Alexander responded to an email from Ms. Hale.  Ms. Hale had

asked whether her temporary appointment would be renewed.  Dean Alexander explained that

Ms. Hale's temporary appointment would end on August 15, 2015.  Dean Alexander did not

terminate Ms. Hale's third temporary appointment.[3]  Instead, Provost Cordle—based on ESU's

practice of limiting temporary employment—previously had decided not to offer Ms. Hale a

fourth temporary appointment.  On July 27, 2015, Ms. Hale resigned from her position during

the third term of temporary appointment.

### E. ESU Investigates the Hales' Report

On July 10, 2015, ESU Interim President Jackie Vietti asked Ray Lauber—Associate

Director of Human Resources—to investigate allegations of racial discrimination and harassment

---

[3]      At trial, Ms. Hale offered plaintiff's Exhibit 3.  Exhibit 3 is a memo from the ESU Grievance Committee to
then ESU President Michal Shonrock and Provost Cordle titled, "Observations/Concerns from the Singh Grievance
Process."  The exhibit lists four concerns about Dr. Singh's former employment at ESU.  At trial, Ms. Hale
contended Exhibit 3 was relevant because Dean Alexander had terminated both Dr. Singh and her employment
contracts.  The proper focus in this case on Dean Alexander's purported retaliation against Ms. Hale, not Mr. Singh.
And, the memo is dated October 31, 2014, approximately six months before Ms. Hale discovered and complained
about the racial slur on which she bases her retaliation claim.  In short, the court concludes Exhibit 3 does not have
any tendency to make any fact of consequence at issue in this case more or less probable than it would be without
the evidence.  *See* Fed. R. Evid. 401 (defining relevant evidence).  The court thus sustains ESU's objection to
Exhibit 3.

in SLIM.  On August 20, 2015, Mr. Lauber submitted his report ("ESU Report") to Dr. Vietti.

The ESU Report, which ESU offered into evidence at trial, addressed three questions:  (1) Was a

hate crime committed on or about April 8, 2015?; (2) Has racial discrimination occurred in SLIM

during the 2014–15 academic year?; and (3) Are there further observations or recommendations

to be made for SLIM?  Def.'s Ex. 424 at 1.  On the second question, Mr. Lauber concluded that

no evidence of discrimination was found where "race or other protected class served as the

rational[e] for unfavorable treatment."  *Id.* at 3.  Mr. Lauber also memorialized the following as a

conclusion of ESU's investigation:

> Additionally, although not racially motivated, it is the conclusion of
> this investigation that Angelica's meeting with the Provost did play
> a part in Dr. Alexander's decision not to reappoint [Ms. Hale] to the
> temporary position or to post the vacancy.  The investigation also
> determined that a common understanding in the department existed
> that the position would be posted in such a way that the result would
> be Angelica's selection as candidate.

*Id.*  And, in a different section of the ESU Report, Mr. Lauber assessed whether Dean

Alexander's failure to post the marketing coordinator vacancy—a position Ms. Hale for which

anticipated applying—was the result of Ms. Hale's meeting with Provost Cordle.  The report

concluded that the decision "not to post a position for [Ms. Hale] to apply for appears, in part, to

be a result not of race, but in response to the meeting [the Hales] had with [Provost] Cordle."  *Id.*

at 19.  And, the ESU Report asserts, the "expectation of continued employment was set."  *Id.*

The ESU Report made several explicit findings Ms. Hale's expectation of employment and Dean

Alexander's decision not post the vacancy, reproduced verbatim as follows:

- Multiple employees, other than the Hales, relayed it was clear, although
  undocumented, from department meetings that a position requiring specific skill
  sets would be posted and those employees understood the position to be designed
  for [Ms. Hale]

- Although [Dean Alexander] states that the decision to not renew [Ms. Hale] in the position was made prior to the [Hales'] contact with [Provost Cordle], [Dean Alexander] did not communicate the change in direction of recruiting for the position to [Ms. Hale] until after the June 26 meeting with [Provost Cordle]

- [Dean Alexander] stated that [the change in direction of recruiting for the position] was a departure from how she would normally handle these circumstances as having someone in position is perceived as a mechanism for protecting the position line and funding

- Documented performance issues [about Ms. Hale] primarily came after the June 26 meeting with David

## III.   Conclusions of Law

### A.   The Parties' Arguments

Plaintiff's retaliation argument is two-fold.  First, plaintiff asserts that defendant ESU terminated her employment by refusing to renew her temporary employment appointment as retaliation for complaining about racial discrimination.  Second, plaintiff contends that, but for her complaint to Provost Cordle, Dean Alexander would have posted—and plaintiff would have received—a full-time position as a marketing coordinator in SLIM.

In its post-trial brief, ESU contends that Ms. Hale has failed to show causation.  Doc. 147 at 8.  Specifically, ESU argues, Ms. Hale has not met her burden to show that—but for her complaint—Provost Cordle would have offered Ms. Hale a fourth temporary appointment.  ESU never addressed, however, whether Ms. Hale has proved that Dean Alexander would have posted a full-time position and selected Ms. Hale but for her complaint.

Ms. Hale contends that she has established the requisite causation by a preponderance of the evidence.  Namely, Ms. Hale contends that the temporal proximity between June 26, 2015— when the Hales met with Provost Cordle—and July 8, 2015—when Dean Alexander informed Ms. Hale that her contract was not being renewed and ESU was changing how they would recruit for the full-time position—establishes a causal connection.  Ms. Hale also contends that the ESU

Report provides direct evidence of retaliation.  Taken together, Ms. Hale asserts, she has shouldered her burden.

### B.    Retaliation[4]

Title VII prohibits an employer from discriminating against an employee "because [she] has opposed any practice made an unlawful employment practice by this subchapter, or because [she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  To establish a retaliatory discharge claim under Title VII, "a plaintiff must establish that the decision to terminate her resulted from retaliatory animus."  *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 549 (10th Cir. 1999).  A plaintiff can satisfy this burden in one of two ways.  *Id.*

"Typically, a plaintiff will rely on the familiar framework" of the *McDonnell Douglas* burden-shifting test.  *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)).  The *McDonnell Douglas* framework consists of three parts.  First, it requires a plaintiff to establish a prima facie case of retaliation by showing that: "(1) [s]he engaged in protected activity; (2) [s]he suffered an adverse employment action; and (3) there is a causal connection between [her] protected activity and the adverse employment action."  *Davis v. Unified Sch. Dist. 500*, 750 F.3d 1168, 1170 (10th Cir. 2014) (citing *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011)).  "The Supreme Court has recently clarified the causation standard for Title VII retaliation claims, explaining:  '[A] plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.'"  *Id.* (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362

---

[4]    Ms. Hale's case is confined to a Title VII retaliation claim.  And so, the court makes no finding—nor does it intend to suggest—that ESU discriminated against Ms. Hale on the basis of race under Title VII.  Also, the court passes no judgment on whether a hate crime was committed, a discussion well beyond the scope of this case.

(2013)).  Next, if plaintiff meets this prima facie burden, the burden shifts to defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action.  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1195 (10th Cir. 2011).  And, last, where defendant discharges its burden, the burden shifts back to plaintiff, requiring her to show that defendant's proffered reasons for its actions are pretextual.  *Id.* (citing *Young v. Dillon Cos.*, 468 F.3d 1243, 1249 (10th Cir. 2006)).

The alternative method used by retaliation plaintiffs to prove retaliatory animus is by providing direct evidence of retaliation.  *Medlock*, 164 F.3d at 550.  In direct evidence cases, "the *McDonnell Douglas* framework is inapplicable."  *Id.* (citing *Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 557–58, 560 (10th Cir. 1996)).  "'Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption.'"  *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007) (quoting *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 855 (10th Cir. 2007)).

Because ESU argues that Ms. Hale has not shouldered her burden to establish causation, the court carefully considers the legal standard for this element of the claim.  As the Supreme Court has explained,  "[c]ausation in fact—*i.e.*, proof that the defendant's conduct did in fact cause the plaintiff's injury—is a standard requirement of any tort claim," including "federal statutory claims of workplace discrimination."  *Univ. of Tex. Sw. Med. Ctr.*, 570 U.S. at 346. Thus, "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."  *Id.* at 352.  As the Tenth Circuit has explained, establishing but-for causation "must be based on more than mere speculation, conjecture, or surmise."  *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014) (quoting *Bones v. Honeywell*

*Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)).  And, plaintiff bears the burden to prove

causation.  *Shabestari v. Utah Non-Profit Hous.*, 377 F. App'x 770, 773 (10th Cir. 2010).

### C.    Conclusions

#### 1.  Protected Activity

The court concludes that Ms. Hale has shown—by a preponderance of the evidence—

that she engaged in a protected activity when she complained about the racial slur found in the

notebook.  To show that she engaged in a protected activity, Ms. Hale "doesn't need to show that

she reported an actual Title VII violation; rather she must only show 'a reasonable good-faith

belief' that she opposed discrimination."  *Fassbender v. Correct Care Sols., LLC*, No. 17-3054,

2018 WL 2208473, at *11 (10th Cir. May 15, 2018) (citation omitted).  The evidence adduced at

trial satisfied this requirement.

Title VII prohibits discrimination against any individual because of the individual's

"race, color, sex, or national origin."   42 U.S.C. § 2000e-2(a)(1).   "To that end, Title VII

proscribes discriminatory hiring as well as employment practices that permeate the workplace

with 'discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to

alter the conditions of the victim's employment and create an abusive working environment.'"

*Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1138 (10th Cir. 2008) (quoting *Harris v. Forklift

Sys., Inc.*, 510 U.S. 17, 21 (1993)).  So, a victim of a racially hostile work environment may

bring a Title VII action.  *Id.*

Ms. Hale presented evidence sufficient to establish that she engaged in a protected

activity when she reported the racial slur to Dean Alexander and Provost Cordle.  Here, the

evidence showed that Ms. Rahmoeller discovered the word "NIGGAZ" written in a notebook in

her office and showed it to Ms. Hale.  Def.'s Ex. 424 at 21.  And, Ms. Hale complained about the

11

slur both to Dean Alexander, and then, to Provost Cordle.  The word "nigger"—and its derivative

"nigga"—are "powerfully potent discriminatory race-based term[s]."  *Id.* at 1230; *see also*

*Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1145 (10th Cir. 2008) ("[I]t is difficult to imagine a

message more calculated to make an African–American feel unwelcome in the workplace than

"nigger" engraved in his or her individual workspace.").  Also, the ESU Report supports a

conclusion that Ms. Hale subjectively believed she was opposing racial discrimination.

Specifically, the report indicates that Ms. Hale believed the slur constituted a hate crime directed

at her.  Def.'s Ex. 424 at 13.  The court thus concludes that Ms. Hale engaged in protected

opposition to discrimination when she complained about the slur to Dean Alexander and Provost

Cordle.[5]

## 2.  Material Adverse Actions

The court also concludes that Ms. Hale has carried her burden to show two materially

adverse actions by ESU:  (1) ESU's decision not to renew Ms. Hale's temporary appointment,

and (2) ESU's decision not to post a full-time position for Ms. Hale.

An employment action is "materially adverse" where it would "dissuade[ ] a reasonable

worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry.*

*Co. v. White*, 548 U.S. 53, 68 (2006).  Both decisions, which effectively ended any prospect of

---

[5]       The racial slur targeted by Ms. Hale's protected activity emerged in unusual fashion.  On April 7 or 8,
2015, someone wrote "NIGGAZ" on one page of a notebook belonging to a Caucasian graduate student employed
by SLIM.  *See* Def.'s Ex. 424 at 1.  If the slur's drafter intended to target Ms. Hale, the author's aim wasn't very
precise.  The notebook belonged to someone else, and neither Ms. Hale nor her husband "generally accessed" that
notebook.  *Id.* at 2.

But this oddity does not threaten Ms. Hale's capacity to establish the elements of a retaliation claim.  For
one thing, a retaliation plaintiff need not show that she opposed conduct amounting to "an actual Title VII violation.
*Fassbender*, 2018 WL 2208473, at *11.  The Circuit's cases recognize that the slur "NIGAAZ" is a "powerfully
potent" race-based term that reasonably makes an African-American "feel unwelcome in his or her individual
workplace."  *Tademy*, 614 F.3d at 1145.  No dispute exists:  Ms. Hale learned that the slur was deposited in an office
closely connected to her workspace.  And so, the court finds that she possessed a reasonable good-faith belief that
she was opposing discrimination when she complained to Provost Cordle about the slur.

continued employment for Ms. Hale at ESU, would dissuade an employee from making a charge of discrimination.  The governing law recognizes that a failure to renew a contract constitutes an adverse employment action.  *Minshall v. McGraw Hill Broad. Co.*, 323 F.3d 1273, 1279–82 (10th Cir. 2003) (concluding on plaintiff's ADEA claim that plaintiff "offered sufficient evidence on which the jury could reasonably conclude [the employer's] decision not to renew [plaintiff's] contract was impermissibly based on his age); *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 320 (3d Cir. 2008) ("The failure to renew an employment arrangement, whether at-will or for a limited period of time, is an employment action, and an employer violates Title VII if it takes an adverse employment action for a reason prohibited by Title VII[.]"); *Moore v. Farmers Ins. Exch.*, No. 15-CV-9105-DDC-GEB, 2016 WL 5871825, at *6 (D. Kan. Oct. 7, 2016) ("Plaintiff asserts 'she suffered two distinct adverse employment actions'—[the employer] rescinding his recommendation to convert her to full-time employment and later, when defendant fired her.").  Ms. Hale has established two distinct materially adverse actions taken by ESU.

### 3.  Causal Connection

Having concluded that Ms. Hale has proved she engaged in protected activity and that ESU took two materially adverse actions, the court turns to the third element of the retaliation formulation—whether Ms. Hale has proved by the preponderance of the evidence "[c]ausation in fact." *Univ. of Tex. Sw. Med. Ctr.*, 570 U.S. at 346.  Specifically, does the balance of evidence prove "that the desire to retaliate was the but-for cause of the challenged employment action[?]" *Id.* at 352.  Often, this question is at the heart of a retaliation case, and so it is here.

The court considers whether Ms. Hale has satisfied her evidentiary burden to establish a causal connection between her protected activity and two decisions by ESU:  (1) the decision not

to provide Ms. Hale with a fourth temporary appointment, and (2) the decision not to post a full-time vacancy for Ms. Hale.  As the court explains below, the court finds that Ms. Hale has not shown by a preponderance of the evidence that ESU would have offered her a fourth temporary appointment but for her complaint.  But, the court finds, Ms. Hale has established that—but for Ms. Hale's complaint—Dean Alexander would have posted a full-time position specifically formulated for Ms. Hale.

### a.   Failure to Renew Plaintiff's Temporary Employment

Ms. Hale has not established that, but for her complaint, she would have been offered a fourth temporary appointment.  The evidence at trial established that Provost Cordle signed temporary appointments as part of his job responsibilities.  And, the court found credible Provost Cordle's testimony that ESU typically limits temporary appointments to one year.  Provost Cordle explained in his testimony that ESU's customary practice was not to extend temporary appointments beyond approximately a year.  Ms. Hale's Notices of Appointment included the following start and end dates:

- July 21, 2014 to November 21, 2014.  Def.'s Ex. 427.
- November 24, 2014 to June 6, 2015.  Def.'s Ex. 428.
- June 8, 2015 to August 15, 2015.  Def.'s Ex. 429.

Together, the three Notices cover a span of just over a year.

Provost Cordle explained why he signed the third Notice, which ran from June 8, 2015, to August 15, 2015.  According to Provost Cordle, Dean Alexander discussed creating a permanent position for Ms. Hale.  Provost Cordle explained that he was skeptical and was not prepared to agree to Dean Alexander's proposal.  Instead, Provost Cordle only agreed to sign the third Notice.  Provost Cordle also testified that he made this decision in the spring before Ms. Hale discovered the racial slur.  Thus, Ms. Hale has not shown that but for her protected activity of

complaining about racial discrimination, Provost Cordle would have renewed Ms. Hale's temporary appointment.

### b.  Dean Alexander's Failure to Post Full-Time Position

In contrast, Ms. Hale has established by a preponderance of the evidence that—but for her complaint to Provost Cordle on June 26—Dean Alexander would have posted a position for a marketing coordinator in the SLIM program and would have selected Ms. Hale to fill that position.  Two categories of evidence satisfied this burden:  (1) temporal proximity and (2) conclusions contained in the ESU Report.  Both were credible and persuasive.

*First*, temporal proximity supports Ms. Hale's but-for causation argument.  The temporal proximity between a plaintiff's protected activity and the adverse employment action may demonstrate "a causal connection sufficient to 'justify an inference of retaliatory motive.'" *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006) (quoting *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006), *overruled on other grounds by Bertsch v. Overstock.com*, 684 F.3d 1023, 1029 (10th Cir. 2012))).  But temporal proximity alone will not establish the requisite causal connection unless the adverse action "is very closely connected in time to the protected activity."  *Id.* (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)).  The Tenth Circuit has determined that a period of six weeks between the protected activity and the adverse action, standing alone, may establish the requisite causal connection.  *Anderson*, 181 F.3d at 1179.  But a period of three months does not.  *Id.*  Here, the Hales met with Provost Cordle on June 26, 2015, when they complained about Dean Alexander's failure to investigate the racial slur.  Def.'s Ex. 424 at 3. Then, 12 dates later on July 8, 2015, Dean Alexander communicated a change in direction for the recruiting of the marketing coordinator position.  Def.'s Ex. 424 at 19–20.  Dean Alexander

informed Ms. Hale about the "terminal nature of [her] contract," and also stated that, for budget reasons, she was waiting to determine the posting of two positions, including the position for which Ms. Hale would apply.  Def's Ex. 424 at 10.  So, within two weeks of Ms. Hale's protected activity, she learned that the full-time posting was placed on hold.

*Second*, conclusions in the ESU Report provide direct evidence that Ms. Hale's meeting with Provost Cordle influenced Dean Alexander's decision not to post the full-time job position. While Ms. Hale submitted four pages of the ESU Report, ESU chose to admit the full report into evidence during its case in chief.  Def.'s Ex. 424.  This full ESU Report made it clear that the four pages Ms. Hale had offered into evidence came from the summary section of the ESU Report.  *Compare* Pl.'s Ex. 2, *with* Def's Ex. 424 at 1–5.  The full ESU Report is more robust than the four pages offered by Ms. Hale.  It includes a summary and three reports for "those with alleged or potential complaints."  Def.'s Ex. 424 at 6.  Mr. Lauber drafted investigative reports about (1) the Hales; (2) Brenda Rahmoeller; and (3) Debra Rittgers.  *Id.* at 6, 21, 26.  Relevant here is the lead investigator's memorandum to Dr. Vietti entitled "Investigation of racial allegations in the School of Library and Information Management (SLIM) – Hale."  *Id.* at 6. Based on this memo contained in the ESU Report, the court makes the following conclusions.

Ms. Hale has shown by a preponderance of the evidence that but for her complaint, Dean Alexander would have posted the job vacancy.  In the ESU Report about the Hales, Mr. Lauber investigated several claims by the Hales.  They included a claim that "Gwen Alexander has retaliated against their claim of a hate crime by . . . Not appointing [Ms. Hale] to a permanent position."  *Id.* at 14.  Then, the ESU Report concludes that the decision "not to post a position for [Ms. Hale] to apply for appears, in part, to be a result not of race, but in response to the meeting [the Hales] had with [Provost] Cordle."  *Id.* at 19.  And, the report explains that, after Ms. Hale's

16

meeting with Provost Cordle, Dean Alexander communicated a "change in direction of recruiting for the position to [Ms. Hale]." *Id.* at 20. And, importantly, "[Dean Alexander] stated that this was a departure from how she would normally handle these circumstances [because] having someone in position is perceived as a mechanism for protecting the position line and funding." *Id.* Provost Cordle's testimony corroborated this conclusion. At trial, Provost Cordle testified that Dean Alexander had discussed creating a permanent position for Ms. Hale before Ms. Hale complained about the racial slur. Taken together with the close temporal proximity between Ms. Hale's meeting with Provost Cordle and this "change in direction," the ESU Report provides compelling evidence that Dean Alexander decided not to post the vacancy in response to Ms. Hale's complaint to Provost Cordle.[6]

Also, Ms. Hale proved by a preponderance of the evidence that ESU would have selected her for the marketing coordinator position but for her complaint about the slur's use in the workplace. *Cf. Powell v. Lockhart*, 629 F. Supp. 2d 23, 46 (D.D.C. 2009) (finding against plaintiff's Title VII retaliation claim after plaintiff wasn't selected for a full-time position because "contrary to her suggestion that she was somehow promised a full-time position," plaintiff presented no evidence that defendant's justification based on funding and authorization was pretextual). Provost Cordle testified that all permanent positions require a search. But, Ms.

---

[6]       Although ESU focused solely on Provost Cordle's authority for temporary appointments, ESU might have argued that the Provost also possessed sole authority to hire Ms. Hale for a full-time position. But, Ms. Hale presented sufficient evidence to demonstrate that it was more likely than not that Dean Alexander exercised control over the decision. *See Zisumbo v. Ogden Reg'l Med. Ctr.*, 801 F.3d 1185, 1199 (10th Cir. 2015) (explaining that, in a Title VII retaliation case, defendant's argument that one employee, unaware of plaintiff's protected activity, was the sole decisionmaker in terminating plaintiff, may be rejected by factfinder if evidence shows a second employee, aware of plaintiff's protected activity, made the decision jointly). In multiple places, the ESU Report refers to *Dean Alexander's decision* not to post the vacancy. Def.'s Ex. 424 at 3, 19. And, Provost Cordle testified that Dean Alexander approached him about creating a full-time position for Ms. Hale. On cross-examination, Mr. Lauber conceded that Dean Alexander's action. *i.e.*, not renewing Ms. Hale's employment, could be interpreted as retaliation. Taken together, the court concludes that Dean Alexander functioned as a decisionmaker when deciding whether to post and offer the full-time position to Ms. Hale.

Hale has shown by a preponderance of the evidence that, in this case, the search would have amounted to a formality. The ESU Report asserts that the "expectation of continued employment for [Ms. Hale] was set[.]" Def.'s Ex. 424 at 19. Specifically, as ESU reported, "[m]ultiple employees, other than the Hales, relayed it was clear, although undocumented, from department meetings that a position requiring specific skill sets would be posted and those employees understood the position to be designed for [Ms. Hale]." *Id.* The ESU Report reiterated this conclusion in its summary: "[A] common understanding [within] the department existed that the position would be posted in such a way that the result would be [Ms. Hale's] selection as candidate." *Id.* at 3. Taken together, ESU's own statements show by a preponderance of the evidence that—but for her complaint to Provost Cordle—Dean Alexander would have posted a full-time position for Ms. Hale and then would have selected her to fill the position. In sum, Ms. Hale thus has established her prima facie case.

In large measure, ESU simply ignored Dean Alexander's decision not to post the full-time position. And, in its post-trial briefing, ESU focuses only on but-for causation as it applies to the temporary appointment, not the full-time position.[7] That is, ESU did not articulate a credible legitimate, non-retaliatory reason why Dean Alexander chose not to post the full-time position—a position tailormade for Ms. Hale. Instead, ESU advanced a theory that Dean

---

[7]     ESU did move for judgment as a matter of law at the close of Ms. Hale's case-in-chief, contending that Ms. Hale had failed to establish causation. The court denied ESU's motion based in significant measure on the four pages of the ESU Report that Ms. Hale had admitted into evidence. Specifically, this portion of the ESU Report contained evidence that "[Ms.] Hale was informed . . . that the position that had been verbally committed to being posted and for which she could apply . . . was not going to be posted after [Ms. Hale's] June 26, 2015 meeting with Provost Cordle." Pl.'s Ex. 2 at 3. The excerpt from the ESU Report also concluded that "[Ms. Hale's] meeting with the Provost did play a part in Dr. Alexander's decision not . . . to post the vacancy. The investigation also determined a common understanding the department existed that the position would be posted in such a way that the result would be [Ms. Hale's] selection as a candidate." *Id.* In short, Ms. Hale carried her burden during her case-in-chief. And then, the balance of the report—admitted during ESU's case—simply enhanced the strength and depth of Ms. Hale's evidence.

Alexander chose not to post the vacancy because Ms. Hale had gone over Dean Alexander's head when Ms. Hale brought her complaint to Provost Cordle.

This argument misses the mark:  Ms. Hale engaged in protected activity when she met with Provost Cordle.  And, Ms. Hale has shown by a preponderance of the evidence that Dean Alexander's decision not to post the vacancy was in response to that meeting.  Because defendant has not come forward with a legitimate, nondiscriminatory reason why Dean Alexander did not post the vacancy—and in light of the compelling evidence suggesting that Dean Alexander did, in fact, retaliate by deciding not to post the position—the court finds for Ms. Hale on her Title VII retaliation claim.

### D.      Damages

Title VII permits the court to award a successful plaintiff any appropriate relief, including reinstatement, back pay, "or any other equitable relief" that the court deems appropriate. *Daneshvar v. Graphic Tech., Inc.*, 40 F. Supp. 2d 1225, 1239 (D. Kan. 1998) (citing 42 U.S.C. § 2000e-5(g)).  In the Pretrial Order, Ms. Hale sought damages in excess of $3,000,000, broken down as follows:  Loss of Income ($700,000); Compensatory Damages ($1,000,000); and Punitive Damages ($2,000,000).  Doc. 78 at 15.  Also, Ms. Hale requested attorneys' fees and any other available equitable relief.  The court addresses Ms. Hale's damages in light of the evidence presented at trial, below.

#### 1. Compensatory Damages

"Compensatory damages are ordinarily awarded for emotional pain, suffering, mental anguish and other nonpecuniary losses."  *Daneshvar*, 40 F. Supp. 2d at 1240.  And, a plaintiff's own testimony on her compensatory damages may support the court's calculation of compensatory damages.  *See id.*  But, Ms. Hale did not testify at trial.  Nor did Ms. Hale adduce

other evidence from which the court could fashion a non-speculative award of compensatory damages. *See Carey v. Piphus*, 435 U.S. 247, 264 n.20 (1978) ("[A]n award of damages must be supported by competent evidence concerning the injury."). The court thus awards Ms. Hale $1 in nominal damages. *Griffin v. Steeltek, Inc.*, 261 F.3d 1026, 1028 (10th Cir. 2001) ("Nominal damages are a token award, compensatory in nature."); *Barber v. T.D. Williamson, Inc.*, 254 F.3d 1223, 1227 (10th Cir. 2001) (concluding nominal damages are appropriate in Title VII cases).

### 2.   Punitive Damages

Ms. Hale is entitled to recover punitive damages if ESU engaged in discriminatory practices "with malice or with reckless indifference to [her] federally protected rights." 42 U.S.C. § 1981a(b)(1). "'Malice' and 'reckless indifference' require proof the employer acted 'in the face of a perceived risk that its actions [would] violate federal law.'" *Zisumbo v. Ogden Reg'l Med. Ctr.*, 801 F.3d 1185, 1201 (10th Cir. 2015) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535–36 (1999)).

But, "agency principles limit[] vicarious liability for punitive awards." *Kolstad*, 527 U.S. at 541. Ms. Hale thus may not hold ESU "vicariously liable for the discriminatory employment decisions of managerial agents where the [ ] decisions [were] contrary to the employer's good-faith efforts to comply with Title VII." *Id.* (internal quotations and citation omitted). Under Tenth Circuit precedent, good-faith requires that an employer, at minimum, "(1) adopt anti-discrimination policies, (2) make a good faith effort to educate its employees about these policies and Title VII's prohibitions, and (3) make good faith efforts to enforce an anti-discrimination policy." *Zisumbo*, 801 F.3d at 1202 (citations omitted). In short, Ms. Hale had the burden to show that ESU—and not just its managerial employees—failed to make good-faith efforts to comply with Title VII. *Zisumbo*, 801 F.3d at 1202.

Ms. Hale has not met this burden.  Ms. Hale focused her argument at trial almost solely on Dean Alexander's actions.  And, Mr. Lauber testified that ESU did have policies in place to prevent retaliation, harassment, and discrimination, including processes to encourage a culture of reporting.  Although Ms. Hale did not utilize ESU's administrative remedies to bring her complaint, Mr. Lauber testified to those remedies and reporting procedures.  *See Zisumbo*, 801 F.3d at 1202 (suggesting defendant's evidence of comprehensive Title VII policies and training procedures creates an "uphill battle" for plaintiff to receive punitive damages).  The court thus finds that punitive damages are unwarranted in this case.

### 3.  Back Pay and Front Pay

Title VII allows the court to award equitable relief, which includes back pay and front pay.  *Townley v. Servicemaster Co., LLC*, No. 17-2430-DDC-JPO, 2017 WL 4843296, at *7 (D. Kan. Oct. 25, 2017).  Back pay awards generally cover the time up until the date of judgment.  *Daneshvar*, 40 F. Supp. 2d at 1239 (citing *Daniel v. Loveridge*, 32 F.3d 1472, 1477 (10th Cir. 1994)).  The district court retains discretion over back pay awards.  *Id.* (citations omitted).

Front pay, in contrast, "is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement."  *McInnis v. Fairfield Communities, Inc.*, 458 F.3d 1129, 1145 (10th Cir. 2006).  "Front pay is an equitable remedy awarded by the court (not the jury)."  *Whittington v. Nordam Grp. Inc.*, 429 F.3d 986, 1000 (10th Cir. 2005) (citing *Denison v. Swavo Geolograph Co.*, 941 F.2d 1416, 1425–27 (10th Cir. 1991)).  Reinstatement and front pay are mutually exclusive, and, while reinstatement is preferred, the court may choose front pay due to the level of animosity between the parties.  *Daneshvar*, 40 F. Supp. 2d at 1240–41.  And, "[t]he amount [of front pay], if any, is set in the court's discretion[.]"  *Id.*  As the Tenth Circuit has explained,

21

> Numerous factors are relevant in assessing front pay including work life expectancy, salary and benefits at the time of termination, any potential increase in salary through regular promotions and cost of living adjustment, the reasonable availability of other work opportunities, the period within which the plaintiff may become re-employed with reasonable efforts, and methods to discount any award to net present value.

*Whittington*, 429 F.3d at 1000–01 (10th Cir. 2005); *Carter v. Sedgwick Cty.*, 929 F.2d 1501, 1505 (10th Cir. 1991) (determining front pay must be based on "more than mere guesswork"). Neither party has briefed the issue of reinstatement or front pay, so the court cannot meaningfully apply the relevant factors. *Compare Whittington*, 429 F.3d at 1001 (concluding no evidentiary hearing was needed on front pay issue when the parties had fully briefed the question), *with Hansel v. Pub. Serv. Co. of Colo.*, 778 F. Supp. 1126, 1136 (D. Colo. 1991) (setting hearing on front pay because the parties had not proffered evidence on front pay factors during bench trial). To address this chasm in the evidence, the court directs Ms. Hale to submit briefing addressing whether front pay or reinstatement, and back pay are appropriate within 30 days of this Order's entry. ESU may file a response within 30 days of Ms. Hale's submission. Either party may request a hearing on its briefing.

### 4.  Attorneys' Fees

Ms. Hale is not entitled to recover attorneys' fees because she proceeded pro se throughout the case. The Supreme Court has concluded that an attorney who proceeds as a pro se litigant in a 42 U.S.C. § 1988 claim is not eligible to recover attorneys' fees. *Kay v. Ehrler*, 499 U.S. 432 (1991). And, several circuits have expanded the holding against parties who are attorneys under other fee-shifting statutes, including Title VII. *See, e.g.*, *Zucker v. Westinghouse Elec.*, 374 F.3d 221, 228 (3d Cir. 2004) ("[A]fter the *Kay* decision the courts of appeals have denied attorney's fees to pro se attorneys under a variety of fee-shifting statutes, including the

Equal Access to Justice Act (EAJA), FOIA, and Title VII."). Extending the logic of these holdings, the court declines to make an attorneys' fee award to Ms. Hale. *See Hillman v. U.S. Postal Serv.*, No. 97-4041-SAC, 2001 WL 1448578, at *5 (D. Kan. Sept. 14, 2001) (concluding pro se plaintiff, who received favorable jury verdict in Title VII discrimination and retaliation claim, was not entitled to receive attorneys' fees).

### 5. Costs

As the prevailing party, Ms. Hale is entitled to her costs. Under Federal Rule of Civil Procedure 54(d)(1), "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." *See also Barber*, 254 F.3d at 1234 (concluding plaintiff in Title VII suit who received nominal damages was "prevailing party" and presumptively entitled to award of costs). The court finds no pertinent reason to depart from the general rule, thus Ms. Hale is entitled to recover her costs. She may submit a bill of costs in compliance with the Federal Rules of Civil Procedure and the District of Kansas's Local Rules.

## IV. Conclusion

For reasons explained above, the court finds for Ms. Hale on her Title VII retaliation claim. The court awards her nominal damages of $1. Although Ms. Hale is not entitled to recover attorneys' fees or punitive damages, she may recover her costs. And, Ms. Hale may submit briefing addressing whether front pay or reinstatement, and back pay are appropriate. She must make her filing within 30 days of this Order's. ESU may file a response within 30 days of Ms. Hale's filing.

**IT IS THEREFORE ORDERED BY THE COURT THAT** the court finds in plaintiff's favor on her Title VII retaliation claim.

**IT IS FURTHER ORDERED THAT** Ms. Hale is awarded nominal damages of $1.

Ms. Hale is not entitled to attorneys' fees or punitive damages, but she may recover her costs.

**IT IS FURTHER ORDERED THAT** Ms. Hale may submit briefing addressing whether

front pay or reinstatement, and back pay are appropriate within 30 days of this Order's entry.

ESU may file a response within 30 days of Ms. Hale's filing.

**IT IS SO ORDERED.**

**Dated this 16th day of July, 2019, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**