## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

ANGELICA HALE,

     Plaintiff,

v.

EMPORIA STATE UNIVERSITY,

     Defendant.

Case No. 16-4182-DDC-TJJ

## MEMORANDUM AND ORDER

After a two-day bench trial in January 2019, pro se[1] plaintiff Angelica Hale prevailed on her Title VII retaliation claim against her former employer, defendant Emporia State University ("ESU"). *See generally* Doc. 149-1. After trial, the court awarded Ms. Hale nominal damages of one dollar because it lacked sufficient evidence to fashion appropriate relief. *Id.* at 20. But, it allowed Ms. Hale to submit briefing about whether she is entitled to equitable relief in the form of back pay or front pay. *Id.* at 22. On June 25, 2020, the court held an evidentiary hearing so that the parties could present evidence on the amount of back pay and front pay Ms. Hale deserves to recover. Doc. 190. For reasons explained below court awards Ms. Hale $48,312.03 in back pay, plus $15,991.28 in prejudgment interest. The court denies Ms. Hale front pay.

### I.    Background

The following facts come from the court's July 16, 2019 Memorandum and Order ruling plaintiff's Title VII retaliation claim (Doc. 149-1).

---

[1]     Although Ms. Hale proceeded pro se during the liability phase of this case, she retained counsel for the damages phase.

Ms. Hale is a black woman.  Doc. 149-1 at 4.  ESU employed Ms. Hale and her husband—Dr. Melvin Hale—in its School of Library and Information Management program ("SLIM").  *Id.*  ESU employed Ms. Hale as a temporary employee.  *Id.*  ESU limits temporary appointments to about one year.  *Id.*  During Ms. Hale's employment with SLIM, she received three Notices of Appointment with the following start and end dates:

- July 21, 2014–November 21, 2014.
- November 24, 2014–June 6, 2015.
- June 8, 2015–August 15, 2015.

*Id.* at 5.  Sometime in the spring of 2015, Gwen Alexander—Dean of SLIM—discussed creating a permanent position for Ms. Hale with Provost David Cordle.  *Id.*

Then, on April 8, 2015, a SLIM graduate assistant found a racial slur—the word "NIGGAZ"—written in a notebook in her office.  *Id.*  The graduate assistant reported the slur to Ms. Hale.  *Id.*  Ms. Hale texted a photo of the slur to her husband, Dr. Hale.  *Id.*  Dr. Hale reported the slur to Dean Alexander.  *Id.*  But the Hales felt that Dean Alexander failed to address their concerns, so, on June 26, 2015, the Hales met with Provost Cordle.  *Id.*

On July 8, 2015, Dean Alexander responded to an email from Ms. Hale.  *Id.* at 6.  Ms. Hale's email had asked whether ESU would renew her third temporary appointment, set to expire August 15, 2015.  *Id.*  Dean Alexander responded that Ms. Hale's temporary appointment would end August 15.  *Id.*  Consistent with ESU's policy limiting temporary appointments to a year, Provost Cordle already had decided not to offer Ms. Hale another temporary appointment.  *Id.*

On July 10, 2015, ESU Interim President Jackie Vietti asked Ray Lauber—Associate Director of Human Resources—to investigate allegations of racial discrimination and harassment

in SLIM.  *Id.* at 6–7.  About a month later, Mr. Lauber submitted his report.  *Id.* at 7.  This report concluded:

> Additionally, although not racially motivated, it is the conclusion of this investigation that Angelica's meeting with the Provost did play a part in Dr. Alexander's decision not to reappoint [Ms. Hale] to the temporary position or to post the vacancy.  The investigation also determined that a common understanding in the department existed that the position would be posted in such a way that the result would be Angelica's selection as candidate.

*Id.* (quoting Def. Ex. 424 at 3).  The "vacancy" and "position" Mr. Lauber's report references was a permanent "marketing coordinator" position that ESU had intended to create specifically for Ms. Hale.  *Id.* at 7–8.

Based on this evidence, the court concluded that Ms. Hale had shouldered her burden to show that ESU had retaliated against her by failing to hire her for the marketing coordinator position.  *Id.* at 15.  The court reached this conclusion for two reasons.  First, the temporal proximity between the June 26, 2015 meeting between the Hales and Provost Cordle, and, 12 days later, Dean Alexander's communication to Ms. Hale that she was waiting to post the marketing coordinator position.  *Id.* at 15–16.  Second, the contents of the ESU report, which concluded that the decision "'not to post a position for [Ms. Hale] to apply appears, in part, to be a result not of race, but in response to the meeting [the Hales] had with [Provost] Cordle.'"  *Id.* at 16 (quoting Def. Ex. 424 at 19).  The ESU Report asserts that "'expectation of continued employment for [Ms. Hale] was set," and that other employees "relayed it was clear, although undocumented, from department meetings that a position requiring specific skill sets would be posted and those employees understood the position to be designed for [Ms. Hale].'"  *Id.* at 18 (quoting Def. Ex. 424 at 19).

After the liability phase of the case, the court awarded Ms. Hale one dollar in nominal damages because she had failed to adduce evidence supporting an award of compensatory

damages. *Id.* at 19–20. The court also declined to award Ms. Hale punitive damages. *Id.* at 20–21. But, because the court lacked sufficient evidence to fashion a non-speculative award of back pay or front pay, the court ordered the parties to submit briefing about whether, and how much, Ms. Hale should recover in equitable relief. *Id.* at 21–22. The parties submitted briefs on this topic. Doc. 150 & 153. Then, the court held an evidentiary hearing on June 25, 2020. Afterward, the parties submitted post-trial briefing. Docs. 191, 192, 193, 194. After considering the evidence presented at the June 25, 2020 evidentiary hearing and the parties' submissions, the court now is prepared to rule Ms. Hale's request for back pay and front pay damages.

## II.    Discussion

Title VII allows the court to award equitable relief, which includes back pay and front pay. *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 556 (10th Cir. 1999). "District courts possess considerable discretion to devise appropriate remedies for Title VII violations." *Zisumbo v. Ogden Reg'l Med. Ctr.*, 801 F.3d 1185, 1203 (10th Cir. 2015). The court's analysis begins with back pay. Then it turns to front pay.

### A.  Back Pay

#### 1.  Legal Standard

"'Back pay awards seek to make whole discharged employees for their lost wages . . . .'" *Wulf v. City of Wichita*, 883 F.2d 842, 870 (10th Cir. 1989) (quoting *EEOC v. Sandia Corp.*, 639 F.2d 600, 626 (10th Cir. 1980) (further citation omitted)); *see also Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419 (1975) ("It is also the purpose of Title VII to make persons whole for injuries suffered on account of unlawful employment discrimination."). "If liability is established, back pay should generally be awarded absent unusual circumstances." *Leidel v. Ameripride Servs., Inc.*, 276 F. Supp. 2d 1138, 1142 (D. Kan. 2003) (citing *Albemarle*, 422 U.S.

4

at 418–21).  Ordinarily, back pay covers "the amount of money plaintiff would have earned from the date she was unlawfully terminated to the date the first judgment is entered." *Mathiason v. Aquinas Home Health Care, Inc.*, 187 F. Supp. 3d 1269, 1277 (D. Kan. 2016) (citing *Daniel v. Loveridge*, 32 F.3d 1472, 1477 (10th Cir. 1994)).  But, "[i]n that time, plaintiff is responsible for mitigating her damages." *Id.*; *see also Sandia*, 639 F.2d at 627 (explaining that wrongfully discharged employee must exert reasonable efforts to mitigate her damages).  "The amount of back pay awarded to a Title VII plaintiff is committed to the sound discretion of the district court." *Leidel*, 276 F. Supp. 2d at 1142 (citing *Loveridge*, 32 F.3d at 1477).

## 2.  Back Pay Period

### a.  When does back pay period begin?

The first question is when a back pay award begins.  Ms. Hale resigned from her position at ESU on July 27, 2015.  That date was about three weeks before the end of her third and final term of temporary appointment.  Ms. Hale contends that back pay should begin accruing on July 27, 2015, because ESU constructively discharged her.  Doc. 191 at 2.  ESU disagrees.  It asserts that no constructive discharge occurred.  Doc. 194 at 1.  Instead, ESU asserts, Ms. Hale quit her temporary appointment voluntarily, after ESU told her it would not create a permanent position for her.  *Id.*

The court agrees with ESU on this point.  "A constructive discharge occurs only 'when an employer, through unlawful acts, makes working conditions so intolerable that a reasonable person in the employee's position would feel forced to resign.'" *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 980 (10th Cir. 2008) (quoting *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1135 (10th Cir. 2004)).  "Working conditions must be so severe that the plaintiff simply had no choice but to quit." *Exum*, 389 F.3d at 1135 (citations omitted).  "In contrast, a plaintiff who

voluntarily resigns cannot claim that he or she was constructively discharged." *Id.* "'[D]ifficult or unpleasant'" circumstances are not enough. *Id.* (quoting *Yearous v. Niobrara Cnty. Mem'l Hosp.*, 128 F.3d 1351, 1357 (10th Cir. 1997)). Instead, a plaintiff "must show that, at the time of [her] resignation, his employer did not allow him the opportunity to make a free choice" about her employment status. *Id.* (citing *Yearous*, 128 F.3d at 1357).

Ms. Hale testified that she resigned because she was being harassed. But she did not elaborate on this testimony or identify any specific acts of harassment. The court did not find her testimony on this point credible. And even if Ms. Hale had adduced evidence of harassment, "'[a] hostile-environment constructive discharge claims entails something more [than conduct that amounts to actionable harassment]: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign.'" *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 961 (10th Cir. 2012) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004)). Because Ms. Hale presented no credible evidence of intolerable working conditions, she failed to carry her "substantial" burden of showing constructive discharge. *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 805 (10th Cir. 2007); *see also Winsor v. Hinckley Dodge, Inc.*, 79 F.3d 996, 1002 (10th Cir. 1996) ("A Title VII claimant 'bears the burden of proving she was constructively discharged by a preponderance of credible evidence . . . .'" (quoting *Hirschfeld v. N.M. Corrs. Dep't*, 916 F.2d 572, 580 (10th Cir. 1990)). This conclusion means that plaintiff is not entitled to back pay for the roughly three weeks between her voluntary resignation and the end of her third temporary appointment.

This conclusion also makes it more difficult to discern the date when back pay began accruing. "Typically, back pay is calculated from the date of wrongful termination to the end of trial." *Zisumbo*, 801 F.3d at 1203. Here, however, no "termination" in the usual sense occurred.

6

Instead, ESU retaliated against plaintiff by failing to post a permanent marketing coordinator position and hire Ms. Hale for that position.  Doc. 149-1 at 17–18.  ESU contends that this set of facts is more like a failure-to-hire case than it is a wrongful termination case.  Doc. 192 at 2. And, ESU asserts, a plaintiff who proves discriminatory failure-to-hire "is entitled to an award of back pay from the date on which the applicant hired for that position began employment through the date of trial."  *Id.* (citing *Sanchez v. Philip Morris Inc.*, 774 F. Supp. 626, 628, 630 (W.D. Okla. 1991)).  ESU contends that because it never created the marketing coordinator position— for Ms. Hale or anyone else—there is no beginning date to use for calculating a back pay award. *Id.*  So, ESU contends, any back pay award is too speculative to award.  Ms. Hale responds that ESU cannot evade damages so easily.  Doc. 193 at 1–2.

On this point, the court agrees with Ms. Hale.  ESU cannot avoid back pay simply because it never created the permanent position intended for Ms. Hale.  *See Albemarle*, 422 U.S. at 421 ("[G]iven a finding of unlawful discrimination, backpay should be denied only for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the economy and making persons whole for injuries suffered through past discrimination.").  ESU's brief relies on *Sanchez*, a failure-to-hire case that calculated back pay from the date when the applicant hired for the position began employment.  774 F. Supp. at 628.  This approach makes sense because it permits a back pay calculation based on when plaintiff—absent discrimination—likely would have begun employment.  But nothing precludes the court from awarding back pay simply because ESU never created or filled the position. Indeed, courts typically award back pay beginning on the date of the discriminatory conduct or when plaintiff could have begun employment.  *See, e.g.*, *Thorne v. City of El Segundo*, 802 F.2d 1131, 1136 (9th Cir. 1986) ("Absent compelling circumstances, when an employer has refused to

hire an employee in violation of that employee's rights under Title VII, the court should compute the backpay award from the date of the discriminatory act until the date of final judgment."); *Dillon v. Coles*, 746 F.2d 998, 1006 (3d Cir. 1984) (affirming trial court's decision to award back pay beginning when plaintiff would have been eligible for hire); *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1276 (11th Cir. 2002) (commencing back pay when defendant's discriminatory conduct deterred plaintiff from applying for open position).

Although ESU's theory does not permit it to avoid back pay altogether, the question when back pay began accruing remains.  Ms. Hale contends that it is reasonable to conclude that ESU would have created a job and offered it to her at the end of her third temporary appointment.  Doc. 193 at 2–3.  It makes little sense for ESU to allow her contract to lapse and place her on extended leave while it created a new position, she asserts.  *Id.*  ESU responds that Ms. Hale's position is too speculative.  It asserts that "there is no evidence in the record indicating how long it would [have] take[n] to create this new job, post it, pick [p]laintiff over the other applicants, and complete the hiring process."  Doc. 192 at 2–3.

ESU is correct that no evidence shows how long it would have taken to hire Ms. Hale for a permanent position.  Provost Cordle testified at trial that all permanent positions require a search.  Doc. 149-1 at 17.  But, given that ESU already intended to hire Ms. Hale for the permanent position, it is reasonable to think that ESU could have approved the position, completed its search, and selected Ms. Hale in a timely fashion.  *See id.* at 18 ("'[A] common understanding [within] the department existed that the position would be posted in such a way that the result would be [Ms. Hale's] selection as candidate.'" (citing Def. Ex. 424 at 3)).

The evidence supports an inference that ESU would have hired Ms. Hale when her third temporary appointment concluded in August 2015.  Ms. Hale already had been working for

SLIM for a year on a temporary basis before her resignation.  It is unlikely ESU would have permitted Ms. Hale's term of temporary appointment to end and then taken months to bring her back to the department in a permanent capacity.  If ESU believed the hiring process would have required a significant amount of time to complete, it should have presented evidence to that effect.  It didn't.  Resolving the ambiguity of when ESU would have hired Ms. Hale against ESU—as the court must when considering back pay—the court adopts August 15, 2015 as the beginning date for back pay.  *See Hance v. Norfolk S. Ry. Co.*, 571 F.3d 511, 520 (6th Cir. 2009) (explaining that back pay calculation does not require "absolute accuracy" and that ambiguities should be resolved against the discriminating employer); *see also Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 156 (3d Cir. 1999) ("Back pay may be awarded even if an exact dollar calculation is impossible" and "uncertainties are resolved against a discriminating employer"); *Arnold v. City of Seminole, Okla.*, 614 F. Supp. 853, 871 (E.D. Okla. 1985) ("Back pay need not be proved to an exact, mathematical certainty.  The wrongdoer bears the risk of the uncertainty it has created." (citations omitted)).  The court thus concludes plaintiff deserves back pay beginning August 15, 2015.

### b.  When does back pay period end?

"District courts possess considerable discretion to devise appropriate remedies for Title VII violations."  *Zisumbo*, 801 F.3d at 1203 (citing *Albemarle*, 422 U.S. at 416–22).  "But the exercise of this discretion must be tied to Title VII's twin purposes of provid[ing] an incentive to employers to avoid discriminatory practices and making persons whole for injuries suffered on account of unlawful employment discrimination."  *Id.* (citations and internal quotation marks omitted).

Mindful of these dual objectives, the court turns to considering when Ms. Hale's back pay award should end.  Although back pay ordinarily "is calculated from the date of wrongful termination to the end of trial," a plaintiff's "back pay may be limited."  *Id.* at 1203.  Typically, the back pay accrual period ends when a plaintiff secures a "substantially equivalent job."  *See Ford Motor Co. v. EEOC*, 458 U.S. 219, 236 (1982) (plaintiff's right to back pay ends when she finds a "better or substantially equivalent job" because she "no longer suffers ongoing injury stemming from the unlawful discrimination").  Retiring, rejecting an offer of reinstatement, or an employer learning about wrongdoing an employee committed while employed also can cut off back pay.  *See, e.g.*, *Zisumbo*, 801 F.3d at 1203 (explaining that courts may limit back pay if an employer learns that the employee—while employed—committed wrongdoing warranting termination); *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 167–68 (2d Cir. 1998) (ending back pay at date of plaintiff's retirement); *U.S. EEOC v. Massey Yardley Chrysler Plymouth, Inc.*, 117 F.3d 1244, 1252 (11th Cir. 1997) (ending back pay when plaintiff rejected employer's pretrial offer of reinstatement).

Here, none of these things happened.  Instead, Ms. Hale testified that she has remained unemployed since resigning from ESU in July 2015.[2]  Doc. 149.  She testified that she and her husband mostly have been homeless since leaving ESU.  She seeks back pay for the entire period she has been unemployed.  ESU, on the other hand, contends that any back pay award should end December 2015 or May 2016.  Doc. 192 at 3.  ESU reasons that, in December 2015, it communicated to Ms. Hale's husband—Dr. Hale—that it would not renew his contract for the next academic year (2016–17).  The Hales relocated to Arizona in December 2015.  Dr. Hale's contract expired in May 2016.  ESU asserts that plaintiff's testimony that she planned to remain

---

[2]     Ms. Hale testified that for a brief period in 2017 she made about $2,000 dollars working part-time at a call center in Wichita, Kansas.  Otherwise, she has been unemployed.

at ESU until her retirement assumes Dr. Hale also would have remained at ESU indefinitely.  *Id.*
But, in fact, the Hales left Emporia in December 2015 and Dr. Hale's contract with ESU ended
in May 2016.  ESU asserts that any back pay award beyond May 2016 would constitute windfall
to Ms. Hale.  *Id.* at 5.

Ms. Hale responds.  She asserts that the end of Dr. Hale's contract with ESU "is not
dispositive on the issue of whether she would have kept her job at ESU" beyond May 2016.
Doc. 193 at 4.  She asserts that defendant's position that she would have left ESU in May 2016—
at the end of her husband's contract with ESU—is speculative.  *Id.*  Ms. Hale contends that if the
art gallery the Hales had established in Emporia had been as successful as the galleries they
previously had maintained in Florida and California, "there is every reason to believe Ms. Hale
would have continued in her position" at ESU beyond the expiration of Dr. Hale's contract.[3]  *Id.*
at 5.

On this point, the court agrees with ESU.  The Hales had moved from California to
Emporia in 2014 because of Dr. Hale's job at ESU.  ESU employed Dr. Hale as a professor in
the SLIM program, the same department where Ms. Hale had worked as a temporary employee.
In December 2015, ESU informed Dr. Hale that it was not renewing his contract for the next
academic year.[4]  His contract expired five months later in May 2016.  Ms. Hale testified that they

---

[3]      Ms. Hale testified that she and her husband opened a gallery in Emporia where they sold artwork
Dr. Hale had created.  Ms. Hale testified that they previously had maintained galleries in Palm Springs,
California and Florida.  Ms. Hale's role with these galleries was assisting Dr. Hale with art sales.  Ms.
Hale testified that, over a 20-year period, she had made about $25,000 marketing these pieces, and that
since 2015, she has made about $2,500.  Ms. Hale also testified that at some point she had secured a
contract with a hotel in Palm Springs where the hotel acquired about 60 pieces of art for about $60,000.
The record is unclear whether these figures represent the total amount of income to the gallery, or just the
amount Ms. Hale earned.  In any event, without more evidence about the financial success of this gallery
in Emporia, the court is not convinced that it represented a compelling reason for the Hales to remain in
Emporia beyond the expiration of Dr. Hale's contract.

[4]      Dr. Hale brought a First Amendment retaliation claim under 42 U.S.C. § 1983 against several
ESU administrators.  Pretrial Order at 22, *Melvin Hale v. Vietti*, No. 16-4183-DDC (D. Kan. Oct. 1,

intended to remain at ESU until their retirement because of Dr. Hale's tenure-track position at ESU.  But, given the turn of events that occurred—*i.e.*, ESU not renewing Dr. Hale's contract— the court is convinced that Ms. Hale likely would have departed ESU in May 2016.  The court is mindful that relocation does not cut off a back pay award automatically.  *See Stone v. D. A. & S. Oil Well Servicing, Inc.*, 624 F.2d 142, 144 (10th Cir. 1980) (declining to hold as a matter of law that relocating shows lack of reasonable diligence in securing comparable employment because "Title VII should not be used to lock . . . persons, fearful of losing backpay awards, into long-term unproductive geographical commitments").  Here, however, the court ends Ms. Hale's back pay not because she chose to leave Emporia in December 2015.  Instead, it ends Ms. Hale's back pay because even if ESU had created a job for her, it is unlikely she would have remained in that job beyond May 2016.

Ms. Hale's employment history supports the conclusion that she was unlikely to have remained in her job at ESU long term.  Her resume shows that she frequently has changed jobs, and never has remained at one job for more than a few years.  Pl. Ex. 4 (Angelica Hale Resume).  From 1988 to 2000, Ms. Hale worked a series of jobs and—except for one position spanning 1996 to 1999—never maintained any one job for more than just a year or two.  *Id.*  In 2000, the Hales relocated to Florida because Dr. Hale had accepted a job there.  Ms. Hale worked at a

---

2018), ECF No. 73.  Dr. Hale's lawsuit arose from the same facts underlying Ms. Hale's lawsuit, *i.e.*, the Hales reporting the racial slur to ESU administrators, and ESU's decision not to renew his contract.  *See id.* at 2–22.  Dr. Hale tried his case to this court, pro se, in July 2019.  The court dismissed as a matter of law several ESU administrator defendants at the close of Dr. Hale's case.  Judgment at 1, *Melvin Hale v. Vietti*, No. 16-4183-DDC (D. Kan. July 15, 2019), ECF No. 134.  Then, the jury returned a verdict in favor of the sole remaining defendant, Provost Cordle.  *Id.*  When asked whether she would have remained at ESU if ESU had created the marketing coordinator position for Ms. Hale—and not renewed Dr. Hale's contract—Ms. Hale testified that she believed the decision not to renew Dr. Hale's contract was because of the Hales reporting of the racial slur incident.  But a jury returned a verdict in Provost Cordle's favor on Dr. Hale's First Amendment retaliation claim.  The court thus is unpersuaded by Ms. Hale's interpretation of events.

company called AuthenTec from 2000 to 2003.  *Id.*  Ms. Hale testified that the company terminated her employment or did not renew her contract—the record is unclear on this point— after three years because it needed someone with certain experience that Ms. Hale lacked.  The next job listed on Ms. Hale's resume is a "community outreach representative" position at Trinity Youth Services in California, which she held from 2007 to 2008.  She testified that she then attended Santa Monica College in 2009 and 2010, earning her associate's degree.  Ms. Hale was not formally employed for the next four years.  Instead, she marketed Dr. Hale's art.  Then, in 2014, the Hales relocated to Emporia because Dr. Hale had secured a position as a professor at ESU.  In short, Ms. Hale's consistent history of frequent job changes belies her testimony that she would have remained at ESU for an extended period.

ESU also invokes a failure-to-mitigate defense.  Doc. 192 at 5–6.  ESU argues that Ms. Hale failed to show mitigation because she presented "voluminous exhibits listing applications she submitted" but "none of those exhibits include the minimum qualifications for any of those job openings."  *Id.*  ESU contends "there is nothing in the record to establish the reasonableness of plaintiff's efforts to find other employment."  *Id.* at 6.  Ms. Hale asserts that she "appl[ied] for scores of jobs in marketing and public outreach over a 5 year period," as well as "numerous low wage retail and customer service jobs."  Doc. 191 at 12–13.

ESU is correct that Ms. Hale must exercise reasonable efforts to secure new employment.  *See Sandia*, 639 F.2d at 627 ("Unquestionably, wrongfully discharged claimants have an obligation to use reasonable efforts to mitigate their damages.").  But ESU misapprehends the burden of proof.  "[T]he employer . . . bears the burden of showing a lack of reasonable diligence."  *Daneshvar v. Graphic Tech., Inc.*, 40 F. Supp. 2d 1225, 1240 (D. Kan. 1998) (citing *Spulak v. K Mart Corp.*, 894 F.2d 1150, 1158 (10th Cir. 1990), *abrogated on other grounds by*

*Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993)); *see also Lints v. Graco Fluid Handling (A) Inc.*, 347 F. Supp. 3d 990, 1009–10 (D. Utah 2018) (explaining that employer carries burden of showing plaintiff "'did not exercise reasonable diligence in mitigating the damages caused by the employer's illegal actions'" (quoting *United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 937 (10th Cir. 1979)). "To satisfy that burden, [defendant] must establish (1) that [plaintiff] could have avoided the damage suffered, *i.e.*, 'that there were suitable positions available which plaintiff could have discovered and for which [s]he was qualified,' and (2) that [plaintiff] 'failed to use reasonable care and diligence in seeking such a position.'" *Fresquez v. BNSF Ry. Co.*, 421 F. Supp. 3d 1099, 1110 (D. Colo. Nov. 4, 2019) (quoting *Sandia*, 639 F.2d at 627).

ESU failed to carry its burden. It presented no evidence of suitable positions for which Ms. Hale could have applied, much less evidence that she failed to seek those positions. *See Daneshvar*, 40 F. Supp. 2d at 1240 (noting that defendant failed to meet its burden to show lack of reasonable diligence because it "failed to introduce evidence that suitable positions were available to plaintiff during the relevant time period"). ESU could have discharged its burden had Ms. Hale made no effort to secure alternative employment. *See Logan v. Pena*, No. 91-2389-JWL, 1993 WL 62316, at *3 (D. Kan. Feb. 9, 1993) ("When a discriminatee makes little or no effort to obtain any type of employment, the court does not need to consider in the abstract whether or not a suitable position for which the plaintiff is qualified might have been offered to the discriminatee if he or she had made the necessary effort to find it." (citations omitted)); *see also Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 16 (1st Cir. 1999) ("Other courts of appeals . . . uniformly have relieved the defendant-employer of the burden to prove the availability of substantially equivalent jobs in the relevant geographic area once it has been shown that the former employee made no effort to secure suitable employment.").

Ms. Hale, however, made at least minimal effort to secure employment after leaving ESU. She introduced as evidence a spreadsheet documenting her job application efforts between 2015 and 2019. Pl. Ex. 1 (Job Search July 2015 to Oct. 2019). Ms. Hale resigned from ESU in late July 2015. The spreadsheet shows that for the remainder of 2015 she applied for six jobs. *Id.* She increased her efforts in January 2016, applying for 13 jobs. *Id.* In February 2016, she applied for two jobs. *Id.* She applied for just one job in March 2016. *Id.* In April and May, she again increased her efforts, applying for 25 jobs total. *Id.* She applied for no jobs in June 2016. *Id.*

While the court isn't convinced that Ms. Hale's efforts represent, as she characterizes them, "extreme diligence," (Doc. 191 at 13), ESU has not shown that she made so little effort that ESU is relieved of its burden to show that there were suitable positions available to Ms. Hale and she failed to apply for them. *See Sandia*, 639 F.2d at 627 (explaining that plaintiff merely must make "an honest good faith effort" to secure employment, but "is not held to the highest standards of diligence" (citation and internal quotation marks omitted)). Her efforts were more diligent than the efforts described in other cases where courts have concluded that plaintiffs have displayed a lack of reasonable diligence. *See, e.g.*, *Booker v. Taylor Milk Co., Inc.*, 64 F.3d 860, 865 (3d Cir. 1995) (concluding that "d[oing] little more than register[ing] with the Job Service and look[ing] through the help-wanted ads" did not represent a good faith attempt to secure employment); *Sellers v. Delgado Coll.*, 902 F.2d 1189, 1195–96 (5th Cir. 1990) (affirming district court's conclusion that plaintiff failed to exercise reasonable diligence where she submitted 19 job applications over an 11-month period and "had a record of failing diligently to pursue employment in her professional field and failing to maintain a history of some permanent employment"). And, in any event, ESU never articulates the amount by which it contends the

court should reduce Ms. Hale's back pay award because of her alleged failure to mitigate.  *See Booker*, 64 F.3d at 866 ("The plain language of section 2000e-5 shows that amounts that could have been earned with reasonable diligence should be used to *reduce or decrease* a back pay award, not to wholly cut off the right to any back pay." (citations omitted)).  The court thus declines to reduce Ms. Hale's back pay award on this basis.

In sum, the court concludes that a back pay award of nine months—ending in May 2016—best "'achieve[s] the broad purpose of eliminating the eff[ects] of discriminatory practices and restoring the plaintiff to the position that she would have likely enjoyed had it not been for discrimination.'"  *Dilley v. SuperValu, Inc.*, 296 F.3d 958, 967 (10th Cir. 2002) (quoting *Fitzgerald v. Sirloin Stockade, Inc.*, 624 F.2d 945, 957 (10th Cir. 1980)).  The court reaches this conclusion because it is unlikely Ms. Hale would have remained at ESU beyond May 2016, given that (1) the Hales had relocated to Emporia because of Dr. Hale's position at ESU, which ended in May 2016, and (2) Ms. Hale's employment history shows a pattern of her holding jobs merely for a year or two.

### 3.   Amount of Back Pay

Because ESU failed to carry its burden to show that the court should reduce an award of damages to Ms. Hale because of a failure to mitigate, the court endeavors to award Ms. Hale the salary and benefits she would have received from August 15, 2015 until May 2016.  *See United States v. Burke*, 504 U.S. 229, 239 (1992) (explaining that wrongfully discharged employee may recover wages he would have earned from the date of discharge to date of reinstatement, plus "lost fringe benefits such as vacation pay and pension benefits"); *Lee Way Motor Freight*, 625

F.2d at 945 (noting that back pay may include fringe benefits such as "health, welfare, and pension benefits").  The court discusses each of these categories of damages, in turn, below.[5]

### a.  Salary

Ms. Hale testified that Dean Alexander represented to her that the permanent marketing coordinator position ESU intended to create for her would be similar to Gwen Larson's position. Ms. Larson served as ESU's Assistant Director of Media Relations.  Her salary was about $56,000 per year.  ESU asserts that it is speculative Ms. Hale would have received the same salary because "the only evidence in the record regarding the salary for this soon to be created job is [p]laintiff's uncorroborated testimony that Dean Alexander told her that the starting salary would be approximately the same as Gwen Larson's salary."  Doc. 192 at 3.  ESU asserts that Ms. Larson's position required a bachelor's degree and had "responsibilities for the entire University."  *Id.*  Ms. Hale, ESU explains, lacked a bachelor's degree and the marketing coordinator position was specific to one department.  *Id.*  Because of these disparities, ESU contends, "it is not reasonable to think that both positions would be paid the same."  *Id.*

ESU is correct that the only evidence in the record about what salary Ms. Hale would have made in the marketing coordinator position is her own testimony.  But, yet again, ESU overlooks the fact that it could have presented evidence about the salary ESU would have paid Ms. Hale.  ESU could have presented testimony by Dean Alexander if it disputed Ms. Hale's version of events.  ESU could have presented evidence about jobs comparable to the one promised to Ms. Hale—and their corresponding salaries—if more appropriate comparisons exist

---

[5]   Ms. Hale also asks the court to enhance her award to reflect the tax burden she would face if the court awards her a lump sum exceeding $160,726.  Doc. 191 at 7.  Because the court awards Ms. Hale less than that amount, this Order does not address her request.  She also seeks to recover amounts she may have earned in annual raises beginning in 2017, and tuition assistance she asserts she would have used to earn her master's degree.  *Id.* at 7–8.  Because Ms. Hale's back pay award ends before 2017 and before she could have earned her master's degree, the court does not consider these requests either.

than Ms. Larson's media relations job.  But ESU presented no evidence about an appropriate

salary for Ms. Hale's promised job.  The court thus concludes Ms. Hale would have made a

salary a $56,000 per year in the marketing coordinator position.  *See Hance*, 571 F.3d at 520

(calculating back pay does not require "absolute accuracy" and ambiguities should be resolved

against the discriminating employer).  Reducing that number to reflect nine months of back pay,

the court awards Ms. Hale $42,000 in salary back pay.

### b.  Health Insurance Benefits

Ms. Hale asserts that "[h]ealth insurance received as a fringe benefit of employment is

recoverable as part of a back pay award."  Doc. 191 at 5 (citing *Munoz v. Oceanside Resorts,*

*Inc.*, 223 F.3d 1340, 1348 (11th Cir. 2000) (noting that fringe benefits such as health insurance

coverage "should be recouped in a back pay award")).  Ms. Hale asserts that her "health care

benefits when she left ESU cost $98.66 per each bi-weekly pay period."  *Id.*  Ray Lauber's[6]

testimony confirmed that, in 2015, Ms. Hale spent $98.66 per pay period on health benefits.  He

also testified that she would have spent the same amount of money on health insurance as a full-

time employee.  ESU's brief never addresses health insurance as a component of a back pay

award.

Ms. Hale is correct that, ordinarily, back pay awards include health benefits.  *Lee Way*

*Motor Freight*, 625 F.2d at 945.  Typically, however, plaintiffs seek the amount the employer—

not the employee—would have paid in premiums.  *See, e.g.*, *EEOC v. Dial Corp.*, 469 F.3d 735,

740 (8th Cir. 2006) ("Health care benefits were awarded in the amount [the employer] would

have paid for premiums, minus any benefits the women had received in the meantime.");

*Galindo v. Stoody Co.*, 793 F.2d 1502, 1517 (9th Cir. 1986) (discussing district court's decision

---

[6]      Mr. Lauber serves as ESU's Director of Human Resources.  When ESU employed Ms. Hale in 2014 and 2015, he served as ESU's Associate Director of Human Resources.

awarding plaintiff back pay for insurance premiums that employer "would have paid on [plaintiff's] behalf had his employment not been interrupted"); *Fariss v. Lynchburg Foundry*, 769 F.2d 958, 966 (4th Cir. 1985) (awarding plaintiff in ADEA action the insurance premiums the employer would have paid as part of back pay award).  Indeed, the court has identified no case where a plaintiff has sought to recover the amount of money she would have paid for health insurance.  Instead, plaintiffs seek the amount the employer would have paid because "[t]he value of being insured for a given period is precisely the amount of the premiums paid" by the employer.  *Farris*, 769 F.2d at 965.

Even if Ms. Hale had sought to recover the amount of money ESU would have paid for her health insurance, "[t]here is a circuit split on whether the value of lost health insurance should be measured by the cost of insurance premiums the employer would have had to pay absent unlawful discrimination."  *Fresquez*, 421 F. Supp. 3d at 1115.  The Tenth Circuit hasn't decided the question.  *Id.*  "The Fifth, Seventh, and Ninth Circuits measure recovery based on actual out-of-pocket expenses."  *Id.* (citations omitted).  "The Fourth and Sixth Circuits measure recovery by the cost of premiums to the employer."  *Id.* (citations omitted).  In *Fresquez*, the District of Colorado concluded that in the back pay context, the approach of the Fifth, Seventh, and Ninth Circuits is the better one.  *Id.* at 1115–16.  *Fresquez* reasoned that measuring lost medical benefits based on "out-of-pocket expenses incurred by the employee for purchasing replacement coverage or paying medical expenses that would have been covered by the employer's policy" makes sense when calculating back pay because it "is the actual measure of damages, and easily calculable."  *Id.*  Here, the court has no evidence about the premiums ESU would have paid for Ms. Hale's health insurance, no evidence whether Ms. Hale purchased replacement health insurance coverage, and no evidence of any out-of-pocket expenses Ms. Hale

might or might not have incurred.  The court thus cannot calculate the value of Ms. Hale's health

insurance benefit under either approach the circuits have endorsed.  Because the court cannot

calculate the value of Ms. Hale's health insurance benefit and she bears the burden of proof, it

denies her request to add the value of her health insurance to her back pay award.

### c.  Retirement Benefits

Ms. Hale also claims she deserves retirement benefits as part of her back pay award.

Doc. 191 at 6.  Indeed, retirement benefits ordinarily are included in a back pay award.  *Lee Way*

*Motor Freight*, 625 F.2d at 945; *see also O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1256

(10th Cir. 2001) (upholding jury verdict awarding retirement benefits in Title VII case).

Mr. Lauber testified that Ms. Hale would have been eligible for ESU's retirement plan

beginning August 2015, one year after she began working at ESU.  *See* Pl. Ex. 8 (Email from

Ray Lauber to Angelica Hale re: "ESU Mandatory Retirement Plan selection needed").  Once an

employee enrolled in the retirement program, ESU would withhold 5.5% of his or her paycheck

and direct it to the retirement account.  Pl. Ex. 8, 9 (ESU Policy Manual).  ESU then would

match 8.5% of the employee's salary each biweekly pay period.  Pl. Ex. 9 (ESU Policy Manual).

Ms. Hale testified that she would have enrolled in ESU's retirement plan when eligible.

She had saved no money for retirement and wanted to maximize her retirement benefits.  The

court found her testimony credible.  Ms. Hale calculated that, based on a $56,000 salary, ESU

would have contributed $396.67 per pay period to her retirement account.  ESU does not oppose

her request.  The court thus awards Ms. Hale $3,570.03 in retirement benefits.  This amount

reflects nine months of contributions to her retirement account that ESU would have made had

Ms. Hale been employed from August 2015 until May 2016.

### d.  Tuition Assistance

Next, Ms. Hale seeks to recover the value of the tuition benefit she would have received as an ESU employee.  Because a plaintiff may recover "additions to straight salary" that serve to make the plaintiff "whole," the court properly may consider the tuition benefit in its back pay calculation.  *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1562 (11th Cir. 1986).  Again, ESU never opposes this request.

ESU's tuition assistance program pays for tuition and student fees for employees to take classes at ESU.  The program limits employees to taking six credit hours per semester.  Mr. Lauber testified that ESU employees are eligible for the program after one year of employment.  Ms. Hale would have been eligible in August 2015.  In 2015, tuition cost $150 per credit hour for employees.  In 2016, tuition cost $155 per credit hour for employees.  Student fees cost $75 per credit hour in 2015 and $77 per credit hour in 2016.

Ms. Hale testified that she intended to rely on ESU's tuition assistance program to earn her bachelor's degree.  She testified that Dean Alexander had encouraged her to earn her degree so that she could advance her career at ESU.  Dean Alexander offered to accommodate Ms. Hale's class schedule and encouraged her to meet with the dean of the interdisciplinary studies department about earning her degree, which Ms. Hale did.  Ms. Hale also testified that she already had enrolled in classes for the fall of 2015 before canceling her enrollment after she resigned in July.  ESU's brief never addresses Ms. Hale's contention that she should recover the value she would have received from the tuition assistance program.

The court found credible Ms. Hale's testimony that she would have availed herself of ESU's tuition assistance program for the fall 2015 and spring 2016 semesters.  Relying on the information Mr. Lauber provided about the cost of tuition and fees, the court calculates the value

of ESU's tuition assistance program for the fall 2015 and spring 2016 semesters as $2,742. The court thus adds $2,742 to Ms. Hale's back pay award to compensate her for the benefit of tuition assistance that she would have received at ESU. This calculation means that Ms. Hale's back pay award—accounting for salary, retirement benefits, and tuition assistance—amounts to a total of $48,312.03.

### e. Prejudgment Interest Rate

Ms. Hale requests prejudgment interest on her back pay award at a rate of 10% per annum. Doc. 191 at 8 (citing Kan. Stat. Ann. § 16-201 ("Creditors shall be allowed to receive interest at the rate of ten percent per asssum . . . .")). ESU never responds to this request.

"Under Title VII, a district court is authorized to grant prejudgment interest on a back pay award." *Loveridge*, 32 F.3d at 1478 (citing *Loeffler v. Frank*, 486 U.S. 549, 557–58) (1988)). "Otherwise, the employer would have an 'interest free' loan on wages due, but unpaid." *Id.* (quoting *Clarke v. Frank*, 960 F.2d 1146, 1153–54 (2d Cir. 1992)). "The rate of prejudgment interest rests within the sound discretion of the trial court." *Leidel*, 276 F. Supp. 2d at 1147 (citing *Kleier Advert., Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036, 1042 n.2 (10th Cir. 1990); and then citing *Loveridge*, 32 F.3d at 1478). "'While the rate of prejudgment interest on a federal claim is a question of federal law, courts generally look to state law to determine the rate.'" *Mathiason*, 187 F. Supp. 3d at 1278 (quoting *Umholtz v. Kan. Dep't of Soc. & Rehab. Servs.*, No. 11-4018-JAR, 2013 WL 5797600, at *1 (D. Kan. Oct. 28, 2013)); *see also Rahn v. Junction City Foundry, Inc.*, 161 F. Supp. 2d 1219, 1241 (D. Kan. 2001) ("Further, the court will order prejudgment interest on the back pay award at the Kansas statutory rate of 10 per cent."). Typically, that 10% interest compounds annually. *Mathiason*, 187 F. Supp. 3d at 1278 (awarding prejudgment interest on plaintiff's back pay award at the Kansas statutory rate of ten

percent, compounded annually); *Leidel*, 276 F. Supp. 2d at 1147 (ordering that prejudgment interest is compounded annually).  Based on a 10% interest rate, compounded annually, Ms. Hale is entitled to prejudgment interest in the amount of $15,991.28.[7]

### B. Front Pay

Ms. Hale seeks 13 years of front pay but acknowledges that an award of two to five years is more consistent with cases decided in this district.  Doc. 191 at 10.  ESU opposes a front pay award.  Doc. 192 at 5.

"[I]f the trial court determines that an award of back pay does not fully redress a Title VII plaintiff's injuries, and reinstatement is not possible, an award of front pay is sometimes appropriate in order to effectuate fully the 'make whole' purposes of Title VII."  *Thornton v. Kaplan*, 961 F. Supp. 1433, 1438 (D. Colo. 1996).  "Front pay is 'money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement' to make the plaintiff whole."  *Zisumbo*, 801 F.3d at 1205 (quoting *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001)).

The parties agree that reinstatement is not feasible in this instance because of animosity and because ESU never created the marketing coordinator position.  Doc. 150 at 5; Doc. 153 at

---

[7]     The court bases this award on the approximately three years between the end date for plaintiff's back pay award in May 2016 and when the court issued its Order deciding for Ms. Hale on her Title VII retaliation claim in July 2019.  Ms. Hale's back pay award doesn't accrue prejudgment interest during the interval between the court's 2019 Order and final judgment because Ms. Hale is responsible for failing to present any evidence at trial that would have permitted the court to fashion an appropriate damages award.  That failure to present evidence about damages at trial—and the court allotting her another opportunity to do so in the form of additional briefing and an evidentiary hearing—does not extend Ms. Hale's back pay award another year.  To permit Ms. Hale to accrue an extra year of prejudgment interest would produce a windfall to her.  *See Cunico v. Pueblo Sch. Dist. No. 60*, 917 F.2d 431, 433–34 (10th Cir. 1990) (affirming trial court's back pay award because it corresponded to the injury sustained and didn't "constitute a windfall to plaintiff").

3.  And because the court already has concluded that 9 months of back pay is sufficient to achieve the "ma[k]e whole" purpose of Title VII, the court denies Ms. Hale front pay.  *Carter v. Sedgwick Cnty., Kan.*, 929 F.2d 1501, 1505 (10th Cir. 1991) ("In light of the remedial purpose of Title VII, an award of front pay should be limited to the amount required to compensate a victim for the continuing effects of discrimination until the victim can be made whole." (citation omitted)).

### III.    Conclusion

The court awards Ms. Hale nine months of back pay, resulting in an award of $48,312.03, plus $15,991.28 in prejudgment interest.  This results in a total award of $64,303.31.  Ms. Hale's back pay award includes her salary, retirement benefit, and tuition benefit.  The court denies Ms. Hale front pay for reasons already explained.  The court concludes that this award best achieves "Title VII's twin purposes of provid[ing] an incentive to employers to avoid discriminatory practices and making persons whole for injuries suffered on account of unlawful employment discrimination."  *Zisumbo*, 801 F.3d at 1203 (citations and internal quotation marks omitted).

**IT IS THEREFORE ORDERED BY THE COURT THAT** Ms. Hale is awarded $48,312.03 in back pay, plus prejudgment interest in the amount of $15,991.28, resulting in a total back pay award of $64,303.31.  The court denies a front pay award.

**IT IS FURTHER ORDERED THAT** the Clerk of the Court is directed to issue a judgment consistent with this Order.

**IT IS SO ORDERED.**

**Dated this 26th day of August, 2020, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**
