**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF KANSAS**

**ANGELICA HALE**,

           *Plaintiff,*

v.

**EMPORIA STATE UNIVERSITY**,

           *Defendant.*

**Case No. 16-4182-DDC**

## PLAINTIFF'S MOTION FOR RECONSIDERATION

Angelica Hale ("Plaintiff" or "Ms. Hale"), appearing pro se, hereby respectfully submits this motion pursuant to FRCP 59(e) and 60(b), and D. Kan. Rule 7.3.

This motion addresses the economic damage inflicted on the Plaintiff by the Defendant for Title VII Retaliation; specifically back pay and front pay. It considers what would have happened if Ms. Hale had been offered, and she had accepted, the position of Marketing Coordinator at Emporia State University (ESU) in 2015. The Court's decision to limit Ms. Hale's back pay to the end of Dr. Hale's contract with ESU in May 2016 was made with the presumption that Ms. Hale would have just up and quit her job for no good reason after May 2016, ostensibly on account of her work history? This presumption does not comport with Ms. Hale's testimony, the facts, common sense, or documentary evidence, enunciated in numerous

exhibits filed with the Court, both in this case, and in the related case of her husband, Dr. Melvin Hale.[1]

## ARGUMENTS AND AUTHORITIES

FRCP 60(b) allows for relief from a final judgment under the following circumstances: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

Local Rule D.Kan.R. 7.3 provides that "[a] motion to reconsider must be based on: (1) an intervening change in controlling law, (2) availability of new evidence, or (3) the need to correct clear error or prevent manifest injustice." *See also Classic Commc'ns, Inc. v. Rural Tel. Serv. Co.,* 180 F.R.D. 397, 399 (D. Kan. 1998). Although the grant or denial of such motions is ultimately "committed to the court's discretion," *Hancock v. City of Oklahoma City*, 857 F.2d 1394, 1395 (10th Cir.1988), "motions to reconsider are disfavored," *Thompson v. Jiffy Lube Int'l, Inc.*, No. 05-1203-WEB, 2007 WL 608343, at *9 (D. Kan. Feb. 22, 2007), and courts should only grant a motion to reconsider when "the court has obviously misapprehended a party's position, the facts or the law, or has decided issues outside of those presented in the original motion." *Voelkel v. Gen. Motors Corp.*, 846 F. Supp. 1482, 1483 (D. Kan.), *aff'd*, 43 F.3d 1484 (10th Cir. 1994). *See also Major v. Benton*, 647 F.2d 110, 112 (10th Cir.1981).

---

[1] *Melvin Hale v. ESU et al*, D. Kan., No. 16-4183-DDC.

Plaintiff believes that there is a need to both correct clear error, and to prevent manifest injustice. In this case the Court has obviously misapprehended Plaintiff's position, and has erroneously concluded that Ms. Hale would have left ESU in May 2016. As a result, the Court limited back pay to that time period, and refused to consider front pay.

**Misapprehended Facts**

In its Order the Court states that:

**"[T]he court ends Ms. Hale's back pay not because she chose to leave Emporia in December 2015. Instead, it ends Ms. Hale's back pay because even if ESU had created a job for her, it is unlikely she would have remained in that job beyond May 2016." Doc. 195, pg. 12. Emphasis added.**

Plaintiff will show beyond any doubt that it is unreasonable to arrive at this conclusion based on the facts admitted in Court. Remaining in Emporia was the *only logical option available* to Ms. Hale *after* May 2016, when Dr. Hale lost his job. Her $56,000 salary would have easily supported them. Plaintiff testified at the evidentiary hearing that it was her and her husband's intention to remain in Emporia for an extended period of time. Doc. 195, pgs. 11-12. Regardless, the Court's Order presumes that Ms. Hale would have just up and left her position at ESU in May 2016. But on a practical level, *who does that?* Respectfully, that notion does not match the facts; neither does it match rational human behavior. By failing to hire Ms. Hale, ESU rendered *both of the Hales unemployed*, and essentially ran them out of town. The Hales had begun to put down roots in Emporia, and it was *never* their intention to leave their home, as Ms. Hale testified at the hearing. The predicate of this lawsuit is that ESU is fully responsible for Ms. Hale's financial woes to the present day by failing to offer her the job of Marketing Coordinator.

*Ms. Hale would have remained in Emporia at her home if she had a job.* With no jobs, the Hales had to leave Kansas as soon as possible in order to get a head start on finding new jobs, i.e. mitigating their coming damages. But they had no intentions of leaving, and from a practical standpoint, Ms. Hale would have been foolish to quit her job at ESU, and that is the point. The Court uses the forced move to Arizona as if Ms. Hale went there to *follow* Dr. Hale, and cuts her off when he was cut off. This motion will prove that if Ms. Hale had commenced the position promised her by Emporia State, neither she nor Dr. Hale would have ever ended up in Arizona to begin with. That is the heart of the matter. She most assuredly would not have quit her job.

The question before this Court according to law should be: *what would have happened if Ms. Hale had been hired for the Marketing Coordinator position*? If she had been hired, Ms. Hale would have continued paying their house note and the rest of their bills. That is what would have happened. No other explanation makes any sense at all, and Dr. Hale would have stayed with her, not leave for Arizona. So what does the Court do? It fires Ms. Hale after May 2016 for no good reason other than that she was in Arizona. It ignores the forced move, and that just doesn't work. The Court, through its action, effectively fired Ms. Hale at the same time that her husband's contract was not renewed. This is an awful and unreasonable decision, and implies that Ms. Hale is unstable and irrational. What else could it mean? If Plaintiff is so irrational, how did she, *as a pro se litigant*, take down Emporia State University, represented by the Attorney General of Kansas, in this federal courthouse? Someone needs to explain that. Ms. Hale was universally told that she could never do that, but she did. Ms. Hale is stable, diligent and rational. It also implies gender and sexual bias in suggesting that Ms. Hale simply followed her husband around, and had no control over her own wants and aspirations. That is false. She aspired to do the job, and equally important, to finish her education. That is what *she* wanted out of this.

Dr. Hale is an award-winning artist, and has numerous patrons, and would have eventually prevailed at his business in Kansas. The Hales *purchased a home in Emporia* in July 2014 with a monthly note of $1,099 a month, and *under no circumstances* would they have abandoned their home to ultimately live in a car. They were not renters in Kansas. Ms. Hale has been the primary breadwinner *more than once* during their twenty-two year marriage. The 10-year amortization schedule for the Hale's home in Emporia is attached herein as **Exhibit "A"**. Worse case, the Hale's would have been stuck in Kansas; in a small town that reviled them. But Ms. Hale would not have quit her job. That is not a reasonable presumption, and it doesn't make sense, at all. What would make the Court arrive at this unrealistic proposition? Is there bias in the Court, and is the Court out to render Ms. Hale Title VII victory over ESU hollow and empty? A ruling so skewed as this in favor of ESU, the culprit here, begs the question.

The Court makes mention of Ms. Hale's resume, but skews the actual length of time that she spent in each position as its basis for restricting her back pay to just nine months. This extremely short tenure is astonishingly arbitrary, and woefully fails to take the actual situation involving Ms. Hale's past work and future plans at ESU into account. It also deprives Plaintiff of receiving a proper reckoning of back pay and front pay, reducing her damages to smallest amount possible. This ruling is nothing less than a slap in the face of Ms. Hale, and a victory for the university. The Court itself noted the fact that Ms. Hale had worked a full year in her *temporary position* at the School of Library and Information Management (SLIM). "Ms. Hale already had been working for SLIM for a year on a temporary basis before her resignation." Doc. 195, pgs. 8-9. Why would Ms. Hale work a shorter length of time in her permanent position? This line of reasoning makes no sense at all. On that basis alone, an award based on a full year of employment would have been more reasonable. But that is not all. The Court is well aware that

Ms. Hale had enrolled in classes to complete her B.A. degree and also to obtain a Masters in Library Science at ESU starting in the fall of 2015. That was a four year commitment that would have taken Ms. Hale until 2019 or 2020 to complete. Ms. Hale had assisted Dr. Hale in obtaining his Ph.D. at UCLA, which took five years to complete, and Dr. Hale was prepared to make sure that she got her degrees as well.

The Hales left Emporia only after Dr. Hale was notified that his contract would not be renewed, which happened towards the end of 2015. Ms. Hale had already been terminated on account of unlawful retaliation, and Dr. Hale was soon to be unemployed. They would *both* have to find work to mitigate damage in both their professional lives. That is why when they recognized that they would have to leave their home in Emporia, that they went to Arizona, the least expensive place they could find to live to try to find work in a warmer climate. In other words, ESU gave the Hales *no choice* except to leave Emporia. There are no comparable job prospects in Emporia. Both would soon be unemployed, and the Emporia community was hostile towards them on account of their public campaign to bring a matter of racial discrimination and retaliation to their attention. They were hated and sneered at publicly by some who had been associates. This is noted in the Complaint. Ms. Hale should not be penalized because she and her husband were *forced out of their home* when she lost her job. That would only be adding insult to injury. This verdict is salt in her wounds. The Court mentions Dr. Hale's loss in a jury trial, but ignored the highly possible reality of racial bias in that jury. And now the Court itself has joined in victimizing Ms. Hale by depriving her of full restitution for the injuries she suffered. The Court's reasoning is not reasonable or logical or fair in this matter. That is why this judgment needs to be reconsidered and revised.

On July 29, 2015 the Associated Press interviewed Plaintiff and Dr. Hale about their claims of racism and retaliation at ESU. That publicity set in motion the sham investigation at ESU in which ESU admits terminating Ms. Hale's permanent position for reporting a hate crime to Provost David Cordle. Ms. Hale has provided the AP story numerous times to this Court as an attachment to various filings, most notably in her two motions for summary judgment, Docs. 47 and 86; provided herein as **Exhibits "B"** and **"C"** respectively. The Hales are quoted in that AP article as stating the following:

> "**The Hales said they plan to stay in Emporia, where they bought a house six blocks from the university, and work to change what they say are negative attitudes toward minorities at the school of about 3,900 students and few minority faculty employees.**" Doc. 47-1, pg. 12 and Doc. 86, pg. 71. Emphasis added.

Staying in Emporia is exactly what the Hales stated they fully intended to do at the very onset of their controversy with ESU, long before this case was filed, and it is exactly what they meant. The Court never positively considers in its ruling what might have happened had Ms. Hale actually been offered the position, and if she had in fact remained in the marital home in Emporia. One thing is certain: Ms. Hale would never have moved to Arizona in the first place, and the May 2016 date would have been mute as far as her employment at ESU would have been concerned. May 2016 has no bearing on Ms. Hale's employment. It is a cruel thing to fire both husband and wife at the same time, and have that sanctioned by this Court. If this is what happens to Black Americans who report a hate crime and get retaliated against, this creates a very chilling effect for those who would dare speak out on matters of public concern. Ms. Hale feels violated and punished by this arbitrary and speculative limit on her professional growth and future at Emporia State. It appears to show that she is not valued in the state of Kansas, and that

*her life does not matter*. The facts in this case more than call out for a *much longer award of back pay, and for front pay*. As it stands, the Court has done little more than give ESU a slap on the wrist for a major violation of Ms. Hale's civil rights. Dr. Hale was indeed out of work following May 2016, but Ms. Hale did not need to be let go at that very exact time, and she would absolutely not have quit her job voluntarily at that time. The position itself had been created expressly for her, as noted in the Order, so that alone speaks volumes in regards to her capabilities and value to the organization, *before she reported a hate crime*. Any speculation on when Ms. Hale's employment would have ended should be decided in *her* favor, not in ESU's favor, as it currently stands. ESU is the perpetrator. There is no justice here if this is allowed to stand. The very fact that Ms. Hale has dedicated herself to litigating this case pro se, in a near-professional manner for four years, is testament by itself to her staying power when she tackles a difficult job.

In its order, the Court refers to an instance where Ms. Hale changed jobs because Dr. Hale (Mr. Hale at the time) had accepted a better position elsewhere, and was relocating to Florida from Washington, D.C. *Id* at 12. In the present situation, Dr. Hale wasn't relocating, and was planning to stay and promote his art business from Emporia. Going to Arizona was a forced move, brought on by the adverse employment actions of ESU. When Dr. Hale was laid off in his job in Florida in 2001, it was Ms. Hale's job at Authentec that brought in steady paychecks, while Dr. Hale opened and managed an upscale brick-and-mortar art gallery in Indialantic named Hale's Gallery-By-The-Sea. *See* **Exhibit "D"**. He was laid off with other workers during a downturn in business, but he promptly rented and renovated a building, opened a business, and became a successful businessman, with the name "Hale" on the building. Ms. Hale kept on working at Authentec…for three years. They did not move anywhere. She testified that when

Authentec began an IPO, they replaced her and several others with high powered executives experienced with IPOs. There is no evidence that Ms. Hale would quit a job when her husband did not have a job, but there is ample evidence that she supported her family, and kept a steady job when times were rough. The same would have been true of her work at ESU. A nine month award of back pay, on account of an assumption that she would have quit her job at ESU for no reason, just to lose her home, misses the mark by a wide margin. Plaintiff is surprised at this allegation/assumption, and has thus included Exhibits A and D to refute it. Surprise, according to FRCP 60 FRCP 60(b), allows for relief from a final judgment.

The Court did not attempt to address the difficult decisions leading up to the Hales having to leave Emporia when they did. The Court should review this situation carefully and reconsider what the outcome *would have been* if Ms. Hale had been offered the position at ESU and she was *on the job in May 2016*. How would that look? When May 2016 arrived, and Dr. Hale lost his job, Ms. Hale would have continued the great job she was doing at ESU; would have attained completion of her college degrees, and they both would have still remained at their home in Emporia. *They had nowhere else to go*. That is the long and short of this motion for reconsideration. This is not based on speculation, but on actual events on the ground, and in the record. *No one in their right mind would leave a comfortable home and great future for nothing except becoming homeless*, but that is exactly what the Court used as the basis for its ruling. Ms. Hale had zero plans to quit her job at ESU, and no evidence has ever been produced to suggest such. The exact opposite is the only assumption that makes any sense whatsoever.

After Dr. Hale lost his contract at ESU, and neither had found suitable employment in Arizona, the Hale's savings ran out in a few months. They were homeless by October 2016. Back pay is a remedy for all of this, not just some of it. How can the Court consider this a

reasonable outcome for two very intelligent people? The Hales may be considered contentious, but they have never been considered stupid. Ms. Hale leaving her job as a Marketing Coordinator at ESU in May 2016 would have been a reckless and stupid decision. Why is the Court taking the liberty to fire her? That is how it looks to Ms. Hale. No one in their right mind at her age would quit such a job. *This entire case is about her fighting for that job.* By taking that job away, in the manner that they did, ESU destroyed her career and her prospects for a secure future. In 2021 Plaintiff will be age 60. In addition to retaliation, she is now experiencing age discrimination when out looking for work. It appears that the Court is treating Ms. Hale with gender and sex discrimination by devaluing her many years working in the family business, in which her contributions have been invaluable. Ms. Hale planned to settle down and fully pursue her career at ESU. That much is clear from her actions.

Regardless of her employment record, Ms. Hale's position at ESU, which the Court allowed an annual salary of $56,000 a year, would have been more than enough to pay a mortgage of $1,099 a month, and all the other household expenses if necessary, and under no circumstances would she have quit her job under *those* circumstances. It is as simple as that. *Plaintiff's job at ESU would have been their salvation*. As stated in open court, the Hales had opened an office in Emporia to provide Dr. Hale a place to run his art business, and life would have been just fine as far as they were concerned. Dr. Hale received his doctorate from UCLA by defending a theory of visual cognition that emerged from his art practice. That Dr. Hale would return full time to his art endeavors after leaving ESU SLIM was a certainty, not conjecture. The Hales had even opened a second office for the business in Lawrence. Ms. Hale would have had *no intentions or reason* to just up and leave her job at ESU, and her home, with nowhere to go, and a husband recently out of work. That is a fact. That is just common sense. Ms. Hale should

not have to argue to this Court that she has common sense, because that is what this outcome has forced her to do in this motion. It has forced her to confront the Court itself, which is something no litigant ever wants to do.

## **CONCLUSION**

Plaintiff understands the difficulties that the Court faces in trying to reach a just and lawful remedy in this matter, and in hundreds of other matters brought before it day after day, but believes that the Court, for whatever reason, did not base its back pay and front pay decisions on the actual facts in the case, or basic human nature, so the facts had to be misapprehended, resulting in clear error. There is truly no basis to assume that Ms. Hale would have just up and left her enviable position at ESU after May 2016 when the Hales needed her income the most. The only real fact here is that the position was never offered.

The Court stated that ESU failed to carry its burden to prove that Ms. Hale did not do her part to mitigate her damages. Doc. 195, pg. 14. The evidence showed that Ms. Hale met the legal requirement of trying to mitigate her damages by searching for suitable work, which she did up until the week of the hearing, and continues to do so today, despite the pandemic. The Court stated that "[Plaintiff's] efforts were more diligent than the efforts described in other cases where courts have concluded that plaintiffs have displayed a lack of reasonable diligence." *Id* at 15. As a matter of fact, Ms. Hale provided the Court with physical evidence of 526 job applications, which were not exhaustive of her efforts. She applied to *over* 526 positions after leaving ESU.

This case is about Title VII Retaliation, but it also reeks of *systemic institutional racism*, which is still raging today in America against its Black citizens. ESU is a prime example of why life is difficult to impossible for millions of Black Americans, regardless of their education,

natural abilities or accomplishments. Ms. Hale wants to believe that this judgment was an inadvertent misapprehension of the facts on the ground, because courts employ humans and humans can make mistakes when reviewing a voluminous record. Plaintiff remains hopeful for a different outcome.

WHEREFORE, Plaintiff Angelica Hale respectfully moves the Court to reconsider its ruling on damages in this matter.

Dated: **August 28, 2020**                               Respectfully submitted,

                                                         /s/ Angelica Hale, Plaintiff pro se
                                                         3806 Pinnacle Circle
                                                         Lawrence, KS 66049
                                                         angelicahale@yahoo.com
                                                         916-690-7927

### CERTIFICATE OF SERVICE

**Case No. 16-4182-DDC**

### PLAINTIFF'S MOTION FOR RECONSIDERATION

I hereby certify that on this 28th day of August, 2020, I electronically filed the foregoing with the Court using the email address KSD_Clerks_Topeka@ksd.uscourts.gov, and a notice of electronic filing was sent via the CM/ECF system to all attorneys of record.

                                                         /s/ Angelica Hale, Plaintiff pro se
                                                         angelicahale@yahoo.com
                                                         916-690-7927

# EXHIBIT "A"

MOON TITLE & ESCROW,
LOAN AMORTIZATION SCHEDULE
30/360 DAY SCHEDULE
10 year mortgage on 615 W. 15th Ave, Emporia, KS

NAME:  Wilson / Hale

```
Loan Amount:                  99,000.00       Interest Rate:            6.00000
Number Of Payments:                 120       First Payment Date:    08/18/2014
Payment Frequency:          M-Monthly         Interest Start Date:   07/18/2014
Payment Amount:                1,099.10       Days Int in 1st Pmt:           30
```

| PMT NUM | DUE DATE | PRINCIPAL | INTEREST | YTD INTEREST | UNPAID INT | PRINCIPAL BAL |
|---------|----------|-----------|----------|--------------|------------|---------------|
| 1  | 8/18/2014  | 604.10 | 495.00 | 495.00    | 0.00 | 98,395.90 |
| 2  | 09/18/2014 | 607.12 | 491.98 | 986.98    | 0.00 | 97,788.78 |
| 3  | 10/18/2014 | 610.16 | 488.94 | 1,475.92  | 0.00 | 97,178.62 |
| 4  | 11/18/2014 | 613.21 | 485.89 | 1,961.81  | 0.00 | 96,565.41 |
| 5  | 12/18/2014 | 616.27 | 482.83 | 2,444.64  | 0.00 | 95,949.14 |
| **TOTALS FOR 2014:** | | 3,050.86 | 2,444.64 | 2,444.64 | | 95,949.14 |
| 6  | 01/18/2015 | 619.35 | 479.75 | 479.75    | 0.00 | 95,329.79 |
| 7  | 02/18/2015 | 622.45 | 476.65 | 956.40    | 0.00 | 94,707.34 |
| 8  | 03/18/2015 | 625.56 | 473.54 | 1,429.94  | 0.00 | 94,081.78 |
| 9  | 04/18/2015 | 628.69 | 470.41 | 1,900.35  | 0.00 | 93,453.09 |
| 10 | 05/18/2015 | 631.83 | 467.27 | 2,367.62  | 0.00 | 92,821.26 |
| 11 | 06/18/2015 | 634.99 | 464.11 | 2,831.73  | 0.00 | 92,186.27 |
| 12 | 07/18/2015 | 638.17 | 460.93 | 3,292.66  | 0.00 | 91,548.10 |
| 13 | 08/18/2015 | 641.36 | 457.74 | 3,750.40  | 0.00 | 90,906.74 |
| 14 | 09/18/2015 | 644.57 | 454.53 | 4,204.93  | 0.00 | 90,262.17 |
| 15 | 10/18/2015 | 647.79 | 451.31 | 4,656.24  | 0.00 | 89,614.38 |
| 16 | 11/18/2015 | 651.03 | 448.07 | 5,104.31  | 0.00 | 88,963.35 |
| 17 | 12/18/2015 | 654.28 | 444.82 | 5,549.13  | 0.00 | 88,309.07 |
| **TOTALS FOR 2015:** | | 7,640.07 | 5,549.13 | 5,549.13 | | 88,309.07 |
| 18 | 01/18/2016 | 657.55 | 441.55 | 441.55    | 0.00 | 87,651.52 |
| 19 | 02/18/2016 | 660.84 | 438.26 | 879.81    | 0.00 | 86,990.68 |
| 20 | 03/18/2016 | 664.15 | 434.95 | 1,314.76  | 0.00 | 86,326.53 |
| 21 | 04/18/2016 | 667.47 | 431.63 | 1,746.39  | 0.00 | 85,659.06 |
| 22 | 05/18/2016 | 670.80 | 428.30 | 2,174.69  | 0.00 | 84,988.26 |
| 23 | 06/18/2016 | 674.16 | 424.94 | 2,599.63  | 0.00 | 84,314.10 |
| 24 | 07/18/2016 | 677.53 | 421.57 | 3,021.20  | 0.00 | 83,636.57 |
| 25 | 08/18/2016 | 680.92 | 418.18 | 3,439.38  | 0.00 | 82,955.65 |
| 26 | 09/18/2016 | 684.32 | 414.78 | 3,854.16  | 0.00 | 82,271.33 |
| 27 | 10/18/2016 | 687.74 | 411.36 | 4,265.52  | 0.00 | 81,583.59 |
| 28 | 11/18/2016 | 691.18 | 407.92 | 4,673.44  | 0.00 | 80,892.41 |
| 29 | 12/18/2016 | 694.64 | 404.46 | 5,077.90  | 0.00 | 80,197.77 |
| **TOTALS FOR 2016:** | | 8,111.30 | 5,077.90 | 5,077.90 | | 80,197.77 |
| 30 | 01/18/2017 | 698.11 | 400.99 | 400.99    | 0.00 | 79,499.66 |
| 31 | 02/18/2017 | 701.60 | 397.50 | 798.49    | 0.00 | 78,798.06 |
| 32 | 03/18/2017 | 705.11 | 393.99 | 1,192.48  | 0.00 | 78,092.95 |
| 33 | 04/18/2017 | 708.64 | 390.46 | 1,582.94  | 0.00 | 77,384.31 |
| 34 | 05/18/2017 | 712.18 | 386.92 | 1,969.86  | 0.00 | 76,672.13 |
| 35 | 06/18/2017 | 715.74 | 383.36 | 2,353.22  | 0.00 | 75,956.39 |
| 36 | 07/18/2017 | 719.32 | 379.78 | 2,733.00  | 0.00 | 75,237.07 |
| 37 | 08/18/2017 | 722.91 | 376.19 | 3,109.19  | 0.00 | 74,514.16 |
| 38 | 09/18/2017 | 726.53 | 372.57 | 3,481.76  | 0.00 | 73,787.63 |
| 39 | 10/18/2017 | 730.16 | 368.94 | 3,850.70  | 0.00 | 73,057.47 |
| 40 | 11/18/2017 | 733.81 | 365.29 | 4,215.99  | 0.00 | 72,323.66 |
| 41 | 12/18/2017 | 737.48 | 361.62 | 4,577.61  | 0.00 | 71,586.18 |
| **TOTALS FOR 2017:** | | 8,611.59 | 4,577.61 | 4,577.61 | | 71,586.18 |

An amortization schedule is accurate ONLY if full payments are made on time.

```
07/15/14                       MOON TITLE & ESCROW,                        PAGE 2
                             LOAN AMORTIZATION SCHEDULE
                                30/360 DAY SCHEDULE


     NAME:  Wilson / Hale


     Loan Amount:                    99,000.00     Interest Rate:           6.00000
     Number Of Payments:                   120     First Payment Date:   08/18/2014
     Payment Frequency:              M-Monthly     Interest Start Date:  07/18/2014
     Payment Amount:                  1,099.10     Days Int in 1st Pmt:          30

PMT NUM  DUE DATE  PRINCIPAL      INTEREST       YTD INTEREST   UNPAID INT  PRINCIPAL BAL
-------  --------  --------------  --------------  --------------  ----------  --------------

42       01/18/2018      741.17        357.93         357.93       0.00       70,845.01
43       02/18/2018      744.87        354.23         712.16       0.00       70,100.14
44       03/18/2018      748.60        350.50       1,062.66       0.00       69,351.54
45       04/18/2018      752.34        346.76       1,409.42       0.00       68,599.20
46       05/18/2018      756.10        343.00       1,752.42       0.00       67,843.10
47       06/18/2018      759.88        339.22       2,091.64       0.00       67,083.22
48       07/18/2018      763.68        335.42       2,427.06       0.00       66,319.54
49       08/18/2018      767.50        331.60       2,758.66       0.00       65,552.04
50       09/18/2018      771.34        327.76       3,086.42       0.00       64,780.70
51       10/18/2018      775.20        323.90       3,410.32       0.00       64,005.50
52       11/18/2018      779.07        320.03       3,730.35       0.00       63,226.43
53       12/18/2018      782.97        316.13       4,046.48       0.00       62,443.46

TOTALS FOR 2018:       9,142.72      4,046.48       4,046.48       0.00       62,443.46

54       01/18/2019      786.88        312.22         312.22       0.00       61,656.58
55       02/18/2019      790.82        308.28         620.50       0.00       60,865.76
56       03/18/2019      794.77        304.33         924.83       0.00       60,070.99
57       04/18/2019      798.75        300.35       1,225.18       0.00       59,272.24
58       05/18/2019      802.74        296.36       1,521.54       0.00       58,469.50
59       06/18/2019      806.75        292.35       1,813.89       0.00       57,662.75
60       07/18/2019      810.79        288.31       2,102.20       0.00       56,851.96
61       08/18/2019      814.84        284.26       2,386.46       0.00       56,037.12
62       09/18/2019      818.91        280.19       2,666.65       0.00       55,218.21
63       10/18/2019      823.01        276.09       2,942.74       0.00       54,395.20
64       11/18/2019      827.12        271.98       3,214.72       0.00       53,568.08
65       12/18/2019      831.26        267.84       3,482.56       0.00       52,736.82

TOTALS FOR 2019:       9,706.64      3,482.56       3,482.56       0.00       52,736.82

66       01/18/2020      835.42        263.68         263.68       0.00       51,901.40
67       02/18/2020      839.59        259.51         523.19       0.00       51,061.81
68       03/18/2020      843.79        255.31         778.50       0.00       50,218.02
69       04/18/2020      848.01        251.09       1,029.59       0.00       49,370.01
70       05/18/2020      852.25        246.85       1,276.44       0.00       48,517.76
71       06/18/2020      856.51        242.59       1,519.03       0.00       47,661.25
72       07/18/2020      860.79        238.31       1,757.34       0.00       46,800.46
73       08/18/2020      865.10        234.00       1,991.34       0.00       45,935.36
74       09/18/2020      869.42        229.68       2,221.02       0.00       45,065.94
75       10/18/2020      873.77        225.33       2,446.35       0.00       44,192.17
76       11/18/2020      878.14        220.96       2,667.31       0.00       43,314.03
77       12/18/2020      882.53        216.57       2,883.88       0.00       42,431.50

TOTALS FOR 2020:      10,305.32      2,883.88       2,883.88       0.00       42,431.50

78       01/18/2021      886.94        212.16         212.16       0.00       41,544.56
79       02/18/2021      891.38        207.72         419.88       0.00       40,653.18
80       03/18/2021      895.83        203.27         623.15       0.00       39,757.35
81       04/18/2021      900.31        198.79         821.94       0.00       38,857.04
82       05/18/2021      904.81        194.29       1,016.23       0.00       37,952.23
83       06/18/2021      909.34        189.76       1,205.99       0.00       37,042.89

An amortization schedule is accurate ONLY if full payments are made on time.
```

```
07/15/14                       MOON TITLE & ESCROW,                      PAGE 3
                           LOAN AMORTIZATION SCHEDULE
                             30/360 DAY SCHEDULE


     NAME:  Wilson / Hale


     Loan Amount:                  99,000.00     Interest Rate:            6.00000
     Number Of Payments:                 120     First Payment Date:    08/18/2014
     Payment Frequency:            M-Monthly     Interest Start Date:   07/18/2014
     Payment Amount:                1,099.10     Days Int in 1st Pmt:           30

PMT NUM   DUE DATE   PRINCIPAL       INTEREST        YTD INTEREST     UNPAID INT   PRINCIPAL BAL
-------   --------   -------------   -------------   --------------   ----------   --------------
84        07/18/2021       913.89          185.21         1,391.20         0.00        36,129.00
85        08/18/2021       918.45          180.65         1,571.85         0.00        35,210.55
86        09/18/2021       923.05          176.05         1,747.90         0.00        34,287.50
87        10/18/2021       927.66          171.44         1,919.34         0.00        33,359.84
88        11/18/2021       932.30          166.80         2,086.14         0.00        32,427.54
89        12/18/2021       936.96          162.14         2,248.28         0.00        31,490.58

TOTALS FOR 2021:       10,940.92        2,248.28         2,248.28         0.00        31,490.58

90        01/18/2022       941.65          157.45           157.45         0.00        30,548.93
91        02/18/2022       946.36          152.74           310.19         0.00        29,602.57
92        03/18/2022       951.09          148.01           458.20         0.00        28,651.48
93        04/18/2022       955.84          143.26           601.46         0.00        27,695.64
94        05/18/2022       960.62          138.48           739.94         0.00        26,735.02
95        06/18/2022       965.42          133.68           873.62         0.00        25,769.60
96        07/18/2022       970.25          128.85         1,002.47         0.00        24,799.35
97        08/18/2022       975.10          124.00         1,126.47         0.00        23,824.25
98        09/18/2022       979.98          119.12         1,245.59         0.00        22,844.27
99        10/18/2022       984.88          114.22         1,359.81         0.00        21,859.39
100       11/18/2022       989.80          109.30         1,469.11         0.00        20,869.59
101       12/18/2022       994.75          104.35         1,573.46         0.00        19,874.84

TOTALS FOR 2022:       11,615.74        1,573.46         1,573.46         0.00        19,874.84

102       01/18/2023       999.73           99.37            99.37         0.00        18,875.11
103       02/18/2023     1,004.72           94.38           193.75         0.00        17,870.39
104       03/18/2023     1,009.75           89.35           283.10         0.00        16,860.64
105       04/18/2023     1,014.80           84.30           367.40         0.00        15,845.84
106       05/18/2023     1,019.87           79.23           446.63         0.00        14,825.97
107       06/18/2023     1,024.97           74.13           520.76         0.00        13,801.00
108       07/18/2023     1,030.09           69.01           589.77         0.00        12,770.91
109       08/18/2023     1,035.25           63.85           653.62         0.00        11,735.66
110       09/18/2023     1,040.42           58.68           712.30         0.00        10,695.24
111       10/18/2023     1,045.62           53.48           765.78         0.00         9,649.62
112       11/18/2023     1,050.85           48.25           814.03         0.00         8,598.77
113       12/18/2023     1,056.11           42.99           857.02         0.00         7,542.66

TOTALS FOR 2023:       12,332.18          857.02           857.02         0.00         7,542.66

114       01/18/2024     1,061.39           37.71            37.71         0.00         6,481.27
115       02/18/2024     1,066.69           32.41            70.12         0.00         5,414.58
116       03/18/2024     1,072.03           27.07            97.19         0.00         4,342.55
117       04/18/2024     1,077.39           21.71           118.90         0.00         3,265.16
118       05/18/2024     1,082.77           16.33           135.23         0.00         2,182.39
119       06/18/2024     1,088.19           10.91           146.14         0.00         1,094.20
120       07/18/2024     1,094.20            5.47           151.61         0.00             0.00

TOTALS FOR 2024:        7,542.66          151.61           151.61         0.00             0.00


GRAND TOTALS:          99,000.00       32,892.57           151.61         0.00             0.00


An amortization schedule is accurate ONLY if full payments are made on time.
```

```
07/15/14                          MOON TITLE & ESCROW,                        PAGE 4
                               LOAN AMORTIZATION SCHEDULE
                                  30/360 DAY SCHEDULE


      NAME:  Wilson / Hale


      Loan Amount:                    99,000.00      Interest Rate:              6.00000
      Number Of Payments:                   120      First Payment Date:      08/18/2014
      Payment Frequency:              M-Monthly      Interest Start Date:     07/18/2014
      Payment Amount:                  1,099.10      Days Int in 1st Pmt:             30

PMT NUM  DUE DATE  PRINCIPAL        INTEREST        YTD INTEREST     UNPAID INT  PRINCIPAL BAL
-------  --------  --------------   --------------  --------------   ----------  --------------
LAST PMT AMOUNT:         1,099.67
```

An amortization schedule is accurate ONLY if full payments are made on time.

# EXHIBIT "B"

 **THE BIG STORY**

# Emporia State couple claims racial harassment at university

By MARGARET STAFFORD Jul. 29, 2015 7:24 PM EDT

    1          

KANSAS CITY, Mo. (AP) — A black couple who have been working for a small university in eastern Kansas says the school is retaliating against them for complaining about a racial incident.

Angelica Hale, a dean's assistant at Emporia State University, said she resigned Monday out of frustration over the university's handling of the complaint. She and her husband, Melvin Hale, an assistant professor in the university's School of Library and Information Management, said they have endured a hostile work environment since reporting in April that someone had gone into the office of Angelica Hale's graduate assistant and tampered with several items before leaving a racial epithet on a piece of paper.

In a telephone interview Wednesday, the Hales said Gwen Alexander, dean of the School of Library and Information Management, initially said she would investigate the incident but then did nothing and instead chastised Melvin Hale for complaining to a university provost and making a complaint to Emporia police. At one point, Alexander told Melvin Hale that he should "recognize that he was in Kansas now," he said.

"We don't understand why (Alexander) wouldn't want this incident investigated," Melvin Hale said. "If she is genuinely concerned about our happiness being at Emporia State, she should definitely be on our side to figure out what happened. Her anger and attitude make it clear that she would rather not deal with this in any way, shape or form."

The school issued a statement saying it's following all its policies and procedures for such complaints.

"The incident is under investigation," spokeswoman Gwen Larson said. "We will act accordingly when the investigation is concluded."

Angelica Hale said Alexander had been pleased with her work since the couple arrived at the school in July 2014 and had suggested she would be in line for a full-time job after her one-year contract ended in August. Instead, Hale said she was recently told her contract would not be renewed, so she resigned. Melvin Hale said Alexander has suggested he might not be named director of the school's archive studies program, which he said was the reason he came to Emporia after graduating from UCLA.

The couple also says Alexander and many other employees in the school have been unfriendly and treated them coldly since their complaint.

The Hales said they plan to stay in Emporia, where they bought a house six blocks from the university, and work to change what they say are negative attitudes toward minorities at the school of about 3,900 students and few minority faculty employees.

Larson said the school has no tenured black professors and four who are on tenure tracks, out of a full-time faculty of about 253.

The Hales are planning a march Sept. 15 when representatives of the American Library Association are visiting.

"They will meet a group of people complaining about how minorities are treated at the university," Melvin Hale said. "I'm done being nice. I'm done holding my tongue."

# EXHIBIT "C"

 THE BIG STORY

# Emporia State couple claims racial harassment at university

By MARGARET STAFFORD Jul. 29, 2015 7:24 PM EDT

   1 

KANSAS CITY, Mo. (AP) — A black couple who have been working for a small university in eastern Kansas says the school is retaliating against them for complaining about a racial incident.

Angelica Hale, a dean's assistant at Emporia State University, said she resigned Monday out of frustration over the university's handling of the complaint. She and her husband, Melvin Hale, an assistant professor in the university's School of Library and Information Management, said they have endured a hostile work environment since reporting in April that someone had gone into the office of Angelica Hale's graduate assistant and tampered with several items before leaving a racial epithet on a piece of paper.

In a telephone interview Wednesday, the Hales said Gwen Alexander, dean of the School of Library and Information Management, initially said she would investigate the incident but then did nothing and instead chastised Melvin Hale for complaining to a university provost and making a complaint to Emporia police. At one point, Alexander told Melvin Hale that he should "recognize that he was in Kansas now," he said.

"We don't understand why (Alexander) wouldn't want this incident investigated," Melvin Hale said. "If she is genuinely concerned about our happiness being at Emporia State, she should definitely be on our side to figure out what happened. Her anger and attitude make it clear that she would rather not deal with this in any way, shape or form."

The school issued a statement saying it's following all its policies and procedures for such complaints.

"The incident is under investigation," spokeswoman Gwen Larson said. "We will act accordingly when the investigation is concluded."

Angelica Hale said Alexander had been pleased with her work since the couple arrived at the school in July 2014 and had suggested she would be in line for a full-time job after her one-year contract ended in August. Instead, Hale said she was recently told her contract would not be renewed, so she resigned. Melvin Hale said Alexander has suggested he might not be named director of the school's archive studies program, which he said was the reason he came to Emporia after graduating from UCLA.

The couple also says Alexander and many other employees in the school have been unfriendly and treated them coldly since their complaint.

The Hales said they plan to stay in Emporia, where they bought a house six blocks from the university, and work to change what they say are negative attitudes toward minorities at the school of about 3,900 students and few minority faculty employees.

Larson said the school has no tenured black professors and four who are on tenure tracks, out of a full-time faculty of about 253.

The Hales are planning a march Sept. 15 when representatives of the American Library Association are visiting.

"They will meet a group of people complaining about how minorities are treated at the university," Melvin Hale said. "I'm done being nice. I'm done holding my tongue."

# EXHIBIT "D"

